UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES CRANFIELD, individually and on behalf of all other Ohio residents similarly situated, | ) ) ) | No. 1:16-cv-01273-CAB |
| | ) | |
| Plaintiff, | ) | Hon Christopher A. Boyko |
| v. | ) | |
| | ) | |
| STATE FARM FIRE AND CASUALTY COMPANY, | ) ) | |
| | ) | |
| Defendant. | ) | |

# EXHIBIT H

Confidential Proprietary - Produced Pursuant to Protective Order

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES CRANFIELD, individually and on behalf of all other Ohio residents similarly situated, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 1:16-cv-001273 |
| STATE FARM FIRE AND CASUALTY COMPANY, | ) ) | |
| | ) | |
| Defendant. | ) | |

EXPERT REPORT OF HEATHER L. ALBRIGHT

March 12, 2021

**Confidential and Proprietary - Produced Pursuant to Protective Order**

## INTRODUCTION

1. I am a director at Stout Risius Ross, LLC. My opinions as expressed in this report are based on my understanding of depreciation concepts, my review and knowledge of authoritative accounting and tax literature, my experience in forensic accounting and data analysis, my prior experience working on other "labor depreciation" cases, as well as on my review of the materials referenced in this report. **Appendix A** is my curriculum vitae, which includes a complete description of my background and qualifications.

2. The law firm of Riley Safer Holmes & Cancila LLP retained me on behalf of State Farm Fire and Casualty Company ("State Farm") in connection with the lawsuit brought against State Farm by Charles Cranfield ("Plaintiff"). I prepared this report pursuant to my engagement as an expert in connection with this litigation. For this engagement, I was asked to 1) explain the application of depreciation in accounting and other similar contexts; 2) provide a summary and explanation of my review and analysis of a random sampling of 149 Ohio structural damage insurance claims with a focus on determining how each claim was evaluated and paid, the claim file records needed to make that determination, and the time required to make that determination; and 3) address, as relevant to my opinions, the views and opinions expressed by Mr. Toby Johnson in his report submitted on February 10, 2021 (the "Johnson Report"). As it relates to these issues, I understand that State Farm contends in this case that its payment obligation for a covered loss, whether for actual cash value ("ACV") or replacement cost benefits ("RC"), is capped at the insured's actual cost to repair the damaged property.[1]

3. A list of documents I considered for this matter is attached as **Appendix B**. To the extent that additional or updated information that impacts my opinions is made available for review, I will update my report as necessary. In addition, I may rebut or respond to any testimony or reports that Mr. Johnson or any other proposed Plaintiff expert(s) may provide that post-date this report (if permitted by the Court).

---

[1] State Farm's Responses to Plaintiff's First Set of Interrogatories to Defendant, p.14.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

## COMPENSATION

4. My hourly rate for this engagement is $405. Fees and expenses related to this engagement are billed by my firm based on hourly rates and actual out-of-pocket expenses incurred. The hourly rates for other Stout Risius Ross, LLC personnel working on this engagement have ranged from $195 to $405, depending on the experience level of the personnel assisting on various aspects of the work. No portion of my firm's compensation is dependent on the nature of my findings or on the outcome of this matter.

## BACKGROUND

5. Plaintiff has filed a class action complaint alleging that State Farm underpaid certain structural damage insurance claims. Specifically, Plaintiff claims that when making ACV payments, State Farm should not have depreciated labor and other non-material costs associated with the estimated cost to repair or replace the damaged property or portion thereof.[2]

6. Based on my review of Plaintiff's homeowners insurance policy, I understand that State Farm's policies contain a loss settlement provision that addresses what State Farm will pay for covered structural damage to insured property (see page 14). I also understand based on my review of materials in this case that State Farm often settles structural damage insurance claims in two steps. First, before the insured undertakes repairs, State Farm generally prepares an estimate of the cost to repair or replace the damaged property (referred to as the estimated replacement cost value or "RCV") and adjusts that estimate (to account for the pre-loss value of the property at the time the damage occurred) by subtracting depreciation from the estimated replacement cost value. The amount that results from the calculation of RCV less depreciation is known as actual cash value or ACV.

7. The ACV, like the RCV, is an estimate, because the actual replacement cost for any component of a damaged structure cannot be known before the insured undertakes

---

[2] 7/31/2020 Second Amended Class Action Complaint (the "Complaint"), ¶¶ 25-28. I understand Plaintiff filed a motion requesting to file a Third Amended Class Action Complaint to add a new party plaintiff on 09/16/2020. As of the date of my report, the motion has not been ruled on by the Court.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

repairs, or obtains a contract for the repairs. In the event the State Farm claim representative deems it appropriate to make a payment based on the prepared estimate (e.g., the insured has not presented documentation with actual repair or replacement costs), State Farm then generally issues an initial payment for the ACV less the insured's deductible, subject to the other terms and conditions of the policy.[3] Thereafter, if policyholders undertake repairs, they may choose to seek payment for any additional amounts needed to complete the repairs that exceed the amount of the ACV payment. Policyholders request these additional payments for replacement cost benefits (known as "RC" or "RCB" payments) by submitting documentation to State Farm that shows their actual cost to repair, such as signed contracts, or contractor invoices and receipts showing that repairs are contracted to be performed, are in progress, or have been completed. State Farm may then issue a RC payment (or payments) based on the policyholder's actual known repair costs.

8. Plaintiff alleges that State Farm understated the ACV of his loss and those of the proposed class members, and thus underpaid both he and the alleged class members. Specifically, Plaintiff believes that the cost of labor and other non-materials included in the estimated replacement cost value should not be depreciated when State Farm calculates ACV.[4] Plaintiff agrees that the cost of materials included in the estimated replacement cost should be depreciated when determining the ACV.[5] Plaintiff further alleges that State Farm fraudulently concealed this practice from its policyholders.[6]

---

[3] I understand that actual cash value generally is intended to be the value, in cash, of the damaged portion of the property at the time of the loss. Plaintiff's homeowners policy provides that the ACV payment is "not to exceed the cost to repair or replace the damaged part of the property" or the applicable limits of the insured's policy. Charles Cranfield State Farm Homeowners Policy No. 70-N6-7546-3 effective August 15, 2014 to August 15, 2015 (SFCRANFIELD00000001 at SFCRANFIELD00000024).

[4] Complaint, ¶¶ 9-11.

[5] Id., ¶ 13.

[6] Id., ¶¶ 10-12.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

## SUMMARY OF OPINIONS AND OBSERVATIONS

9.  The following is a summary of my opinions, which are set out in the following sections of this report:

   a.  It is well-established in accounting and tax literature that the cost basis of a structure, such as a home, includes all material, labor and other non-material costs incurred to acquire or construct the structure and make it ready for use. With the passage of time, the entire cost basis is depreciated because the entire structure is subject to wear and tear and a decline in value. These accounting and tax principles are conceptually consistent with the cost approach that is used in the appraisal industry and in the property insurance context, where value is determined by estimating a replacement cost value and applying depreciation to that value.

   b.  State Farm's determination of estimated replacement cost and actual cash value for purposes of adjusting a property damage claim typically involves the use of the Xactimate estimating software, an Xactware product,[7] which estimates repair and replacement costs. Estimates prepared using the Xactimate software do not necessarily reflect the actual cost to repair or replace the damaged property. For claims that have actual cost documentation available (see opinion 9c. below), the actual repair costs may differ substantially (either higher or lower) than the estimated repair costs. That is, some insureds spend *more* money repairing their damaged property than State Farm originally estimated (and receive payment for that additional cost to the extent reasonable and necessary). On the other hand, some insureds spend *less* money repairing their damaged property than State Farm originally estimated, sometimes even being able to repair their damaged property for less than the estimated ACV amount that they were paid. In those latter instances, the insureds' ACV was sufficient not only to pay for the damaged

_____

[7] Xactware is the company that owns and licenses the Xactimate software. *See* State Farm's Responses to Plaintiff's First Set of Interrogatories to Defendant, pp. 25-26.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

portion of the property in its pre-loss depreciated condition, but also to pay for the damaged portion of the property in new condition.

c.  Based on my review, it is not possible to rely solely on the Xactware estimating data and State Farm's claims management system to systematically and accurately determine whether policyholders who received an ACV payment, or otherwise had unclaimed RCBs, completed repairs or were fully reimbursed for their actual cost to repair. Rather, because State Farm does not require its policyholders to submit repair-related documentation unless they are claiming RCBs, State Farm generally does not have repair-related documentation for insureds who did not claim some or all of their RCBs. Some of these insureds may have been able to use their existing payments to fully complete repairs, but it is not possible to determine that without obtaining additional records which are solely in the insured's possession (or that of their contractor), and/or by inspecting the insured's property to determine the extent and scope of any repairs completed.

d.  Based on my review, whether a policyholder incurred any out-of-pocket costs[8] due to State Farm's practice of depreciating labor and other non-material costs when making a payment based on the estimated ACV, can only be determined on an individual policyholder basis. It generally is not possible to accurately and reliably determine if a policyholder (i) received an initial payment with no deduction for labor or other non-material depreciation, (ii) received payments up to the applicable policy limit, or (iii) received payments that were sufficient to complete the repairs, solely by using estimating data extracted from Xactware and payment data from State Farm's claim management system, the Enterprise Claim System ("ECS").[9] (The data extracted from Xactware and ECS and transferred to Excel spreadsheets will be referred to herein as the "Data Report".[10])

---

[8] "Out-of-pocket costs" is referring to out-of-pocket costs incurred by the policyholder, resulting from State Farm's application of non-material depreciation, and exceeding the policy's required deductible payment.

[9] State Farm's Responses to Plaintiff's First Set of Interrogatories, dated August 19, 2020, pp. 6-10.

[10] SFCRANFIELD00005462.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

Instead, it is generally necessary to review claim notes and other documentation from the claim file to correctly identify such claims. Further, even for those policyholders that received a payment with non-material depreciation applied, the Data Report cannot be used to reliably identify the amount and timing that non-material depreciation was applied. That is because the Data Report includes Xactware data for estimates that were not used as a basis for payments and estimates that do not reflect an insured's known actual cost to repair. An individual review of the claim file for each asserted class member would be necessary to correctly identify the amount and timing of labor and other non-material depreciation that was unpaid at any point in time.

e.  Mr. Johnson states that he can identify class members and calculate the amount of non-material depreciation that was "withheld" from a payment and the timing of the withholding in 2-3 minutes per claim.[11] He did not apply his supposed approach to either the Plaintiff's claim or any of the claim files in the 149-claim file sample produced in this case. Mr. Johnson's opinion therefore cannot be tested for reliability, rate of error, or accuracy (i.e. whether Mr. Johnson accurately describes the process he would use). My team, in contrast, reviewed the 149-claim file sample produced in this case. It took my team approximately 70 hours to do an initial review of these claim files.[12] My team's review demonstrated that to evaluate the individual facts and circumstances of each claim accurately and reliably, it is necessary to review the State Farm claim file at the very least. Often, the State Farm claim file, on its own, does not provide sufficient information to determine whether repairs have been completed and the actual cost of such repairs. Ascertaining that information would often require a review of records solely in the insured's or the contractor's possession and/or inspection of the insured's home. Even without review of records not in State Farm's possession, a review of each potential class member's claim file would be

---

[11] Johnson Report, ¶ 45.

[12] This estimate is based on the time to complete an initial review of the sampled claim files, which does not include time spent on a second "quality control" review, the time my team spent checking and analyzing the information captured, or our recordkeeping and documentation to support our conclusions.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

extraordinarily time-consuming. Across the potentially relevant population of approximately 34,000 claims identified in the Data Report,[13] a conservative estimate of the time to review the remaining claims would be approximately 16,000 hours. This equates to one person working 40 hours a week for nearly 3 years in order to do an initial review of the population of claim files. That estimate does not include time potentially needed to resolve disputes that may arise as to whether the documentation supports an insured's membership in the class or the calculation of individualized damages for insureds.

f.      Mr. Johnson explained that his preferred approach for identifying members of the proposed class and determining the amount and timing that non-material depreciation was applied to a payment would require access to the Xactimate .ESX file and what he characterizes as State Farm's claims management "software", although he also suggested that he could sometimes use the Data Report alone.[14] Mr. Johnson's approach assumes that all Xactimate estimates (and the corresponding .ESX files) were the basis of a payment to the policyholder and that the Xactimate estimates are always updated to reflect known actual repair costs. From my review of the 149-claim file sampling, however, that is not the case. Johnson glosses over these types of issues by referring vaguely to "more complex claims" that may "require more time."[15] But, Johnson did not provide an approach to evaluate claims where the payments (whether found in the Data Report or in the claim file itself) do not reconcile to the Xactimate estimate and therefore the estimate (and .ESX file) do not reflect what was paid to the policyholder and what items were paid on an ACV versus an actual repair cost basis. I have identified a number of claim handling scenarios (starting on page 51 of my report) where Mr. Johnson's overly simplistic approach would lead to inaccurate results.

---

[13] A total of 34,072 claims are identified in SFCRANFIELD00005462.

[14] Johnson Report, ¶ 48.

[15] *Id.*, ¶ 50.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

## LABOR AND OTHER NON-MATERIAL DEPRECIATION

10. Depreciation is a fundamental accounting and tax principle that accounts for the decline in value of a fixed asset,[16] such as a home or structure, over time due to wear and tear and/or functional obsolescence. Depreciation is calculated based on the fixed asset's cost basis and its useful life (e.g. its estimated lifespan). A fixed asset's cost basis comprises *all* costs incurred to acquire or construct the asset and make it ready for use, known as "capitalized costs," including the cost of materials, labor, tools, machinery and equipment, taxes, and profit.[17] The decline in value (i.e. depreciation) of a fixed asset is represented by subtracting a portion of the cost basis of the asset. Thus, all costs incurred to acquire or construct the home or structure – including materials and labor – are depreciated.

11. Appraisers also take depreciation into account when valuing a property.[18] In the cost approach, an appraiser first estimates the total current costs to construct a replacement of an existing structure, which includes labor and other non-material costs. The replacement cost estimate is reduced by depreciation to adjust for the loss in value caused by the age, condition, and utility of the structure. The authoritative appraisal reference material I reviewed shows that, as in the accounting context, an appraiser using the cost approach does not exclude or remove labor or any other non-material costs from the cost basis of a structure before applying depreciation.

12. Accounting, tax, and appraisal principles recognize that applying depreciation to material, labor, and other non-material components yields an approximation of a property's value. In my professional and academic experience, as well as my knowledge and review of accounting and tax literature, I have not encountered anything to support

---

[16] A fixed asset is a long-term tangible piece of property that is not expected to be consumed or converted into cash in less than one year's time.

[17] "All costs necessary to acquire the asset and make it ready for use are included in the asset account. Costs included in the asset account are called **capitalized costs.** (Expenditures excluded from asset categories are 'charged-off' to income-that is, expensed.)" *See* Revsine, Collins, and Johnson. *Financial Reporting and Analysis 3rd Edition.* Chapter 10. Pearson Education, Inc., 2005.

[18] "Chapter 27: The Cost Approach." *The Appraisal of Real Estate, 14th Edition.* Illinois:  The Appraisal Institute 2013.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

the removal of labor or other non-material capitalized costs from the cost basis of a fixed asset when applying depreciation. Based on my review of State Farm structural damage claim files, the process State Farm uses parallels the process used in the accounting, tax, and appraisal fields to identify the current value of a structure in its aged state.[19]

### *State Farm's process for determining ACV is consistent with fundamental concepts in accounting and tax practices.*

13. Plaintiff has stated that labor and other non-materials are "NOT traditional subjects of depreciation."[20] This is contrary to what is found in accounting-related literature, cost accounting standards, generally accepted accounting principles, the Internal Revenue Code,[21] and the Code of Federal Regulations, which all present the capitalization of labor and other non-material costs as a fundamental concept.[22] These sources consistently hold that all costs incurred in the production of inventory and the construction of fixed assets, including labor and other non-material costs, are to be capitalized, becoming part of the asset's cost basis, and are subject to depreciation. For example, the cost of a building includes all expenditures related to its acquisition or construction, including the materials,

---

[19] See 12/4/20 Transcript of Deposition of Tyler McKitterick ("McKitterick Deposition") at 131:19 to 132:22.

[20] Complaint, ¶17.

[21] The Internal Revenue Service (the "IRS") recognizes that property is subject to wear and tear and allows individuals to take tax deductions for the depreciation of property that is a place of business or produces income. The Internal Revenue Code clearly lays out that the cost basis of a home includes labor and other non-material costs along with fees and taxes, which are all subject to depreciation.

Internal Revenue Service – U.S. Internal Revenue Code:  Tax Standards 26 U.S. Code § 167 – Depreciation, which states that "[t]here shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) – (1) of property used in the trade or business, or (2) of property held for the production of income.";  Internal Revenue Service - U.S Internal Revenue Code:  Publication 527 – Residential Rental Property; Internal Revenue Service - U.S Internal Revenue Code:  Publication 587 – Business Use of Your Home; Internal Revenue Services - U.S Internal Revenue Code:  Publication 551 – Basis of Assets.

[22] See Financial Accounting Standards Board - Accounting Standards Codification:  ASC 330-10 Inventory; ASC 360-10 Property, Plant and Equipment; 26 U.S. Code § 263A; and Code of Federal Regulations (CFR) – Title 48: Federal Acquisition Regulations System, Part 9904 – Cost Accounting Standards.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

labor, and overhead costs incurred during construction as well as professional fees and building permits.[23]

14. Accounting and tax literature clearly lay out that nearly all fixed assets decrease in value due to wear and tear.[24] Fixed assets are described in accounting textbooks as having a quantity of usefulness, or a useful life.[25] The daily existence of a structure, such as a roof, and its exposure to the elements, causes a portion of its quantity of usefulness to be consumed and eventually the structure will need to be replaced. Accounting literature makes no distinction between the consumption of labor versus materials or any other inputs included in an asset's cost basis – the asset as a whole is subject to depreciation and at some point will have zero or near-zero value. When a roof needs to be replaced, all costs incurred in the prior construction will need to be incurred again since the roof does not forever retain the value of the cost of labor (or any other input) originally used in construction. The contractor hired to repair or replace the roof will not provide the homeowner a "credit" for the labor and other non-material costs previously incurred to build that structure.

15. State Farm's process for determining ACV when handling structural damage claims parallels the depreciation approach used in accounting and tax disciplines. Adjusters include labor and other non-material costs in the estimated replacement value of damaged property and apply depreciation, if appropriate, to that value.

***All costs used in the manufacturing of inventory and construction of fixed assets become an integral part of an asset's cost basis.***

16. The construction of fixed assets and the manufacturing of inventory involves using inputs of labor, tools, equipment, and machinery, to convert raw materials into products. The inputs then lose their separate identities, becoming fungible and integrated into the

---

[23] Kieso, Weygandt, and Warfield. *Intermediate Accounting 13th Edition.* Chapter 10. John Wiley & Sons, 2010.

[24] One exception is land because it is a limited resource with an unlimited life. However, land used for its natural resources such as oil and minerals is subject to depletion, which is very similar to the concept of depreciation.

[25] Pyle, William W. and John Arch White. *Fundamental Accounting Principles, 7th Edition.* Illinois: Irwin, 1975. Kieso, Weygandt, and Warfield. *Intermediate Accounting 13th Edition.* Chapter 11. John Wiley & Sons, 2010.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

overall product.[26] The cost basis of a material used for the construction of a home would include labor costs that were incurred in the manufacturing of that material. For example, a manufacturer of wood roofing shingles includes the cost of timber (raw material), workers' wages and benefits (labor), as well as the cost of the tools, equipment, and machinery used to construct the shingles in the overall cost of inventory. Once the shingles are sold to a third party, such as a homebuilder, they become a material cost for the homebuilder.[27] A homebuilder uses a variety of materials along with direct labor, tools, equipment, and machinery to construct a home. A builder's home inventory becomes a fixed asset once purchased by a homebuyer and the purchase price becomes the cost basis for the homebuyer.[28]

17. A shingle is a finished product to a shingle manufacturer just as a mobile home is a finished product to a manufacturer of mobile homes. Both of these assets would not exist if there had not been material inputs and labor and other non-material inputs used to manufacture them. In an accounting context, the cost for all of these inputs are included in the asset's costs basis and the entire asset is subject to depreciation. Plaintiff is not disputing that material costs are subject to depreciation, and those costs would include the cost of labor necessary to construct that material.

### *Depreciation used in the calculation of ACV*

18. Mr. Johnson states that an ACV payment that depreciates certain non-material costs is "[w]ithholding future labor costs."[29] Depreciation applied in calculating an ACV payment does not withhold *future* labor costs, just as it does not withhold *future* material

---

[26] "Materials are purchased, wages and salaries are paid, and repair costs are incurred in specific and easily identifiable transactions. But once production begins, these costs must be transferred to Work in Process accounts so that they will reflect the combining of materials and services during processing." Chatfield, Michael and Dennis Neilson. "Chapter 3:  Cost Allocation." *Cost Accounting*. Harcourt Brace Jovanovich, Inc., 1983.

[27] This would include the manufacturer's inventory cost plus profit and likely other costs such as sales tax.

[28] "As direct materials, direct labor, and overhead are introduced into the production process, they become part of the work in process inventory value. When the home is completed, the accumulated costs become part of the finished goods inventory value" Mitchell Franklin, Patty Graybeal, and Dixon Cooper. "Chapter 4: Job Order Costing." *Principles of Accounting, Volume 2: Managerial Accounting.* XanEdu Publishing Inc., 2019.

[29] Johnson Report, ¶ 20.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

costs. The depreciation used for the calculation of an ACV payment is applied to an estimate of the *current* replacement cost in order to determine the pre-loss value of an existing structure based on its age and condition prior to the loss. To be clear, the application of depreciation has nothing to do with the payment or non-payment of "future" costs.

19. Further, while Mr. Johnson states that the Xactimate software has setting functions to exclude the application of depreciation to non-material components of replacement cost estimates,[30] that is not a basis for concluding that changing the setting functions in that manner results in an appropriate measure of the pre-loss value of an aged structure.

20. As I have explained, the cost basis of a structure includes more than the cost of materials, in that labor and other non-material costs are required to assemble materials used in building the structure. As set forth in the authoritative literature and based on my experience, applying depreciation to non-material costs included as part of the property's cost basis is a proper and accepted practice in the accounting, tax, and appraisal fields, and there is no reason why it also would not result in an accurate approximation of the pre-loss value of property in the property insurance context.

---

[30]*Id.*, ¶¶ 17-21.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

## STRUCTURAL DAMAGE CLAIMS

21. I understand that the dispute in this case involves the loss settlement provision of the homeowners insurance policy issued to Plaintiff and other State Farm insureds. The loss settlement provision for structural losses in Plaintiff's homeowners policy, in what I understand to be the pertinent part, states the following in explaining how State Farm will pay structural damage claims:

SECTION I - LOSS SETTLEMENT

Only the Loss Settlement provisions shown in the Declarations apply. We will settle covered property losses according to the following.

COVERAGE A – DWELLING

1. A1 – Replacement Cost Loss Settlement – Similar Construction.

a. We will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under SECTION I - COVERAGES, COVERAGE A – DWELLING, except for wood fences, subject to the following:

 (1) until actual repair or replacement is completed, we will pay only the actual cash value at the time of the loss of the damaged part of the property, up to the applicable limit of liability shown in the Declarations, not to exceed the cost to repair or replace the damaged part of the property;

(2) when the repair or replacement is actually completed, we will pay the covered additional amount you actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the Declarations, whichever is less;

(3) to receive any additional payments on a replacement cost basis, you must complete the actual repair or replacement of the damaged part of the property within two years after the date of loss, and notify us within 30 days after the work has been completed; . . . .

**Confidential and Proprietary - Produced Pursuant to Protective Order**

Charles Cranfield State Farm Homeowners Policy No. 70-N6-7546-3 effective August 15, 2014 to August 15, 2015 (SFCRANFIELD00000024) (emphases omitted).

22. From my review of the 149 claim files that State Farm produced (the "Reviewed Sample"), I have observed that State Farm frequently adjusts policyholders' structural damage claims (also referred to as building, dwelling, or Coverage A claims) by estimating the cost to repair and/or replace the damaged property, and then applying depreciation to estimate the pre-loss value of that property. State Farm's adjustment process typically involves the use of the Xactimate estimating software. The Xactimate software applies unit prices (which often comprise both material and labor components) for the specific geographic area (as provided by Xactware)[31] to estimated quantities (e.g. number of units, labor hours, square feet, linear feet, etc.) that the adjuster enters into Xactimate based on a physical inspection of the damaged property and conversations with the policyholder and/or their contractor (if they are present or otherwise provide relevant information). The Xactimate tool also applies general contractor overhead and profit if the adjuster thinks the repairs are complex enough to warrant this expense and applicable sales tax. If the adjuster obtains replacement cost information from another source, such as a contractor's estimate, contract, or invoice, or a laboratory test result as to the cost of a particular material,[32] the adjuster may input that estimated (or actual) replacement cost information for a repair instead of using the Xactimate unit price.

23. Based on my analysis of the Reviewed Sample, when preparing an estimate using Xactimate, the adjuster may apply depreciation, if appropriate, to the estimated repair or replacement cost for some tasks. As the claim files in the Reviewed Sample reflect, the adjuster determines the amount of depreciation applied to any particular portion of the insured's damaged property. Thus, the application of depreciation on an Xactimate estimate may vary from task to task. For example, if the adjuster inputs information that a

---

[31] Xactware is the company that owns and licenses the Xactimate software. *See* State Farm's Responses to Plaintiff's First Set of Interrogatories to Defendant, pp. 25-26. The pricing by Xactware is based on "cost information based on actual prices and transactions (completed bids) that have occurred recently in your area." www.xactware.com/en-us/resources/pricing-data-services/overview/ (downloaded on 3/3/2021).

[32] In some claims, the State Farm adjuster submits a flooring sample to ITEL Laboratory to determine the estimated price per square foot based on the condition and quality of an insured's flooring material.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

roof of average condition with 20-year shingles is 5 years old, the software applies a 25% depreciation rate (5 years/20 years) to the roofing line item for which the depreciation was identified as necessary by the adjuster. In the same estimate, if the roof vent was recently installed, the adjuster may not apply any depreciation to the vent.

24. I have noted in my review that State Farm adjusters sometimes do not make an initial ACV payment based on an Xactimate estimate, but rather make an up-front replacement cost payment for the full amount the insured has incurred or has contracted to pay for repair or replacement of their damaged property, with no deduction for depreciation. Generally, the State Farm adjusters make this payment after first preparing an Xactimate estimate that reflects the replacement cost estimate and application of depreciation as they have deemed appropriate, which can be different from the full amount of the replacement cost paid up-front. Further, in some claims the State Farm adjuster may prepare an Xactimate estimate where the resulting ACV payment amount exceeds the applicable policy limit. In these situations, the policyholder holder will typically receive payment only up to the applicable policy limit.

25. For claims where the full replacement cost or applicable policy limit is not paid up front, the initial payment made to the policyholder frequently is an ACV payment equal to the total estimated replacement cost less depreciation and less the policy's deductible. As more information becomes available about the potential costs that may be incurred to complete repairs or replacement, the adjuster may update the Xactimate estimate to reflect the new information. Such information could include, for example, an estimate provided by the insured's contractor or findings from an additional inspection of the property. The adjuster may also choose to not reflect additional information in the Xactimate estimate but in other claim file documentation, such as a Summary of Loss.[33] When such updates are made, the policyholder may receive one or more additional ACV payment(s). The actual repair costs generally cannot be known with certainty until the policyholder has contracted for or completed the repairs.

---

[33] For example, Claim nos. 35-6F98-486 and 35-959N-136.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

26. Based on my review, the estimate prepared by the adjuster may also reflect judgments that benefit the policyholder, e.g., pricing and type of materials; allowing for a larger quantity of materials; providing for additional labor hours and/or higher labor rates, including general contractor overhead & profit where that may not be necessary,[34] or applying a lower depreciation rate. Any of these factors taken alone or in combination, may result in an increase in the replacement cost estimated, the resulting ACV calculated, and the insured's ACV payment. For example, in Claim No. 35-6S56-824, [35] the insured told State Farm that their damaged basement paneling was first installed "when they bought [the] house 23 yo." When inputting the age of the paneling into Xactimate, the adjuster reported it as 15 years old, instead of its actual age of 23 years old. Xactimate therefore applied 10% depreciation to the paneling (15 years/150 years) as opposed to 15.3% depreciation (23 years/150 years). This resulted in the insured receiving $103.62 more than she would have received if the higher depreciation percentage had been applied. An adjustment like this is in the policyholder's benefit and increases the policyholder's ACV payment above the amount that would have otherwise been appropriate given the age and condition of the damaged property. I understand from State Farm's position in the litigation that it contends that such overstatements may equal or exceed any depreciation for labor and other non-material costs that was applied when making a payment based on the estimated ACV.[36] Evaluating these issues would need to be done on a claim by claim basis, as demonstrated by this example.

27. For claims in which the policyholder first receives an ACV payment, the policyholder may later recover supplemental replacement cost benefits. Based on my review, the RC payments do not "repay" depreciation previously applied, but rather cover the insured's additional costs incurred to complete repairs above their initial ACV payment(s), (less deductible). This amount can be less than, equal to, or more than the amount of

---

[34] For example, Claim no. 35-944G-500 (State Farm Xactimate estimate included General Contractor Overhead and Profit (SFCRANFIELD00043120) when determining the ACV payment but the contractor invoice with the actual repair costs did not appear to include this expense (SFCRANFIELD00042981)).

[35] SFCRANFIELD00022824 – SFCRANFIELD00023010.

[36] State Farm's Answer, Additional Defenses, and Jury Demand, dated June 24, 2020, at pp. 18-21.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

depreciation originally applied in calculating the ACV payment. Additional inputs from contractors may support a reduction in the total estimated cost to repair property, such as where an insured has retained a contractor who charges less for repairs than the replacement cost estimate generated from the adjuster's use of Xactimate. When this happens, it is clear that the initial Xactimate estimate overstated the RCV and accordingly, overstated the calculated ACV of the damaged property. Based on my review and, consistent with testimony provided by State Farm employees in this case and the policy language quoted above, State Farm does not typically pay policyholders more than their incurred cost to repair – at either the ACV or RC stage of the loss adjustment process – when that cost is known.[37]

28. I have seen in my review that State Farm engages in a reconciliation process with the policyholder and/or their contractor when the policyholder submits an estimate, invoice, or other documentation demonstrating that actual repair costs is different than the estimated replacement costs in the Xactimate estimate. For example, in Claim No. 35-9X17-955,[38] after the Xactimate estimate was prepared and an initial ACV payment was sent to the policyholder, a signed contractor quote was submitted for repairs to the garage roof. State Farm reviewed the contractor quote, noted that the contractor amount was "less than the SFE for the same scope," updated the Xactimate estimate with the lower contractor amount, and issued a partial RC payment to the policyholder.

29. Further, based on my review of the claim files, contractor estimates vary significantly in form. Some contractors include a detailed itemization of the repairs, but more often the

---

[37] McKitterick Deposition at 133:22-134:16; 1/28/21 Transcript of Deposition of Alice Sandvick at 129:9-14

[38] SFCRANFIELD00048106 – SFCRANFIELD00048340.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

contractor estimates provide very little detail, such as this example of a contractor estimate for claim number 35-751L-086.[39]



30. Contractor estimates and invoices like the above example that are provided with lump sum amounts and minimal itemization make it difficult to determine if the repairs were completed per the scope of the State Farm estimate. In instances where a reconciliation between the State Farm estimate and the contractor documentation is not possible, there is a possibility the claim was overpaid. For example, the policyholders may have received a RCB payment for repairs that were not completed and/or paid for repairs that were completed by the contractor but were outside of the scope of damages. Without an inspection of the property after the repairs were completed and/or a discussion with the policyholder and their contractor to determine what repairs were done, State Farm cannot be certain the repair costs that were paid were for the same items that were in the Xactimate estimate. I understand from State Farm's position in the litigation that it contends that potential overpayments may equal or exceed any depreciation for labor and other non-material costs that was applied when making a payment based on the estimated ACV.[40] Such examples can only be determined from an individual review of each claim file.

---

[39] SFCRANFIELD00029353.

[40] State Farm's Answer, Additional Defenses, and Jury Demand, dated June 24, 2020, at pp. 18-21.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

31. I have observed that the policyholders often do not pay out-of-pocket for the repair or replacement costs. As a matter of practice, State Farm frequently pays policyholders RCBs when they provide documentation showing the repairs are contracted to be performed.[41] Such payments for replacement costs are often made before the repairs are completed and/or before the policyholder has paid out-of-pocket for any repairs (aside from a deductible), even if State Farm has previously made an ACV payment to the policyholder.[42] I have also observed in my review of claim files that contractors may accept the ACV payment as a deposit and/or not require the insured to pay additional sums until they receive payment(s) from State Farm for RCBs.[43] In some instances the payments may be made directly from State Farm to the contractor performing the repairs.[44] For claims where all payments were made directly to the contractor, or where the payments were made to the policyholder before the amount was due to the contractor, the policyholder would be in the same economic position whether or not State Farm depreciated non-material costs when making a payment based on the estimated ACV. Identifying these types of claims will require an individual review of each claim file.

32. Finally, I understand that Plaintiff has alleged that State Farm fraudulently concealed from policyholders its practice of including non-material costs when applying depreciation for an ACV payment.[45] State Farm has disputed this allegation. In my

---

[41] For example, Claim no. 35-897F-851 (State Farm issued an RC payment based on an estimate from the contractor who "is now contracted with [the] insured to do the repairs" (SFCRANFIELD00034842)) and Claim no. 35-707H-509 (State Farm issued an RC payment at the time of inspection after the policyholder "presented [a] signed contract" (SFCRANFIELD00024870)).

[42] Explanation of Building Replacement Cost Benefits, "we will consider paying replacement cost benefits prior to actual repair or replacement if we determine repair or replacement costs will be incurred because repairs are substantially under way or you present a signed contract acceptable to us." Charles Cranfield claim file, SFCRANFIELD00000099 - SFCRANFIELD00000431 at SFCRANFIELD00000209.

[43] For example, Claim no. 35-688J-404 (Certificate of Completion provided shows the "First Draft Amount" is equal to the initial ACV payment made to the insured and that the balance is "to be Released from Insurance Carrier" (SFCRANFIELD00019195). I also observed in this claim file that State Farm paid RCBs based on the contractor estimate that included items (turtle vent and drip edge) which State Farm determined were not warranted when preparing the estimate (SFCRANFIELD00019142 and SFCRANFIELD00019198).

[44] For example, Claim no. 35-8K82-243 (The initial ACV payment was made to the policyholder but there was a Stop Pay on that check and the subsequent payments were sent to the Contractor doing the repairs. (SFCRANFIELD00036246)).

[45] Complaint, ¶ 10-12.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

review of the claim files in the Reviewed Sample, I have seen nothing to suggest that State Farm informed policyholders that only material costs were depreciated. I reviewed the Building Estimate Summary Guide attached to the Xactimate estimates found in the claim files, an example of which is shown below:[46]



The Summary Guide describes depreciation as "[t]he decrease in the value of property over a period of time due to wear, tear, condition, and obsolescence."[47] This description is fully consistent with the application of depreciation in an accounting and tax context, where depreciation is applied to the entire cost of property (as discussed on pages 9 through 13 of my report). It certainly does not suggest, as Plaintiff has asserted,[48] that State Farm would be applying depreciation only to the material cost component of the property value.

33. In addition, the detail that is included with Xactimate estimates provides ample evidence that State Farm was applying depreciation to both the material and non-material

---

[46] SFCRANFIELD00010097.

[47] *Id.*

[48] Complaint, ¶ 132.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

components of replacement cost. As an example, below is an excerpt from the Xactimate estimate from one of the claim files in the Reviewed Sample:[49]

| | QUANTITY | UNIT PRICE | TAX | RCV | AGE/LIFE CONDITION | DEPREC. DEP % | ACV |
|---|---|---|---|---|---|---|---|
| 25. R&R Laminate floor - per specs from independent analysis | | | | | | | |
| | 290.05 SF | 9.68 * | 123.65 | 2,931.34 | 5/25 yrs Avg. | (586.27) 20.00% | 2,345.07 |
| 26. Vapor barrier - 15# felt | | | | | | | |
| | 290.05 SF | 0.27 | 1.05 | 79.36 | 5/15 yrs Avg. | (26.45) 33.33% | 52.91 |
| 27. Content Manipulation charge - per hour | | | | | | | |
| | 4.00 HR | 32.50 | 0.00 | 130.00 | | | 130.00 |
| 28. R&R Quarter round - 3/4" - stain grade | | | | | | | |
| | 82.60 LF | 1.55 | 4.73 | 132.76 | 5/150 yrs Avg. | (4.43) 3.33% | 128.33 |
| 29. Stain & finish base shoe or quarter round | | | | | | | |
| | 82.60 LF | 0.82 | 1.08 | 68.81 | 5/15 yrs Avg. | (22.94) 33.33% | 45.87 |
| 30. R&R Reducer strip - for wood flooring | | | | | | | |
| | 3.00 LF | 5.66 | 1.00 | 17.98 | 5/25 yrs Avg. | (3.59) 20.00% | 14.39 |
| **Totals:  Family Room** | | | 131.51 | 3,360.25 | | 643.68 | 2,716.57 |

34. As shown, the Xactimate estimate does not separate material depreciation from non-material depreciation. However, based on certain repair task descriptions one can reasonably assume there would be non-material costs included. For example, some repair tasks are for "R&R," which means remove and replace and indicates there is a labor cost component of the repair task (in addition to the material cost component). When depreciation is applied to those tasks on a flat percentage basis (i.e. the depreciation percentage is multiplied by the full RCV amount), as on the estimate reflected above, that strongly suggests that depreciation was applied to non-material cost components of replacement cost. Similarly, other tasks on this example estimate are worded in a manner that strongly suggests to the person reading the estimate that non-material costs were included, such as repair line '29. Stain and finish base shoe or quarter round'. Here, too, the flat depreciation percentage for this line item all but confirms that depreciation was applied to non-material cost components of replacement cost.

35. Finally, based on the tax amount shown on an estimate, one also could determine that a repair task includes material and non-material costs. That is because, as I have determined through my review, sales tax is only applied to materials. For example, the

---

[49] Claim no. 35-0634-3N7, SFCRANFIELD00010105.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

material sales tax rate for this example claim is 7.25%.[50] The Xactimate estimate for repair line '25. R&R Laminate floor…' has a total pre-tax replacement cost of $2,807.68 (290.05 SF x 9.68 unit price). If the entire cost was for materials the tax for this line item would be approximately $203.56 ($2,807.68 x 7.25%), and not the $123.65 tax as shown. This proves that a portion of the $2,807.68 pre-tax replacement cost is attributable to non-material costs. Again, because depreciation of 20% was applied to the *full* cost for this item when the ACV was determined, I can be confident that depreciation was applied to non-material cost components of replacement cost on this estimate.

36. Finally, Plaintiff has stated that "policyholders… would have no way to discern that Defendant was depreciating labor from the ACV calculations."[51] I do not believe that the above illustrations are particularly complex. Regardless, I reviewed several claims in the Reviewed Sample where the claim file indicates that a public adjuster represented the policyholder and was involved in the adjustment process, including for Plaintiff Cranfield's claim.[52] A professional public claims adjuster would presumably be able to discern that labor and other non-material costs were depreciated when determining an ACV payment.[53] State Farm contends, and I agree, that each claim would need to be evaluated, and the policyholders would have to be interviewed, to determine what the policyholder or his or her public adjuster knew about the practice of including non-material costs when applying depreciation for an ACV payment.

---

[50] SFCRANFIELD00010198.

[51] Complaint, ¶ 91.

[52] For example, claim nos. 35-0032-H22, 35-2630-V95, 35-6F43-685, and 35-6M27-437. Plaintiff Cranfield confirmed in his deposition that he hired Metro Public Adjustment to represent him in connection with his insurance claim. 1/13/21 Transcript of Deposition of Charles Cranfield ("Cranfield Deposition") at 56:13-21. He stated that he did so because the public adjuster knew more about insurance claims than he did. Cranfield Deposition at 170:9-18.

[53] Mark Jacoby testified in his deposition that he was the public adjuster who represented Plaintiff Cranfield. 1/15/21 Transcript of Deposition of Mark Jacoby ("Jacoby Deposition") at 41:12-42:12. He is a licensed public adjuster since 2012 and is currently a public adjuster with Metro Public Adjustment since August 2014. Jacoby Deposition at 23:20-25:12. He has also been retained as a consulting expert by Plaintiff's counsel in this case. Jacoby Deposition 26:5-16. Mr. Jacoby had training in Xactimate in addition to other training on how to inspect damage, how to estimate, and negotiation. Jacoby Deposition at 21:20-23:1, 87:7-88:4. He acted as Plaintiff Cranfield's agent for purposes of negotiating their insurance claim. Jacoby Deposition at 46:5-13.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

### *Claim Review Process*

37. I understand that Mr. Johnson was informed by Plaintiff's counsel that the putative class is defined as State Farm policyholders who made a structural damage claim for property located in Ohio, where non-material depreciation was "withheld" from an actual cash value payment;[54] or where an actual cash value payment would have been made but for the withholding the non-material depreciation causing the loss to drop below the deductible.[55] Plaintiff's counsel have defined the class such that an insured would *not* be included in the asserted class if *any one* of the following are true: (i) the insured's policy included policy forms expressly permitting labor depreciation or (ii) the insured received payment from State Farm for the full amount of insurance (i.e. the policy limits).[56]

38. I understand the 149 claim files in the Reviewed Sample were randomly selected from a population of Ohio structural damage (Coverage A) claims. The population of claims had a "date of loss" on or after January 1, 2014 and the estimate reflected application of depreciation to labor components of repair unit prices.[57] These claims are potential class members according to Plaintiff's definition.

39. My team reviewed and analyzed the produced claim files in order to:

    a. Categorize what was paid on each claim based on the information contained within the claim file;

    b. Determine what information was available in the claim file pertaining to the actual cost to repair;

    c. Determine the extent to which review and analysis of claim files is necessary, and the amount of time needed to perform such review and analysis, in order to (i)

---

[54] Mr. Johnson defines "non-material depreciation" to include the application of either the "depreciate removal", "depreciate non-material" and/or "depreciated overhead and profit" settings in Xactimate. Johnson Report, ¶ 2.

[55] Johnson Report, ¶ 2.

[56] *Id*.

[57] State Farm's Responses to Plaintiff's First Set of Interrogatories, dated August 19, 2020, p. 7; State Farm's Supplement to its Objections and Responses to Plaintiff's First Set of Interrogatories, dated October 6, 2020, pp. 1-2; State Farm's Second Supplement to its Objections and Responses to Plaintiff's First Set of Interrogatories, dated November 13, 2020, pp.1-2.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

identify any claim files where the policyholder received a payment from State Farm with no deduction for non-material depreciation, the policyholder received the applicable policy limit, or the policyholder would not have received a payment from State Farm even if non-material depreciation had not been applied, (ii) determine the amount and timing of any subsequent payments of RCBs for policyholders who received a payment with a deduction for non-material depreciation, and (iii) assess whether a policyholder incurred any out-of-pocket costs as a result of State Farm's practice of depreciating non-material costs when making a payment based on the estimated ACV.

40. My team has reviewed over a thousand State Farm structural damage claims before our involvement in this matter and we are familiar with the nature and organization of the information contained in the claim files for the Reviewed Sample. We have developed an understanding of the claim process for State Farm structural damage claims as well as the variety of unique circumstances that may arise as to any individual claim.

41. We utilized an electronic form to capture specific claim file attributes identified from our review. In this electronic form we imported general claim information from the Data Report, such as Policy Description, Date of Loss, Deductible, Policy Limits, and other static data (data that does not change after being recorded) associated with the claim. We also used the Data Report to import estimate and payment information into the electronic form. These imported values included Total Depreciation, Net ACV, Payment Amount, Payment Date, and the Draft Remark, among other data fields.

42. Our claim file review process included reading the file notes for each claim and reconciling payments to applicable Xactimate estimates and/or to vendor/contractor invoices, estimates, and proposals. Through our review we were able to determine if each payment was:

- an initial or supplemental ACV payment
- a partial RC payment
- a combination ACV and partial RC payment

Confidential and Proprietary - Produced Pursuant to Protective Order

- a full RC payment[58]

- a payment related to loss mitigation

- a deductible refund to the insured (i.e. subrogation)

- other

Although we reviewed the Draft Remark accompanying each payment we found that it is not a reliable source for determining the type of payment made to a policyholder because its content is freeform and varies or is often blank.

43. We used our analysis of the types and amounts of payments in each file, as well as other information in the claim file, to assign each claim to one of the following categories:

- Policy Limits Paid

- Full RC paid up front (no depreciation applied)

- ACV paid; no replacement cost benefits claimed

- ACV paid; partial replacement cost benefits subsequently paid

- ACV paid; full replacement cost benefits subsequently paid

- Combination ACV/RC paid initially; no replacement cost benefits subsequently claimed

- Combination ACV/RC paid initially; partial replacement cost benefits subsequently paid

- Combination ACV/RC paid initially; full replacement cost benefits subsequently paid

- Claims with no payment

- Other

### *Summary of Claim File Review*

44. Due to the dynamic nature of the claim process, it was necessary to review each claim file in the Reviewed Sample in order to assign one of the overall categories described in paragraph 43. The claim files contain a variety of documents related to the claim-

---

[58] References in this report to claims where "full" RC was paid mean that the insured was paid for the full recoverable cost to complete all repairs *and* that for repairs paid on an ACV basis with non-material depreciation applied, the insured ultimately recovered *more* than that ACV amount.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

handling process, including estimates, repair documentation, correspondence, and claim file history notes. Many of these documents – including repair documentation – are in imaged form, and often handwritten, such that they must be individually reviewed and analyzed. Further, claim file history notes are freeform and must be reviewed and analyzed individually.

45. The process of associating, reconciling, and identifying each claim payment to the applicable Xactimate estimate or other documentation that supports actual repair costs for a particular claim involves thoroughly reading the claim notes and often reviewing numerous pages of claim information. Many claims contained multiple Xactimate estimates due to, for example, changes in scope, cost changes, and revised estimates. In addition, some estimates are created but are not used as a basis for a payment to the policyholder.

46. For illustration, I describe the claim file review process my team undertook for claim number 35-0634-3N7.[59] This claim took 34 minutes to review and was 194 pages long. First, we reviewed the payment summary for this claim, which was found on page 16 of the claim file.

| PAYMENTS | | | | | | |
|---|---|---|---|---|---|---|
| C denotes consolidated payment | | | | | | |
| E denotes EFT payment | | | | | | |
| Payment Number | Issued Date | Payee | | Status | Amount | Auth ID |
| 116244705J | 06-07-2017 | | | Paid | $71.58 | AR5N |
| 116113813J | 02-09-2017 | | | Paid | $7,991.98 | AR5N |
| 116098378J | 01-26-2017 | | | Void | $7,991.98 | NRYT |

The payment summary showed that the policyholder received payments totaling $8,063.56 (after an initial payment that was voided).[60] The payment summary does not include any indication of the basis for the payments (such as an Xactimate estimate or a contractor invoice), or whether the payments are for estimated ACV, supplemental ACV, or a full or partial RC payment.

---

[59] SFCRANFIELD00010023 - SFCRANFIELD00010216.

[60] SFCRANFIELD00010038.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

47. Next, we located the first Xactimate estimate created for this claim on page 76 of the claim file. Each claim file varied in terms of where the first Xactimate estimate could be found and many of the claims had multiple Xactimate estimates throughout the claim file. As shown below, for this claim the first Xactimate estimate showed an estimated RCV of $10,667.25, depreciation of $1,675.27, and a net ACV payment of $7,991.98.[61] Upon reviewing the first Xactimate estimate, I was able determine that the first payment listed in the payment summary represented the net ACV amount based on the first Xactimate estimate. Additionally, the date of the first Xactimate estimate agrees with the issued date of the first payment, January 26, 2017. There were no other Xactimate estimates in the claim file to support the second payment on this claim for $71.58.

| | |
|---|---|
| Date of Loss: 12/27/2016 | |
| Date Inspected: 1/25/2017 | |

**Summary for Coverage A - Dwelling - 37 Water Damage and Freezing**

| | |
|---|---|
| Line Item Total | 10,227.67 |
| Material Sales Tax | 343.27 |
| Subtotal | 10,570.94 |
| Cln&Carpet Svc Tax | 96.31 |
| Replacement Cost Value | 10,667.25 |
| Less Depreciation (Including Taxes) | (1,675.27) |
| Less Deductible | (1,000.00) |
| Net Actual Cash Value Payment | $7,991.98 |

**Maximum Additional Amounts Available If Incurred:**

| | | |
|---|---|---|
| Total Line Item Depreciation (Including Taxes) | 1,675.27 | |
| Replacement Cost Benefits | | 1,675.27 |
| Total Maximum Additional Amount Available If Incurred | | 1,675.27 |
| Total Amount of Claim If Incurred | | $9,667.25 |

Date: 1/26/2017 3:42 PM

48. In addition to reviewing the summary page of the Xactimate estimate, we also reviewed the underlying detail, which listed the RCV, depreciation, and ACV for each individual repair task. This claim was for damages to a bathroom, three bedrooms, furnace/hot water

---

[61] SFCRANFIELD00010098.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

closets, and a family room. Shown below is an excerpt from the Xactimate detail showing the estimated repair costs for the family room.

| | QUANTITY | UNIT PRICE | TAX | RCV | AGE/LIFE CONDITION | DEPREC. DEP % | ACV |
|---|---|---|---|---|---|---|---|
| 25. R&R Laminate floor - per specs from independent analysis | | | | | | | |
| | 290.05 SF | 9.68 * | 123.65 | 2,931.34 | 5/25 yrs Avg. | (586.27) 20.00% | 2,345.07 |
| 26. Vapor barrier - 15# felt | | | | | | | |
| | 290.05 SF | 0.27 | 1.05 | 79.36 | 5/15 yrs Avg. | (26.45) 33.33% | 52.91 |
| 27. Content Manipulation charge - per hour | | | | | | | |
| | 4.00 HR | 32.50 | 0.00 | 130.00 | | | 130.00 |
| 28. R&R Quarter round - 3/4" - stain grade | | | | | | | |
| | 82.60 LF | 1.55 | 4.73 | 132.76 | 5/150 yrs Avg. | (4.43) 3.33% | 128.33 |
| 29. Stain & finish base shoe or quarter round | | | | | | | |
| | 82.60 LF | 0.82 | 1.08 | 68.81 | 5/15 yrs Avg. | (22.94) 33.33% | 45.87 |
| 30. R&R Reducer strip - for wood flooring | | | | | | | |
| | 3.00 LF | 5.66 | 1.00 | 17.98 | 5/25 yrs Avg. | (3.59) 20.00% | 14.39 |
| **Totals: Family Room** | | | 131.51 | 3,360.25 | | 643.68 | 2,716.57 |

49. Next, we reviewed the claim notes to understand other important context for this claim, which were found on pages 18 through 23 of the claim file. The claim notes documented that an initial inspection took place with the policyholder present, where it was concluded that a sample of the flooring would need to be sent to ITEL in order to complete the Xactimate estimate. It was noted that the policyholder performed mitigation, for which a total of 16 hours of work was allowed.[62]

> Additional information:
> I met with Mrs. PH this morning. She showed me where HWH is located and showed me they had new one put in.
> This is on finished lower level of the home. The lower level consists of 3 bedrooms, bathroom, the closets housing the water heater and furnace and large family room. The water ran into all the rooms and it is buckling everywhere.
> It will all need pulled up and replaced.
> I took photos and uploaded to file. I also completed a sketch and got measurements and scope.
> PH advised she had her husband had several hours each in cleaning up water. I allowed 8 hours each and allowed 5 days for a fan and 5 days for dehumidifier.
> PH had to get to work so I explained no coverage for HWH itself and that I would be sending her a partial denial letter explaining this. Took sample of floor and explained I would send to ITEL. Then I would complete estimate. She understood.
> Allowed for new flooring throughout entire lower level, the quarter round will need replaced as well. There will also be content manipulation. Allowed dumpster for all the flooring.
>
> I have sketched and completed SFE. I will await ITEL results and then settle with PH.
> Uploaded photos to file as well.

50. Subsequently, a claim note dated January 26, 2017 indicates that the State Farm estimate was completed based on the ITEL pricing and 5 year depreciation based on when the

---

[62] SFCRANFIELD00010043.

Confidential and Proprietary - Produced Pursuant to Protective Order

house was purchased. The adjuster advised the policyholder to send in a signed contract or complete repairs in order to collect RCBs.[63]

> Updated State Farm estimate with the ITEL pricing.
>
> Called and spoke to Mrs. PH. Advised her of flooring results.
> Went over scope of repairs with her again and explained again HWH was not covered as part of loss. Used 5 years dep as that is when they purchased house. Explained ACV and RCV and advised her to collect RCB's she can send in signed contract or repairs must be completed.
>
> Went over settlement as follows:
>
> SFE RCV $10,667.25
> less dep  -  1,675.27
> less ded  -  1,000.00
> -------------------------------
> Total ACV $7,991.98

51. The claim note on February 27, 2017 indicates that the policyholder signed a contract to have the repairs completed:[64]

| 02-27-2017 - 7:31 AM CST | Performer: Myers, Erica | Office:HPROX |
|---|---|---|
| File Note: F/U | | |
| Participant: | COL / Line (Participant): 37 / 001(Named Insured(s)) | |
| Category: Assignment Claim Handling | Sub Category: | |

Reviewed phone message.
Called PH. She has signed contract to have work completed. She needed to know where/how to send in. I gave her statefarmfireclaims@statefarm.com email and advised her to put claim number in subject line.

---

[63] SFCRANFIELD00010042.

[64] SFCRANFIELD00010041.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

52. On page 65 of the claim file we located an invoice from Carpet One for repairs totaling $9,663.56, [65] which was less than the estimated RCV in first Xactimate estimate.



In this claim, and others like it, I needed to review the contractor invoice in order to determine if the invoice was for all repairs or a portion of the repairs and to reconcile the amounts listed in the claim notes and any subsequent payment amounts.

53. The claim note on February 28, 2018 indicates that the State Farm adjuster received the invoice from Carpet One and spoke to the contractor. The contractor indicated that there was an additional $600 discount so the total invoice for the repairs was $9,063.56. The adjuster pointed out that the amount incurred is less than the estimated repair costs. [66]



I reviewed flooring invoice from Washington's Carpet One submitted by the NI.  I called and spoke with Tara at Carpet One.  She confirms invoice includes installation and trim and adds that invoice was revised.  They provided an additional $600 discount so total is $9063.56.  NI paid $8000 deposit and owes balance of $1063.56.

I called agent's office and spoke to Heidi to advise there may be some misunderstanding about the recoverable depreciation as amount incurred is less than SFE.  I then called and spoke to Lisa and reviewed the invoice and discount of $600.  She is not aware of the discount and has been working with Heather at Carpet One.  She will contact Heather and get back to me regarding total amount of the invoice.  I reviewed RC amount must be incurred to recover full amount of RC benefits and she understands.

---

[65] SFCRANFIELD00010087.

[66] SFCRANFIELD00010041.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

54. The claim notes on March 10, 2017 indicate that the policyholder was considering other contractors but by June 7, 2017 the claims notes indicate that there was a final invoice from Carpet One and a payment would be issued for the cost of repairs that were in excess of the initial ACV payment (less the deductible).[67]



55. As a result of my team's review, we were able to fully reconcile the estimate used for payment, the type of payments made to the insured, and the basis for payments on this claim. Without a detailed review of the claim file, I would not have been able to determine that the final payment for $71.58 was for full RCBs and there was no remaining depreciation on this claim.

Even though this claim was relatively straightforward because there was only one Xactimate estimate and one relevant contractor invoice in the claim file, it demonstrates the extensive amount of work involved to understand and categorize each claim. As stated previously, my team's initial review of the Reviewed Sample took approximately 70 hours, or approximately 28 minutes per claim on average. The vast majority of that time was spent reviewing documents necessary to understand the manner in which the claim was adjusted and analyzing that documentation. This time did *not* include time spent on a second "quality control" review, time spent creating documentation to support our conclusions, or all of the time my team spent checking and analyzing the information captured. It also does not include any additional time that may be needed to calculate the

---

[67] SFCRANFIELD00010040.

**Confidential and Proprietary – Produced Pursuant to Protective Order**

amount and timing that non-material depreciation was applied to an ACV payment, either under Mr. Johnson's approach or otherwise, or to resolve disputes that may arise in this litigation as to particular insureds' class membership status and/or any damages calculations. This time estimate also does not include the time that would be needed to obtain, review, and analyze repair documentation or information that is outside of State Farm's possession. Based on the average time it took my team to review each claim file in the Reviewed Sample, and assuming that State Farm's practice of applying depreciation to *all* components of total replacement cost (including non-material cost components) when calculating ACV is found to be improper, it still would take approximately 16,000 hours to review the 34,000 claims that are in the Data Report in order to determine which asserted class members (if any) could show they incurred out-of-pocket costs as a result of State Farm's practice (or even whether they received a claim payment from State Farm where depreciation for non-materials was in fact applied).

## *Analysis of Claim File Information*

56. The following table classifies the 149 claims in the Reviewed Sample by general claim category.

| Claim Category | Count | % of Claims |
|---|---|---|
| ACV paid; no replacement cost benefits claimed[1] | 71 | 48% |
| ACV paid; full replacement cost benefits subsequently paid[2] | 31 | 21% |
| ACV paid; partial replacement cost benefits subsequently paid | 27 | 18% |
| Claims with no payment (below deductible)[3] | 12 | 8% |
| Full RC paid up front (no depreciation applied) | 3 | 2% |
| Policy limits paid | 2 | 1% |
| Other[4] | 3 | 2% |
| Total | 149 | 100% |

[1] Includes six claims with a combination ACV/RC paid initially and no replacement costs subsequently paid.

[2] Includes one claim with a combination ACV/RC paid initially and full replacement costs subsequently paid.

[3] Nine claims would likely still be below the deductible even if there had not been non-material depreciation.

[4] One claim where the first payment made to the policyholder was a full RC payment, but subsequent ACV payments were made. One claim where the estimate was below the deductible, but repairs were completed and RCBs were claimed. One claim where an initial ACV payment was made for the dwelling and dwelling extension, then a partial policy limit was paid for the dwelling extension.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

**Replacement cost paid up-front with no deduction for depreciation**

57. A total of 3 claims (or 2%) in the Reviewed Sample included an Xactimate estimate showing a net ACV payment amount with a deduction for depreciation, but the policyholder actually received an up-front payment for the full amount of actual repair or replacement costs, with no deduction for recoverable depreciation (and accordingly no recoverable depreciation applied to labor or other non-material costs). These policyholders did not incur any out-of-pocket costs for their loss as the result of State Farm's practice of depreciating non-material costs when making a payment based on the estimated ACV. It would not be possible to identify these claims without reviewing each claim file. For example, below is the information available in the Data Report for claim no. 35-897F-851:[68]

SFCRANFIELD00005462, "Payment Listing" Tab

| Claim Number | Payment Date | Payment Amount | Draft remark |
|---|---|---|---|
| 35897F851 | 06/21/2016 | $2,681.21 | Payment for Roto Rooter Services bill $5121.21 less policy deductible ($2440.00) = net due $ 2681.21. |
| 35897F851 | 08/16/2016 | $7,431.56 | Payment per contractor's estimate enclosed |
| | **Total** | $10,112.77 | |

SFCRANFIELD00005462, "For All Years" Tab

| CLAIM_ NUMBER | REPLACEMENT_ COST_VALUE | ACTUAL_CASH_ VALUE | NET_ACTUAL_CASH _VALUE_PAYMENT | TOTAL_ DEPRECIATION | NON_MATERIAL_ DEPRECIATION | Cov. A Deductible |
|---|---|---|---|---|---|---|
| 35897F851 | $6,263.08 | $5,673.24 | $5,673.24 | $589.84 | $111.00 | $2,440.00 |

58. It is not evident from the information in the Data Report that this claim never received a payment with non-material depreciation applied. Specifically, the claim has more than one payment, no individual payment nor the sum of the payments equals the REPLACEMENT_COST_VALUE less the Cov. A Deductible, and the Data Report shows NON_MATERIAL_DEPRECIATION greater than $0 even though this policyholder received payment for their full actual repair costs. On page 51 of my report, I describe this claim in detail to show how I was able to determine, through a detailed claim file review, that this policyholder received a full RC up-front payment.

---

[68] SFCRANFIELD00034827 – SFCRANFIELD00035082.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

59. There is no systematic way to identify claims like 35-897F-851. The Data Report alone cannot be used to identify all policyholders that received payment for their full actual repair costs. Such policyholders would not have had labor or other non-material depreciation withheld from their estimated ACV payment and, therefore, would not be able to show any out-of-pocket costs as a result of State Farm's depreciation practices. As this example shows, for any given claim, an up-front payment for actual repair costs could be made in *any* amount, regardless of the ACV and RCV figures reflected in the Data Report. An individualized review of the claim file notes and other documentation for all potential class members would be needed to reliably identify all insureds who did not receive an ACV payment with non-material depreciation applied.

### Policy limits paid

60. Based on my analysis of the Reviewed Sample and the Data Report, there is no systematic way to reliably identify claims that were paid policy limits and therefore could not recover any additional amounts under their policy from State Farm. The Data Report cannot be used alone to *accurately* identify policyholders who received payment up to the policy limit because it does not indicate which policy limit is applicable for the claim (i.e. dwelling limit, dwelling extension limit, or back-up of sewer and drain ("BUSD") limit). A total of 2 claims in the Reviewed Sample were paid the applicable policy limits.[69] In these two claims, the amount of total payments in the Data Report did not equal any of the policy limits and the Data Report shows NON_MATERIAL_DEPRECIATION greater than $0 even though the policyholders were paid the full amount of insurance. If the same ratio of these claims appeared throughout the full list of 34,000 claims on the Data Report, there could be approximately 500 claims where the policyholders were already paid their policy limits. On page 58, I describe an example of one of these claims to show how I was able to determine, only through a detailed claim file review, that the policyholder was paid up to the applicable policy limit.

---

[69] The two claims (Claim nos. 35-0972-7J4 and 35-643L-299) reached the applicable policy limit in the initial payment.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

**Full replacement costs paid after initial payment**

61. A total of 31 claims (or 21%) in the Reviewed Sample were claims where the
policyholder received the full amount of recoverable repair or replacement costs through
supplemental replacement cost payment(s) after an initial ACV payment. Our claim file
review process captured information necessary to compare the actual repair costs paid by
State Farm to the estimated RCV prepared using Xactimate.

| Claim Category | Count | % of Claims |
|---|---|---|
| Full replacement cost benefits subsequently paid | | |
| Actual Repair Cost = RCV in Xactimate estimate | 13 | 42% |
| Actual Repair Cost > RCV in Xactimate estimate | 14 | 45% |
| Actual Repair Cost < RCV in Xactimate estimate | 4 | 13% |
| Total | 31 | 100% |

62. The above table shows that it is not infrequent for the actual repair costs to be different
than the estimated RCV shown on an Xactimate estimate.[70] It happened more often than
not in the Reviewed Sample. This is to be expected since the Xactimate tool creates an
estimate of the costs to repair or replace the property and the actual cost cannot be known
until the repairs have been completed or contracted to be completed. Because the actual
repair cost can vary from the estimated repair cost, one cannot always rely on the amount
of supplemental payments (whether reflected in the Data Report or in the claim file itself)
to determine whether the supplemental payments were for partial or full repairs, or for
newly discovered damage paid on an ACV basis. Instead, that determination requires an
individual review and analysis of claim file information, including claim notes,
Xactimate estimates, and contractor documentation such as estimates or invoices.

63. Further, although these policyholders received full RCBs, Mr. Johnson indicates that he
could use the Xactimate .ESX file and claims management system to determine the
interest that may be owed for any period of time that non-material depreciation was

---

[70] We also noted through our analysis that generally, for claims where the actual repair costs equal the Xactimate
estimate RCV, the contractor and the insured agreed to have the repairs completed for the amount of the State Farm
RCV after being provided with the estimate (rather than the contractor independently proposing an amount for
repairs that is identical to the Xactimate estimated RCV).

**Confidential and Proprietary - Produced Pursuant to Protective Order**

deducted from a payment.[71] Assuming Mr. Johnson would be able to use these sources as he claims, it would be a time-consuming and tedious exercise to determine the period of withheld non-material depreciation (after the amount is isolated) for claims with multiple payments and scope changes where the withheld amount changed over time. Mr. Johnson did not illustrate his methodology for addressing these types of claims. As noted below (see page 45), more than half of the claims on the Data Report fall into this category of "multiple" payment claims.

64. Finally, for claims where the actual repair costs are less than the estimated repair costs, the policyholder would have received an overpayment of the pre-loss value of the damaged property in their initial ACV payment. Mr. Johnson does not explain how, if at all, he would address any such overpayment when determining interest. For illustration, I present a hypothetical example:

| | Estimated | | Actual | |
|---|---|---|---|---|
| Replacement Cost | $ | 1,000 | $ | 900 |
| Less Material Depreciation | | (100) | | (90) |
| Less Non-Material Depreciation | | (50) | | (45) |
| Actual Cash Value (pre-loss value) | $ | 850 | $ | 765 |

65. In this example (which for simplicity assumes no deductible), the policyholder received an ACV payment for the estimated pre-loss value of the property equal to $850, based on the estimated replacement cost of $1,000. After the ACV payment was issued, repair documentation was submitted showing the policyholder completed the repairs for $900 and an RC payment was issued for $50 ($900 RC less $850 ACV payment). The policyholder in this example received payment for the estimated pre-loss value of the property that was $85 higher ($850 less $765) than the actual pre-loss value of the property. Further, the amount of overpayment exceeds the non-material depreciation ($50) that was applied to the initial payment.

---

[71] Johnson Report, ¶¶ 50-52. Based on my review, the dates between the ACV payment and the subsequent full RC payment, which I understand to be the dates Mr. Johnson would use in calculating interest, can be very close. For example, in claim 35-6S58-113, the policyholder received payment for RCBs 20 days after the initial ACV payment was made. (SFCRANFIELD00023025)

**Confidential and Proprietary - Produced Pursuant to Protective Order**

66. Plaintiff and Mr. Johnson appear to claim that such a policyholder would still be entitled to an interest payment on the non-material depreciation ($50) that was applied in calculating ACV. It is unclear why interest would be due on an ACV payment that was overstated, which became apparent only after the actual replacement cost proved to be less than the estimated replacement cost.

67. I reviewed several claims in the Reviewed Sample where the RCV was overstated, which resulted in an ACV overpayment.[72] In some claims the overpayment may have exceeded the amount of non-material depreciation that was applied to the ACV payment. Claim number 35-1104-P70[73] is an example where the claim file documentation shows that the actual repair costs were less than the estimated repair costs in the Xactimate estimate. For this claim, a State Farm representative created an Xactimate estimate for roofing and interior repairs with an estimated RCV of $15,082.13, depreciation of $6,024.59, and a net ACV payment of $6,526.54.[74] An initial ACV payment was sent to the policyholder based on this estimate. The claim file contains a signed contractor estimate for the roof repairs that shows the actual cost to repair was $11,000,[75] which was less than the RCV for the roof which was $14,215.19.[76] The policyholder was paid RCBs based on the lower contractor amount.[77] Based on the actual cost to repair, the estimated cost to repair the roof in the Xactimate estimate was overstated by $3,215.19, which means that the policyholder also received an overstated ACV payment for the roof. The amount of the overpayment may have been more than the amount of non-material depreciation applied to the ACV payment for the roof.

---

[72] For example, claim nos. 35-0634-3N7, 35-1104-P70, and 35-9X17-955.

[73] SFCRANFIELD00012902 – SFCRANFIELD00013226.

[74] SFCRANFIELD00013110.

[75] SFCRANFIELD00012980.

[76] SFCRANFIELD00013115.

[77] SFCRANFIELD00012913.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

**Partial replacement costs subsequently paid**

68. There were 27 claims (or 18%) in the Reviewed Sample where the policyholder was paid RCBs for some repair tasks after an initial ACV payment. Our claim file review process captured information necessary to compare the actual repair costs paid by State Farm to the estimated RCV in the Xactimate estimate contained in the claim file. Here, too, the actual costs incurred are frequently different from the estimated costs – 78% of the time:

| Claim Category | Count | % of Claims |
|---|---|---|
| Partial replacement cost benefits subsequently paid | | |
| Actual Repair Cost > RCV in Xactimate estimate | 17 | 63% |
| Actual Repair Cost = RCV in Xactimate estimate | 6 | 22% |
| Actual Repair Cost < RCV in Xactimate estimate | 4 | 15% |
| Total | 27 | 100% |

69. The amount of the RCB payments (the payments in excess of the initial ACV payment) may be greater than, less than, or the same as the amount of depreciation applied to the insured's initial payment. Further, for some claims the Xactimate estimate was not updated to reflect the actual repair costs that were subsequently paid to the policyholder. In other words, the last uploaded Xactimate estimate (and accompanying .ESX file that Mr. Johnson intends to use for his analysis), show depreciation remaining for some repairs where the policyholder received the full actual repair costs.

70. The policyholders in these 27 claims received, on average, 93% of their repair costs available. This is because partial RCBs claimed often related to large dollar repair items, such as a roof. Policyholders who claimed partial RCBs apparently understood the process and would have strong incentive to claim additional RCBs to complete any remaining repairs if the ACV payment was not sufficient to cover the cost of those repairs. These facts suggest that for these claims, the total payments received may well have been sufficient to complete the remaining repairs. Again, since policyholders would not have to submit records showing incurred repair costs for items they did *not* claim RCBs for, it is not possible to determine conclusively whether policyholders who received payment for partial RCBs completed the remaining repairs or were paid

**Confidential and Proprietary - Produced Pursuant to Protective Order**

sufficient funds to do so without gathering additional information not contained in the claim files.

71. There is no systematic way to identify claims where the policyholder was paid partial RCBs and determine which items remain paid on an ACV basis. That is because one cannot easily determine whether a claim with total payments falling between the ACV and RCV figures (or even one where the total payments were above the RCV figure) is one in which the policyholder received replacement cost benefits for *every* repair initially paid on an ACV basis (e.g. the actual cost for all repairs was less than the estimated RCV for those repairs and there would be no remaining non-material depreciation) or just a portion of those repairs. In these claim handling scenarios Mr. Johnson could not rely on the Data Report or the data from the Xactimate estimate (saved in an .ESX file) to determine the amount of non-material depreciation that was still "withheld" and/or the timing of any previous or current amounts that were withheld. To illustrate, the Data Report for claim number 35-915D-378 lists the following:

| Claim Number | Payment Date | Payment Amount | Draft remark |
|---|---|---|---|
| 35915D378 | 11/03/2016 | $392.90 | Additional supplement for minor wind repair and missing steep charges on original estimate |
| 35915D378 | 05/31/2017 | $4,635.57 | roofing benefits |
| | Total | $5,028.47 | |

| CLAIM_NUMBER | REPLACEMENT_COST_VALUE | ACTUAL_CASH_VALUE | TOTAL_DEPRECIATION | NON_MATERIAL_DEPRECIATION | O_AND_P_DEPRECIATION | Cov. A Deductible |
|---|---|---|---|---|---|---|
| 35915D378 | $6,932.40 | $3,849.35 | $3,083.05 | $1,737.93 | $0.00 | $1,500.00 |

72. The Data Report shows that the payments totaling $5,028.47 are less than the REPLACEMENT_COST_VALUE less Cov. A Deductible, which is $5,432.40. After a detailed review of the claim file, I was able to determine that the second payment of $4,635.57 was to reimburse the policyholder for additional repairs costs after submitting a signed contractor proposal for a full roof replacement. There were other repair tasks in the Xactimate estimate where RCBs had not been claimed. In this example, the last uploaded Xactimate estimate in the Data Report was not updated for the payment of RCBs for the roof and therefore the NON MATERIAL_DEPRECIATION listed does not represent an accurate amount of depreciation that can be recovered by the policyholder.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

73. These claims further illustrate why individualized review of claim files, and in some cases review of information that State Farm does not have in its possession, is required to understand how each claim was ultimately handled.

### ACV Payment Only

74. A total of 71 claims (or 48%) in the Reviewed Sample fell into the "ACV payment only" category. These claims relate to losses where the policyholder received an initial ACV payment, or multiple ACV payments as a result of a reinspection or additional damages being identified, and did not claim RCBs for additional repair costs.[78]

75. Mr. Johnson used four example claims in his report, each of which involved the situation where the policyholder received a single payment that was equal to the ACV (less deductible) in the Data Report. In the Reviewed Sample, many of the claims in this category were not as straightforward as Mr. Johnson's examples. Of the 71 claims I identified where the policyholder only received an ACV payment, in 25 of those claims (or 35%), the payments did not equal the ACV (less deductible) in the Data Report. In addition, I identified one claim where the payments *did* equal the ACV (less deductible) in the Data Report but based on my claim file review I discovered that the payments were equal to the actual repair costs incurred by the policyholder (this claim has been categorized as receiving full replacement costs benefits and is discussed in detail on page 55).[79] I was only able to identify and correctly categorize these claims after a detailed, time-consuming review of each claim file.

76. Further, Mr. Johnson's approach does not account for policyholders who received only an ACV payment (or payments) and may have been able to use their payments to complete all repairs or a portion of the repairs. In fact, the Reviewed Sample included one such claim where the contractor documentation demonstrated that the ACV payment was sufficient to complete some of the repairs.[80] There is no systematic way to identify these

---

[78] One of these claims had an ACV only policy.

[79] Claim no. 35-8K82-243.

[80] Claim no. 35-9J58-288.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

types of claims, and instead, a detailed review of the claim file (including claim notes and repair documentation, if available) and possibly obtaining information that is outside of State Farm's possession may be necessary.

77. Because insureds are not required to submit any repair-related documentation unless they are claiming RCBs, it is often not possible to determine if the policyholders completed the repairs, and if so, the cost of those repairs, without gathering additional information in the possession of only the policyholder and/or their contractor(s) and/or inspecting the properties. I noted a number of instances in "ACV payment only" claims where the policyholder had a contractor on site during the inspection,[81] where the policyholders indicated they would perform the repairs themselves,[82] or where the policyholders inquired about what was required to receive payment for replacement costs.[83] Further, some "ACV payment only" claims contain evidence that the policyholder *does* have repair documentation that he or she did not submit to State Farm. For example, the final claim notes for Claim 35-922M-106 state that the policyholder contacted State Farm saying they "sent in [a] contractor estimate and the work was complete." State Farm advised the policyholder that they had not received the contractor estimate and asked them to re-submit it for review.[84] The policyholder never re-submitted the contractor estimate to State Farm so no additional payment was released, and the claim was closed.[85] It is possible the ACV was sufficient for the actual repair costs, and that could explain why the policyholder didn't re-send the necessary documentation. For this policyholder, and others who may have completed repairs without submitting repair-related documentation, the only way to determine whether the policyholder completed the repairs to their property is to inspect the property and/or to gather repair-related documentation from the policyholder and/or their contractor(s).

---

[81] For example, claim nos. 35-1245-3S1, 35-2975-K89, 35-6T15-515, 35-922M-106, and 35-721W-306.

[82] For example, claim nos. 35-6S56-505, 35-7Z10-784, 35-6S63-845, and 35-1011-0Q7.

[83] For example, claim nos. 35-922M-106 and 35-9W57-479.

[84] SFCRANFIELD00042490.

[85] *Id.*

**Confidential and Proprietary - Produced Pursuant to Protective Order**

### Results of Claim File Review

78. My team's review of the 149 sampled claim files found claims where the remaining recoverable depreciation was less than what is shown in last uploaded Xactimate estimate in the Data Report.[86] Specifically, there were 45 claims (or 30%) in the Reviewed Sample that had no recoverable depreciation remaining (and therefore no recoverable non-material depreciation remaining), either because the policyholders never received a payment with depreciation applied, they were paid up to the applicable policy limit, or because the last uploaded Xactimate estimate was not updated to show that the policyholder was paid full replacement cost benefits.[87] Yet the Data Report for all of these claims listed remaining recoverable depreciation. In addition, there were 10 claims (or 7%) in the Reviewed Sample where the amount of recoverable depreciation remaining was greater than $0 but again was less than what is listed in the Data Report (and therefore the remaining non-material depreciation would also be less). This demonstrates that there are no "data points" (in Mr. Johnson's vernacular) that can be used to accurately identify policyholders who had non-material depreciation "withheld" from a payment, or the amount and timing of that "withholding".

79. My review and analysis of the Reviewed Sample shows that it is not possible to determine, without a detailed review of policyholder's claim file and potentially information that is outside of State Farm's possession, which asserted class members (if any) could show they incurred out-of-pocket costs as a result of State Farm's practice (or even whether they received a claim payment from State Farm where depreciation for non-materials was in fact applied).

---

[86] There was also one claim (claim no. 35-8K65-823) where my review determined the amount of remaining recoverable depreciation was <u>more</u> than what is shown in the Data Report. SFCRANFIELD00035990 – SFCRANFIELD00036234.

[87] The 45 claims included 12 claims that never received a payment with depreciation applied, 2 claims that were paid the applicable policy limit, and 31 claims that were paid the full cost of repairs but the Xactimate estimate was not updated to reflect $0 recoverable depreciation remaining.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

## PLAINTIFF'S APPROACH

80. I reviewed Mr. Johnson's Report and opinions regarding whether objective information exists to determine if a policyholder had non-material depreciation applied to a payment they received on their claim;[88] and, if so, how long it would take to determine the amount of non-material depreciation "still withheld" on a claim and potential interest that Plaintiff contends may be owed to some insureds.[89]

81. My team individually reviewed each claim in the Reviewed Sample and determined whether the insured received an ACV payment where depreciation was applied to non-material costs, whether the insured subsequently recovered any RCBs, what other circumstances impacted State Farm's handling of the claim, and what additional information might be needed from the insured to determine whether their payment(s) from State Farm were equal to (or more than) the actual repair costs. Mr. Johnson did not perform such an analysis. Though Mr. Johnson claims that he could determine class membership, damages, and interest in 2-3 minutes per claim, he did not do so for any claim in the Reviewed Sample and therefore has not shown that he could apply his approach accurately and reliably in a few minutes per file.[90]

82. Mr. Johnson states, "[t]here are only a select few data points needed to confirm if the claimant is a part of the defined group."[91] To demonstrate how he would use the "data points," Mr. Johnson references four claims that each had one Xactimate estimate created and a single payment to the policyholder that matched the amount of the net ACV payment in the estimate.[92] For these four claims, he states that one could "effortlessly" determine the amount of non-material depreciation applied to an ACV payment. Mr. Johnson further adds that further "data points" would be needed for "more complex claims" but he offers no explanation or examples in his report for what those data points

---

[88] Johnson Report, ¶ 3.

[89] *Id.*, ¶ 44.

[90] *Id.*, ¶ 4.

[91] *Id.*, ¶ 36.

[92] *Id.*, ¶¶ 40-43.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

would be or how he would evaluate more complicated claims. Based on my findings from the Reviewed Sample, the majority of claims do not involve a single payment that matches the amount of the net ACV payment in the estimate.[93] And even for those claims that do have these characteristics, it is not possible – and Mr. Johnson has offered no approach – to determine systematically and accurately whether policyholders who received payment for some or all repairs on an ACV basis completed repairs or were fully reimbursed for their incurred cost to repair without obtaining and reviewing records that State Farm does not have.

83. An essential step in Mr. Johnson's approach is determining the types and amounts of payments the policyholder received. Mr. Johnson claims he can use the "Draft Remarks" column in the Data Report to identify the type of payment made to the policyholder.[94] Mr. Johnson has not done any analysis of the 34,000 potentially relevant claims in the Data Report, or of the 149 claims in the Reviewed Sample, to show that the Draft Remarks can be used to reliably identify payment types. As an initial matter, for 3,314 of the claim payments identified in the Data Report, the Draft Remark is blank. Moreover, even when it has content, the Draft Remark field is not a reliable source for determining the type of payment made to a policyholder because its content is freeform and varies.

---

[93] In the Reviewed Sample, 74% of the claims did *not* involve a single payment that matched the net ACV payment.

[94] Johnson Report, ¶ 3.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

For example, from my manual review of the claim file for claim 35-6M98-285,[95] I was able to determine that the policyholder was paid an initial ACV payment on 6/14/2015. This payment was followed by two RC payments on 10/23/2015 and 11/16/2015. The nature of the payments is not evident from the Draft Remarks provided in the Data Report, as shown below.

| Claim Number | Payment Date | Payment Amount | Draft Remark | Payment Type Based on Manual Review of Claim File |
|---|---|---|---|---|
| 356M98285 | 06/14/2015 | $2,319.99 | dwelling upper front and upper rear slopes, chimney flashings | Initial ACV Payment |
| 356M98285 | 10/23/2015 | $4,527.54 | Payment for your loss - Depreciation and PWI released | RC Payment |
| 356M98285 | 11/16/2015 | $1,451.89 | supplement payment | RC Payment |

The Draft Remarks in this example, and others like it, do not contain keywords (such as "ACV", "actual cash value", "RC", or "replacement cost") that can be used in order to easily determine the nature of the payments.

84. When explaining the mechanics of how he would calculate the amount of non-material depreciation associated with claims, Mr. Johnson states that:

> "Utilizing Xactimate software and claim management software (and presuming I have been provided with a current and workable Xactimate .ESX file), I would open the .ESX file which contains all germane claim data information. Next, I would review the total amount of depreciation that was withheld from the Replacement Cost totals in the Xactimate estimates. Additionally, I would then toggle off the box labeled 'Depreciate Non-Material,' 'Depreciate Removal' and/or 'Depreciate Overhead and Profit' and then review the total amount of depreciation that was withheld from the Replacement Cost total. By taking the difference of the two [sic] depreciation figures as described above, I could easily

---

[95] SFCRANFIELD00021254 – SFCRANFIELD00021496.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

calculate the amount of non-material deprecation that was withheld within the Xactimate file." [96]

85. Mr. Johnson goes on to say that he would use the dates of the allegedly deficient claim payment or the date of the estimate (if a claim fell below the deductible) to determine the applicable dates of withholding needed to calculate interest allegedly owed.[97] Mr. Johnson says that after he calculates the amount of "withheld" non-material depreciation and determines the dates of withholding, the "calculation of interest owed for the time value of the withheld non-material depreciation is a straightforward mathematical calculation that could be accomplished for all class members' claims through a single Excel spreadsheet containing the data…"[98] Mr. Johnson has not provided an accurate or reliable approach for calculating damages with respect to non-material depreciation or interest amounts, nor has he actually attempted to calculate these figures for any of the claims in the Reviewed Sample or the broader population found in the Data Report. Because Mr. Johnson has not tested his approach for any claim, it is not possible to assess the accuracy or reliability of his approach, to identify an error rate, or to fully evaluate the time he claims it would require.

86. Notably, regarding the calculation of interest owed, Mr. Johnson says the process is so mechanical it would add "merely seconds to the time required to review each individual claim file."[99] Mr. Johnson does concede that there are "more complex claims such as multi-payment claims that will require more time."[100] When filtering the Data Report, approximately 18,000 claims have more than one payment. Multiple claims have 20 or more payments and one claim has 72 individual payments listed. Mr. Johnson does not provide an estimate of how much more time claims with multiple payments would take to review, but it would presumably take him much longer than 2-3 minutes. Moreover, Mr.

---

[96] Johnson Report, ¶ 4.

[97] *Id.*, ¶ 51.

[98] *Id.*, ¶ 52.

[99] *Id*.

[100] *Id.*, ¶ 50.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

Johnson does not appear to have built in any time for documenting the bases for his conclusions.

87. Mr. Johnson oversimplifies the extensive review required to accurately quantify policyholders who have "still withheld" non-material depreciation available for recovery, and to determine the dates of withholding to calculate any interest owed. Identifying reliable inputs needed to apply Mr. Johnson's approach will require individualized review of the claim file, including claim file notes, repair invoices, and contractor documents submitted by the insured, to arrive at the figures Mr. Johnson would then use for his calculations. Further, Mr. Johnson indicates he would work with the current .ESX file containing the last uploaded Xactimate estimate and then toggle off the non-material depreciation boxes in order to determine the amount of non-material depreciation applied to a claim. Mr. Johnson did not mention that he would have to work with multiple files for claims where the estimate, and the amount of non-material depreciation, changed over time. Finally, Mr. Johnson did not address how he would apply his approach for claims where the last uploaded Xactimate (and .ESX file) did not reflect all payments made on the claim and the known actual repair costs. As previously stated, I have seen claims where Xactimate estimates are not updated after RCBs are paid and those payments are only documented in the claim file notes or other documentation in the claim file. Finally, Mr. Johnson's approach ignores the possibility that some insureds may have completed repairs to their property for less than the amount of their ACV payment(s). Claim files very rarely contain repair documentation for insureds who did *not* submit claims for RCBs, and understanding whether policyholders who had unclaimed RCBs completed repairs will require obtaining records from the insureds and/or their contractors, and sometimes, inspecting the insureds' properties.

88. The determination of whether any policyholder incurred any out-of-pocket costs[101] as a result of State Farm's application of depreciation on non-material costs cannot be made *accurately* by relying solely on the Data Report nor can it be made *quickly* using the

---

[101] "Out-of-pocket costs" is referring to out-of-pocket costs incurred by the policyholder, resulting from State Farm's application of non-material depreciation, and exceeding the policy's required deductible payment.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

Xactimate files and claims management system as Mr. Johnson has proposed. The following points summarize the flaws with Mr. Johnson's approach:

- Mr. Johnson did not address how he would accurately identify claims where the policyholder was paid the full replacement costs up front and did not receive a payment with non-material depreciation applied or policyholders who received the applicable policy limit. Those policyholders would not be able to show any additional recoverable amounts under their policy or any out-of-pocket costs from their loss due to State Farm's practice of depreciating non-material costs when making a payment based on the estimated ACV. There are no "data points" that can be used to systematically and accurately identify all such claims.

- Mr. Johnson's approach assumes that all loaded Xactimate estimates are used for a payment and that the Xactimate estimates are always updated to reflect the most recent payment. His approach therefore does not address the time-consuming effort of reconciling payments to estimates in order to determine the basis for each payment and whether the policyholder received a payment that included non-material depreciation. Based on my review, Xactimate estimates are sometimes created and not used as the basis for a payment. In these instances, the Data Report does not reflect non-material depreciation that was actually applied to a payment. Further, when a payment is made to the policyholder for full replacement cost benefits, and nothing further is owed on a claim, a final Xactimate estimate is not always created to show that there is no recoverable depreciation remaining. Furthermore, if the RCBs were different from the estimated repair costs, which is not uncommon, it would not be clear that the payments were for full RCB and nothing further was owed on a claim.

- Assuming that State Farm's payment obligation is no more than the reasonable cost an insured has actually incurred for completed repairs, based on my review, it is not possible to determine whether policyholders who received only an ACV payment, or otherwise had unclaimed RCBs, completed repairs or were fully reimbursed for their incurred cost to repair without obtaining documentation or information that State Farm does not have in its possession.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

- Mr. Johnson indicates the Draft Remarks can be used to determine the type of payment received by policyholder. As explained on page 45, this is a freeform field that cannot be relied on to accurately determine what has been paid to the policyholder (and in any event must be individually reviewed).

- There can be other facts about the claim that must be considered to understand the amount of non-material depreciation applied to an estimated ACV payment. A full review of the claim file would be necessary to identify these outside factors, and this would take longer than the 2-3 minutes that Mr. Johnson has estimated. Examples of this would be 1) claims where the policyholder received a prior payment for the same repair, 2) claims where the salvage value was deducted from the ACV payment, 3) other claims where no payment was made for reasons other than the ACV being below the deductible.[102] In all of these scenarios, the Data Report may show more replacement cost benefits able to be claimed by the policyholder than he or she can recover.

- Some claims may have involved errors or judgment calls that would impact the sufficiency of the claim payments already received. However, Mr. Johnson's approach does not address determining whether each insured's RCV estimate was too high (and accordingly, whether their ACV payment was too high). Mr. Johnson's approach therefore assumes away an element of analysis that is necessary and important for determining whether any particular insured received sufficient payment.

89. Mr. Johnson stated that the existence of an actual cash value payment, the dates of the claim payments, the amount of non-material depreciation, whether there is still depreciation "withheld" and whether applicable policy limits have been paid "are all objective and easily determined data points." The examples below from the Reviewed Sample illustrate why this is not true and why an individualized review of claim materials, and in some cases review of information that State Farm does not have in its possession, is needed to understand how each claim was handled, whether each

---

[102] When filtering the Data Report, there are 4,705 claims with no payments; 1,294 of which show an ACV that is more than the deductible.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

policyholder received an ACV payment with non-material depreciation applied, whether each policyholder incurred any out-of-pockets costs due to State Farm's depreciation practice, and the amount and timing that non-material depreciation was "withheld" for the claim either under Mr. Johnson's approach or any alternative view the Court may adopt. The examples below further illustrate the basis for my disagreement with Mr. Johnson's estimate that the time needed to review each claim file is just 2-3 minutes on average.

### *Example 1: Full replacement cost paid initially*

90. Some policyholders receive an up-front payment for the total actual repair costs with no deduction for depreciation. This payment may be made after an Xactimate estimate was created that calculates an ACV payment with depreciation applied. These policyholders cannot be identified without an individualized review of claim files.

91. To illustrate, the Data Report for claim number 35-897F-851 lists the following:

| CLAIM_NUMBER | ESTIMATES | LAST_ESTIMATE_DATE | REPLACEMENT_COST_VALUE | ACTUAL_CASH_VALUE | NET_ACTUAL_CASH_VALUE_PAYMENT | TOTAL_DEPRECIATION | NON_MATERIAL DEPRECIATION | O_AND_P_DEPRECIATION | Cov. A Deductible |
|---|---|---|---|---|---|---|---|---|---|
| 35897F851 | 3 | 8/15/2016 5:58:59 PM | $6,263.08 | $5,673.24 | $5,673.24 | $589.84 | $111.00 | $0.00 | $2,440.00 |

| Claim Number | Payment Date | Payment Amount | Draft remark |
|---|---|---|---|
| 35897F851 | 06/21/2016 | $2,681.21 | Payment for Roto Rooter Services bill $5121.21 less policy deductible ($2440.00) = net due $ 2681.21. |
| 35897F851 | 08/16/2016 | $7,431.56 | Payment per contractor's estimate enclosed |
| | **Total** | **$10,112.77** | |

92. The Data Report for the last uploaded Xactimate estimate lists an RCV of $6,263.08, a net ACV payment of $5,673.24, and $111.00 of non-material depreciation. The Data Report similarly identifies Coverage A payments totaling $10,112.77, which is more than the RCV less the deductible. The information in the claim file (which took 37 minutes for initial review) shows that the policyholder never received a payment with a deduction for non-material (or any other) depreciation.[103]

---

[103] SFCRANFIELD000034827 - SFCRANFIELD000035082.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

- Page 71 (SFCRANFIELD00034897 and SFCRANFIELD00034902) – A contractor estimate dated 6/14/2016 was located in the claim file for mitigation repairs totaling $5,121.21. State Farm issued a payment to the policyholder for $2,681.21 (the contractor amount less deductible) on 6/21/2016 (SFCRANFIELD00034845 and SFCRANFIELD00034839).

- Page 171 (SFCRANFIELD00034997) – A State Farm representative created an Xactimate estimate on 7/12/2016 with estimated RCV of $4,695.16, depreciation of $862.26, and net ACV payment of $3,832.90. The previously incurred (and paid) mitigation costs were not included in the Xactimate estimate. There was an ACV payment made to the policyholder based on this estimate but the payment status is listed as "Stop Pay" in the Financial Information section of the claim file (SFCRANFIELD00034839) and the claim notes indicate the policyholder did not receive the payment (SFCRANFIELD00034841).

- Page 58 (SFCRANFIELD00034884 and SFCRANFIELD00034889) – A contractor estimate dated 7/26/2016 was submitted to State Farm to complete all repairs for $7,431.56. A review of the claim notes and comparison of the contractor estimate to the Xactimate estimate indicated that the contractor estimate included additional rooms and closets that were not included in the Xactimate estimate. (SFCRANFIELD00034842).

- Page 15 (SFCRANFIELD00034841) – The claim notes on 8/16/2016 indicate that State Farm reviewed the estimate with the contractor. State Farm adjusted the Xactimate estimate "to a AV+ grade carpet" which brought the RCV in the estimate closer to the contractor amount.

- Page 189 (SFCRANFIELD00035015) – The claim file included an updated Xactimate estimated dated 8/15/2016 with estimated RCV of $6,263.08, depreciation of $589.84, and net ACV of $5,673.24. The RCV in the updated Xactimate estimate is less than the contractor amount. This was the last uploaded Xactimate estimate and these figures are found in the Data Report. There was no payment to the policyholder based on this Xactimate estimate according to the claim file and the Data Report.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

- Page 13 (SFCRANFIELD00034839) – The financial summary in the claim file shows that the policyholder received a second payment on 8/16/2016 equal to the contractor estimate for $7,431.56. This payment was for all of the repair costs and therefore the policyholder never received a payment with a deduction for depreciation.

93. The Data Report contains many claims where the amount of a single payment to the policyholder did not equal the net ACV payment amount or the RCV less the deductible reflected on the Xactimate estimate. These may well be claims where the policyholder received an initial payment for full RC, but an individual review of the claim files is needed to understand the nature of the claim payments and make that determination. This is a critical inquiry because these insureds did not receive an ACV payment with non-material depreciation applied and did not incur any out-of-pocket costs as a result of State Farm's practice of depreciating non-material costs.

### *Example 2:  ACV payment sufficient to complete repairs*

94. Some insureds are able to complete some or all of their repairs for less than the amount of the ACV payment plus their deductible. It would appear that these insureds did not incur any out-of-pocket costs due to State Farm's practice of depreciating non-material costs because the payment they received from State Farm was sufficient to pay for their repairs. Further, if the actual repair cost is lower than the ACV payment, then the ACV payment (which is supposed to be the *pre-loss* value of the property) was overstated. Finally, these insureds would not be entitled to *any* recovery if the Court determines that State Farm does not owe payment above an insured's incurred cost to complete repair.

There are no "data points" to systematically identify claims where the policyholder completed some or all of their repairs for an amount less than or equal to the ACV payment plus their deductible. To illustrate, the Data Report for claim number 35-9J58-288 lists the following:

| CLAIM_ NUMBER | ESTIMATES | LAST_ESTIMATE_ DATE | REPLACEMENT_ COST_VALUE | ACTUAL_ CASH_VALUE | NET_ACTUAL_ CASH_VALUE_ PAYMENT | TOTAL_ DEPRECIATION | NON_ MATERIAL_ DEPRECIATION | O_AND_P_ DEPRECIATION | Cov. A Deductible |
|---|---|---|---|---|---|---|---|---|---|
| 359J58288 | 2 | 3/2/2017 1:58:28 PM | $7,905.49 | $6,861.89 | $228.27 | $1,043.60 | $456.50 | $173.94 | $500.00 |

**Confidential and Proprietary - Produced Pursuant to Protective Order**

| Claim Number | Payment Date | Payment Amount | Draft remark |
|---|---|---|---|
| 359J58288 | 11/03/2016 | $6,133.62 | ACV payment per SF estimate less deductible |
| 359J58288 | 03/02/2017 | $228.27 | Per State Farm Estimate- Replacement cost benefits for window replacement |
| | **Total** | $6,361.89 | |

95. The Data Report for the last uploaded Xactimate estimate lists an RCV of $7,905.49, a net ACV payment of $228.27, and $456.50 of non-material depreciation. The Data Report similarly identifies Coverage A payments totaling $6,361.89, which is equal to the ACV less deductible. Mr. Johnson may conclude based on this data that the policyholder received an ACV payment and the amount of non-material depreciation in the Data Report is "still withheld". However, a review of the claim file (which was 230 pages long and took 22 minutes to initially review)[104] shows that the actual cost for some repairs was less than the ACV paid to the policyholder and therefore they were paid the full repair costs for those items.

- Page 22 (SFCRANFIELD00045049) – The claim files notes on 11/3/2016 indicate that a State Farm representative met with the policyholder for an inspection of the damages.

- Page 176 (SFCRANFIELD00045203) – The State Farm representative created an Xactimate estimate on 11/3/2016 listing estimated RCV of $7,905.49, depreciation of $1,059.87, and a net ACV payment of $6,133.62.[105]

- Page 102 (SFCRANFIELD00045129) – A copy of a signed contractor proposal dated 11/7/2016 in the amount of $3,100 is included in the claim file for repairs to the vinyl siding, underpinning, and windows. The contractor invoice listed the repair tasks but did not break out specific line item costs or the cost for materials versus labor.

- Page 18 (SFCRANFIELD00045045) – The claim notes on 3/2/2017 indicate that State Farm spoke with the policyholder and reconciled the contractor invoice to the

---

[104] SFCRANFIELD00045028 – SFCRANFIELD00045257.

[105] This policyholder has an ACV only policy (SFCRANFIELD00045049).

**Confidential and Proprietary - Produced Pursuant to Protective Order**

Xactimate estimate. State Farm explained to the policyholder that RCBs for the window repairs would be paid. The claim notes also say that the amount of siding/underpinning replacement costs are less than what was estimated for by State Farm and that the ACV payment is "adequate for replacement."

- Page 168 (SFCRANFIELD00045195) – The claim file included an updated Xactimate estimate dated 3/2/2017, which listed an ACV payment equal to the depreciation that was previously deducted from the RCV for the windows.

96. A review of the claim file revealed that the ACV payment was *more* than the actual repair costs for the vinyl siding and underpinning. Due to the contractor invoice not being itemized it is difficult to determine the amount by which the ACV payment that the policyholder received exceeded their actual repair costs. However, this amount may have been more than the non-material depreciation figure ($456.50) that is reported in the Xactware data for the last uploaded estimate.

97. It is not possible to determine whether a policyholder completed repairs for less than the amount of their ACV payment without reviewing every single claim file. Even then, because insureds who do not seek RCBs are not required to submit repair-related documentation, a file review may not yield the necessary information for evaluating whether the insured's ACV payment exceeded the cost of repairs. For those insureds who did not submit repair records, it will be necessary to contact the insureds and/or their contractors, and possibly to inspect the property to assess the scope and extent of any repairs completed.

### *Example 3:  Xactimate estimate ACV equal to actual repair costs*

98. I have seen in my review that the ACV (less deductible) in the Xactimate estimate may reflect the actual repair costs based on a contractor estimate. Policyholders that were paid the full repair costs (which equal the ACV less deductible in an Xactimate estimate) cannot be identified without an individualized review of claim files.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

To illustrate, the Data Report for claim 35-8K82-243 lists the following:

| CLAIM_NUMBER | ESTIMATES | LAST_ESTIMATE_DATE | REPLACEMENT_COST_VALUE | ACTUAL_CASH_VALUE | NET_ACTUAL_CASH_VALUE_PAYMENT | TOTAL_DEPRECIATION | NON_MATERIAL DEPRECIATION | O_AND_P_DEPRECIATION | Cov. A Deductible |
|---|---|---|---|---|---|---|---|---|---|
| 358K82243 | 2 | 6/7/2016 1:39:11 PM | $23,909.51 | $21,827.93 | $19,562.93 | $2,081.58 | $830.80 | $336.54 | $2,265.00 |

| Claim Number | Payment Date | Payment Amount | Draft remark |
|---|---|---|---|
| 358K82243 | 06/03/2016 | $17,825.40 | |
| 358K82243 | 06/07/2016 | $1,737.53 | |
| | **Total** | $19,562.93 | |

99. The Data Report for the last uploaded Xactimate estimate lists an RCV of $23,909.51, a net ACV payment of $19,562.93, and $830.80 of non-material depreciation. The Data Report similarly identifies Coverage A payments totaling $19,562.93 with no draft remarks indicating the nature of the payments. Although the "data points" for this claim indicate that the policyholder received payments equal to the ACV (less deductible) the information in the claim file (which was 178 pages long and took approximately 25 minutes for initial review)[106] shows that the policyholder received a combination ACV/partial RC payment initially and then received full RCBs based on a contractor estimate that was less than the estimated RCV in the Xactimate estimate.

- Page 17 (SFCRANFIELD00036251) – The claim notes dated 4/21/2016 indicate that the policyholder had a contractor inspect the damages before State Farm had done an inspection.

- Page 46 (SFCRANFIELD00036280 and SFCRANFIELD00036287) – An estimate from contractor Richland Renovating dated 4/28/2016 was located in the claim file for repairs totaling $21,827.70.

- Page 71 (SFCRANFIELD00036305) – A State Farm representative created an Xactimate estimate on 5/2/2016 with an estimated RCV of $23,909.51, depreciation of $3,819.11, and Net ACV of $17,825.40. The estimate included a line item for cabinetry that was based on a contractor amount and did not have any depreciation applied but other items in the estimate did have depreciation applied. A check was

---

[106] SFCRANFIELD00036235– SFCRANFIELD00036412.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

issued to the policyholder and the contractor in the amount of the Net ACV in the Xactimate estimate. A review of the estimate shows that it was for the same scope as the repairs in the estimate from Richland Renovating dated 4/82/2016 but the estimated cost for many items was different.

- Page 14 (SFCRANFIELD00036248) – The claim notes on 6/3/2016 indicate that State Farm spoke to the insured because the initial payment for $17,825.40 had been issued but never received by policyholder. The insured and State Farm agreed that there should be a stop pay on the initial check and it should be reissued for the same amount to the contractor only. This was confirmed by the financial summary on page 12 of the claim file (SFCRANFIELD00036246).

- Page 14 (SFCRANFIELD00036248) – The claim notes on 6/7/2016 indicate that State Farm reviewed the Xactimate estimate with the contractor and the contractor noted he was still due payment of $1,700. The State Farm representative said the Xactimate was revised and a supplemental payment of $1,737.53 was sent to the contractor. This was confirmed by the financial summary on page 12 of the claim file (SFCRANFIELD00036246).

- Page 84 (SFCRANFIELD00036318) – State Farm revised the Xactimate estimate on 6/7/2018. The revised estimate has an estimate RCV of $23,909.51 and ACV of $19,562.93. This was the last uploaded Xactimate estimate found in the Data Report. The ACV amount on the Xactimate estimate is equal to the estimate from Richland Renovating less the policyholders deductible ($21,827.70 - $2,265.00) which was for full repair costs and is the amount of the two payments sent directly to Richland Renovating.

100.     In this example, the Data Report shows the total payments are equal to the Net ACV. Presumably Mr. Johnson would interpret this to mean that the policyholder had non-material depreciation "still withheld" equal to the amount listed in the Data Report. However, a review of the claim file determined that the contractor directly received payment for the full repair costs. This policyholder never received a payment that had non-material depreciation applied as all payments were sent directly to the contractor.

Confidential and Proprietary - Produced Pursuant to Protective Order

Further, this is another example of the last uploaded Xactimate estimate (and corresponding .ESX file) that Mr. Johnson intends to use that purports to show depreciation withheld even though the total actual repair costs were paid.

### Example 4:  Full policy limit paid

101.     Plaintiff has defined the putative class to exclude insured's who received their full amount of insurance (i.e. policy limit).[107] The different policy limits (dwelling limit, dwelling extension limit, BUSD limit) are easily identifiable in the claim file and Data Report. However, I have not seen any "data points" in my review to quickly and accurately determine which limit is applicable for a claim without reading the claim file to understand the nature of the damages. Further, I have reviewed claims where the total payment(s) to the policyholder do not equal any of the provided policy limits even though the policyholder was paid the applicable limit. In those circumstances, the policyholders did not receive an ACV payment with non-material depreciation applied and did not incur any out-of-pocket costs as a result of State Farm's practice of depreciating non-material costs. Since there is no accurate way to determine what policy limit is applicable, an individual claim by claim review would be necessary to identify those policyholders that cannot recover any additional amounts under their policies.

102.     For example, the Data Report for claim 35-643L-299 shows the following:

| CLAIM_NUMBER | ESTIMATES | LAST_ESTIMATE_DATE | REPLACEMENT_COST_VALUE | ACTUAL_CASH_VALUE | NET_ACTUAL_CASH_VALUE_PAYMENT | TOTAL_DEPRECIATION | NON_MATERIAL_DEPRECIATION | O_AND_P_DEPRECIATION |
|---|---|---|---|---|---|---|---|---|
| 35643L299 | 1 | 4/30/2015 1:46:15 PM | $9,635.53 | $7,243.45 | $6,243.45 | $2,392.08 | $1,341.27 | $398.66 |

| Cov. A Dwelling Limit | Cov. A Dwelling Extension Limit | Cov. A BUSD Limit | Cov. A Deductible |
|---|---|---|---|
| $158,340.00 | $15,834.00 | $10,000.00 | $1,000.00 |

| Claim Number | Payment Date | Payment Amount | Draft remark |
|---|---|---|---|
| 35643L299 | 05/13/2015 | $10,500.00 | |

103.     The Data Report for the last uploaded Xactimate estimate lists an RCV of $9,635.53, a net ACV payment of $6,243.45, and $$1,341.27 of non-material depreciation. The Data Report similarly identifies Coverage A payments totaling

---

[107] Johnson Report, ¶ 2.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

$10,500.00. The draft remark accompanying the payment, which Mr. Johnson indicates he would rely for his analysis, is blank and does not provide any additional information on how the claim was handled. This claim had a dwelling limit of $158,340.00, a dwelling extension limit of $15,834.00 and a BUSD limit of $10,000. A review of the claim file (which was 117 pages long and took 15 minutes to initially review)[108] shows that the policyholder's claim was for the back-up of their sewer and that they received one payment for their BUSD policy limit plus an additional $500 for mitigation:

- Page 89 (SFCRANFIELD00016799) – A State Farm representative created an Xactimate estimate on 4/30/2015 showing estimated RCV of $9,635.53, depreciation of $2,392.08, and net ACV payment of $6,243.45. No payment was made to the policyholder based on this estimate.

- Page 44 (SFCRANFIELD00016754 and SFCRANFIELD00016758) – A copy of a mitigation invoice dated 5/4/2015 from Paramount Restoration for $2,629.63 is included in the file for mitigation tasks completed. The mitigation tasks were not included in the initial State Farm estimate created on 4/30/2015.

- Page 48 (SFCRANFIELD00016765) – A separate estimate from Paramount Restoration for the Basement repairs only was also in the claim file for $2,692.17. The State Farm estimate included estimated RCV for the basement repairs totaling $5,379.36 and repairs for other rooms.

- Pages 13 and 14 (SFCRANFIELD00016723 - 16724) – The claim notes on 5/0/2015 confirm that State Farm reviewed the repair estimate from Paramount and that State Farm's estimate had a large scope of repairs. The claim notes on 5/11/2015 and 5/13/2015 indicate the mitigation invoice the claim is now above the policyholder's $10,000 BUSD limit. State Farm issued a payment for the $10,500 for the policy endorsement limits for water mitigation and repairs.

---

[108] SFCRANFIELD00016711 – SFCRANFIELD00016827.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

104. A review of this claim file reveals that the policyholder received an initial payment in an amount equal to their applicable policy limit and therefore did not incur any out-of-pocket costs as a result of State Farm's practice of depreciating non-material costs. An individual claim by claim review would be necessary to identify this claim and others like it.

### Example 5:  Policy limit reached if RCBs claimed

105. Mr. Johnson indicated that once he determined the amount of non-material depreciation applied to a claim he would confirm that payment of the "withheld" non-material depreciation would not cause the policyholder to receive more than the applicable policy limits.[109] As explained in Example 4 on page 58, there is no method for Mr. Johnson to accurately identify which limit is applicable on single claim without a review of the claim file. For example, the Data Report for claim 35-753Q-400 shows the following:

| CLAIM_NUMBER | ESTIMATES | LAST_ESTIMATE_DATE | REPLACEMENT_COST_VALUE | ACTUAL_CASH_VALUE | NET_ACTUAL_CASH_VALUE_PAYMENT | TOTAL_DEPRECIATION | NON_MATERIAL_DEPRECIATION | O_AND_P_DEPRECIATION |
|---|---|---|---|---|---|---|---|---|
| 35753Q400 | 2 | 11/9/2015 12:53:29 PM | $12,072.23 | $10,738.27 | $6,765.12 | $1,333.96 | $684.40 | $222.30 |

| Cov. A Dwelling Limit | Cov. A Dwelling Extension Limit | Cov. A BUSD Limit | Cov. A Deductible |
|---|---|---|---|
| $108,648.00 | $10,865.00 | $10,000.00 | $1,000.00 |

| Claim Number | Payment Date | Payment Amount | Draft remark |
|---|---|---|---|
| 35753Q400 | 10/29/2015 | $2,973.15 | Basement water damage |
| 35753Q400 | 11/10/2015 | $6,765.12 | water mitigation |
| | **Total** | **$9,738.27** | |

106. The Data Report for the last uploaded Xactimate estimate lists an RCV of $12,072.23, a net ACV payment of $6,765.12, and $684.40 of non-material depreciation. The Data Report similarly identifies Coverage A payments totaling $9,738.27, which is equal to the ACV less deductible. The draft remarks do not clearly define the nature of the payments. This claim had a dwelling limit of $108,648.00, a dwelling extension limit of $10,865.00 and a BUSD limit of $10,000. A review of the claim file (which was 257

---

[109] Johnson Report, ¶ 4.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

pages long and took 16 minutes to initially review)[110] shows that the policyholder's claim was for the back-up of their sewer and that the estimated RCV was not fully recoverable due to the $10,000 BUSD policy limit:

- Page 199 (SFCRANFIELD00029716) – A State Farm representative created an Xactimate estimate on 10/29/2015 showing estimated RCV of $5,307.11, depreciation of $1,333.96, and net ACV payment of $2,973.15. An initial ACV payment was made to the policyholder based on this estimate.

- Page 79 (SFCRANFIELD00029596) – A copy of a ServiceMaster Mitigation Summary Report for $6,765.12 is included in the claim file for mitigation tasks completed after the initial State Farm inspection. The mitigation tasks were not included in the initial State Farm Xactimate estimate created on 10/29/2015.

- Page 191 (SFCRANFIELD00029708) – An updated Xactimate estimate was created on 11/9/2015 showing an estimate RCV of $12,072.23, depreciation of $1,333.96, and a net ACV payment of $6,765.12. The estimate was updated to include the mitigation amount per the ServiceMaster summary. With the addition of the mitigation cost the RCV of the estimate exceeded the BUSD policy limit and if RCBs are claimed the amount available would only be up to the limit ($261.73 of the $1,333.96 of total depreciation).

- Page 16 (SFCRANFIELD00029533) – The claim notes on 11/9/2015 indicate that the ACV and mitigation payments made to the policyholder were below the $10,000 BUSD limit, but that if the policyholder were to claim RCBs they made need to absorb the deductible.

107.     A review of this claim reveals that due to the BUSD policy limit the RCBs available to the policyholder are less than what is shown in the Data Report. While it may be possible to determine if claiming RCBs will cause a claim to exceed the dwelling limit, it is not possible to determine from the Data Report alone whether a claim will

---

[110] SFCRANFIELD00029518 – SFCRANFIELD00029774.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

reach the dwelling extension or BUSD limits. One must review the claim file for that information. Using the non-material depreciation amount in the Data Report overstates the actual depreciation that is recoverable and that Mr. Johnson would conclude was still "withheld."

### *Example 6:  ACV overpayment due to an error*

108.　　　In my analysis of the Reviewed Sample, I noted claims where the documentation suggested an error that resulted in an overpayment to the policyholder. Any such errors may need to be considered when determining the amount of non-material depreciation unpaid or interest owed. An individual review of each claim file is necessary to understand whether the policyholder received an overpayment.

109.　　　As an example, the Data Report for claim 35-0352-G98 shows the following:

| CLAIM_ NUMBER | ESTIMATES | LAST_ESTIMATE_ DATE | REPLACEMENT_ COST_VALUE | ACTUAL_ CASH_VALUE | NET_ACTUAL_ CASH_VALUE_ PAYMENT | TOTAL_ DEPRECIATION | NON_ MATERIAL_ DEPRECIATION | O_AND_P_ DEPRECIATION | Cov. A Deductible |
|---|---|---|---|---|---|---|---|---|---|
| 350352G98 | 5 | 5/5/2020 6:41:24 AM | $16,369.30 | $6,581.97 | $5,581.97 | $9,787.33 | $4,359.92 | $0.00 | $1,000.00 |

| Claim Number | Payment Date | Payment Amount | Draft remark |
|---|---|---|---|
| 350352G98 | 06/13/2017 | $6,592.87 | Pay per State Farm Estimate  Minus Depreciation and Deductible |
| 350352G98 | 06/13/2017 | $856.90 | Pay per State Farm Estimate  Minus Depreciation and Deductible |
| 350352G98 | 04/04/2019 | $7,966.57 | Payment for depreciation on the roof, elevations & added supplement item(pricelist update). |
| | **Total** | **$15,416.34** | |

110.　　　The Data Report for the last uploaded Xactimate estimate lists an RCV of $16,369.30, a net ACV payment of $5,581.97, and $4,359.92 of non-material depreciation. The Data Report similarly identifies Coverage A payments totaling $15,416.34, which is more than the RCV less deductible. A review of the claim file (which was 575 pages long and took approximately 1 hour and 22 minutes for initial review)[111] shows the policyholder's initial ACV payment was overpaid, which was noted in the claim notes:

---

[111] SFCRANFIELD00009189 – SFCRANFIELD00009763.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

- Page 442 (SFCRANFIELD00009630) – A State Farm representative created an Xactimate estimate on 6/13/2017 for the dwelling and dwelling extension showing combined estimated RCV of $26,644.58, depreciation of $18,194.81, and Net ACV of $7,449.77. An ACV payment was made to the policyholder based on this estimate (which is shown as the first two payments in the Data Report).

- Page 16 (SFCRANFIELD00009204 - 9205) – The claim notes on 11/15/2018 indicate that the policyholder reached out to State Farm more than one year after receiving their Xactimate estimate and ACV payment. The policyholder mentioned their concern for the R&R window screen line item in the estimate that had a quantity of 267 and an RCV of $10,821.35. State Farm reviewed the Xactimate estimate and determined that the line item needed to be revised.

- Page 419 (SFCRANFIELD00009607 and SFCRANFIELD00009612) – After speaking with the policyholder State Farm revised the Xactimate estimate on 11/15/2018. The line item for R&R window screen was updated from having a quantity of 267 and an ACV of $2,164.27 to having a quantity of 1 and an ACV of $8.10.

- Page 13 (SFCRANFIELD00009201) – A review of the claim notes indicate that the second payment to the policyholder on 4/4/2019 for $7,966.57 was for their full repair costs based on a reconciliation between the State Farm Xactimate estimate and a signed contract for the repairs. The policyholder was paid their full repair costs.

111.     In this example, the policyholder received an ACV payment that was overstated by $2,156.17 for the window screens. The policyholder had the benefit of this overpayment for nearly two years (the time between the initial ACV payment and RC payment). There is no remaining "withheld" depreciation for this claim but I presume Mr. Johnson would calculate interest for the two year time period. I understand from State Farm's position in the litigation that it contends that potential overstatements may equal or exceed any depreciation for labor and other non-material costs that was applied when making a payment based on the estimated ACV.[112] A manual claim file review is

---

[112] State Farm's Answer, Additional Defenses, and Jury Demand, dated June 24, 2020, at pp. 18-21.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

necessary to determine if there were any payment errors in the claim files and how those errors impact the amount of non-material depreciation applied and the calculation of any potential interest.

## CONCLUSION

112.     This report outlines the opinions I have formed to date in this matter. If additional information is provided for my review, I reserve the right to supplement these opinions.

Respectfully submitted,

Heather L. Albright

## Appendix A

# Heather Albright, CFE
Director



---



**Chicago, IL USA**
**Office:** +1.312.237.4843
**Mobile:** +1.773.848.8634
halbright@stout.com

### Education

M.B.A, Accounting and Finance (2008)
Northwestern University

B.S., Finance (2001)
Indiana University

### Designations

Certified Fraud Examiner (CFE) (2013)

### Practice Areas

Investigations
Complex Business Litigation

Heather Albright is a Director in the Disputes, Compliance, & Investigations group at Stout. She has over 18 years of experience providing forensic accounting assistance and expert witness services in commercial litigations, class certification matters, and fraud and white collar investigations.

Ms. Albright's experience spans a range of industries including financial services, insurance, healthcare, oil & gas, and manufacturing. Her specialties include analyzing economic damages and lost profits, complex data analytics, and other forensic accounting services. Much of Ms. Albright's work has included the collection and analysis of extremely large data sets, which is often used for expert testimony.

Further, Ms. Albright has assisted counsel throughought all phases of the litigation process and has testified as an expert witness. She has also provided operational consulting services to clients who wish to improve processes and internal controls.

Prior to joining Stout, Ms. Albright was a Director at Natoma Partners and a Director at Huron Consulting Group and a consultant at Arthur Andersen.

### Professional and Civic Memberships

- Association of Certified Fraud Examiners
- HFS Chicago Scholars - Board of Directors Executive Committee

---

Investment Banking | Valuation Advisory | Dispute Consulting | Management Consulting

stout.com

**Heather Albright, CFE**
Director

Appendix A



---

## Select Experience

- Engaged by outside counsel for a company involved in a False Claims Act investigation. Led a forensic investigation into allegations that the company fraudulently sent duplicate healthcare claims to a government entity and was overpaid. Our work included analyzing healthcare claims in order to determine the amount and cause of any overpayment by the government. We were also tasked with investigating other errors in the company's claim processing and creating improved controls. To analyze the claims we created a database to warehouse over five terabytes of claims data and a series of complex SQL code that compared claim attributes. The purpose of the analysis was to identify errors in claims processing and the cause of those errors to defend against False Claims Act allegations.

- Retained as an expert witness by counsel representing a large personal lines insurance company involved in several federal multi-state class action defense matters. Work included reviewing, mining, and analyzing information from hundreds of structural damage claim files in order to assess the commonality and typicality of the claims in response to plaintiffs' class action certification motions. Also provided background and context for the application of an accounting concept that was at issue in relation to the manner in which the claims were settled.

- Hired by outside counsel representing a district in a dispute with developers of oil and gas drilling sites regarding their valuation of depreciable property used for the payment of property taxes. Work included a detailed review of the developers accounting records, chart of accounts and vendor invoices in order to determine if the correct labor and material costs were included in the cost basis of the property. Presented results of forensic analysis to the State Assessment Review Board.

- Led a team in a multi-year engagement for a Fortune 500 U.S. truck manufacturer in the course of an accounting restatement. Assisted the restatement efforts to reconstruct and document the fixed assets accounting for a six year period. The scope of the work covered all aspects of fixed assets accounting, including in-service dates, capitalized interest, and book and tax depreciation expense. Effort included the design and development of a SQL database tool to calculate the depreciation of all fixed assets over the restatement period.

- Provided forensic accounting services and complex data analytics for counsel who represented a former executive of a Futures Commissions Merchant ("FCM") accused of violating CFTC regulations relating to the safeguarding and investment of customer funds. Work included: 1) gaining an overall understanding of the FCM's systems and process used to generate and support the daily segregated and secured reports filed with the regulators; 2) retrieving, querying, and analyzing historical financial and operational data stored in over 200 SQL tables; 3) identifying transfers to and from customer segregated and secured accounts as well as transactions involving its broker dealer entity; and, 4) analyzing bank statement and general ledger detail as well as various operating records to identify the timing and magnitude of certain transactions. Our analysis was a core component of expert reports prepared by a retired FCM operations director and in connection with the cross examination of opposing experts.

- Assisted in preparing an expert report the Joint Defense Team for multiple pharmaceutical manufacturers related to class action litigation matters associated with pharmaceutical pricing and reimbursement issues. Work included extensive analysis of manufacturer, wholesaler, pharmacy benefit manager, provider and health insurance data involved in the distribution and reimbursement of pharmaceutical drugs.

---

**Heather Albright, CFE**
Director

Appendix A



- Engaged as an expert witness by counsel for an SEC registered securities broker-dealer ("defendant") accused of violating certain securities trading practices over a five-year period. The plaintiffs alleged that the defendant did not fulfill its duty of "best execution" as broker-dealer, by not executing orders promptly and executing proprietary trades for the specialists' own accounts ahead or instead of the plaintiffs' orders, in addition to handling orders in violation of the SEC diligence and priority rules. Work included the data collection, management and analysis of over 100 terabytes of data provided by two securities exchanges, the Options Price Reporting Authority (OPRA) and the plaintiffs' proprietary systems in order to identify exculpatory evidence.

- Hired by investigative counsel of a live entertainment production company to investigate whistleblower allegations and alleged Foreign Corrupt Practices Act ("FCPA") violations. Work included the review and analysis of the Company's domestic and foreign banking and accounting records. Participated in numerous interviews of Company personnel, contractors and foreign officials, which were led by the investigators. We reviewed voluminous iterations of project budgets and transactional data and analyzed the project's overall net cash flows. In addition, we reviewed emails, recovered text messages and other related documents to understand the  internal discussions surrounding certain cash disbursements and events.

- Assisted with the preparation of an expert report to evaluate damages to an insurance broker resulting from a breach of non-solicit and non-compete terms of an employment contract. Work included a discounted cash flow analysis to quantify lost profits from departed customers and a lost merger opportunity.

- Assisted in preparing an expert report to evaluate damages to a Fortune 100 chemical company arising from a leak at a storage facility and verified claims made by the other party to the litigation. Work included the recreation of company owned financial models to determine potential lost profits and a review of industry transactions to identify comparables for valuing storage.

- Supported an international rail operator with a dispute involving the exchange of rail traffic with another major rail operator in Latin America. Work included analyzing a database of all shipping records over a seven year period, as well as examining various accounting records to determine the accuracy of both the client's payables and receivables. Also assisted the client in identifying control weaknesses with data collection and billing processes.

- Assisted with the preparation of an expert report to support a damage analysis calculating lost profits and reasonable royalties resulting from a patent infringement for a manufacturer of thermal barcode printers.

- Provided various financial and litigation consulting services to counsel of a leasing company in defense of a compensation dispute. Specifically, assisted with the calculation of the profit and loss related to various incentive compensation plans within the venture capital division and with the discovery process related to the claims.



## Heather Albright, CFE
Director

### Testimony Experience

- Annie Arnold, individually and on behalf of all other Alabama residents similarly situated v. State Farm Fire and Casualty Company, Southern District of Alabama – Northern Division, Case No. 2:17-cv-00148-TFM-C, (Deposition Testimony), February 2019.

### Publications

- Co-author: "Demystifying Data:  A Litigator's Guide to Understanding Data Analytics," Stout.com, October 3, 2018.

**Confidential and Proprietary - Produced Pursuant to Protective Order**

Cranfield v. State Farm Fire and Casualty Company                                                                                      **Appendix B**
Documents Reviewed and Considered

| Document | Bates Range |
|---|---|
| Per Curiam Opinion, filed March 23, 2020 | N/A |
| State Farm Fire and Casualty Company's Answer, Additional Defenses, and Jury Demand, filed June 24, 2020 | N/A |
| Second Amended Class Action Complaint, filed July 31, 2020 | N/A |
| State Farm Fire and Casualty Company's Responses to Plaintiff's First Set of Interrogatories, dated August 19, 2020 | N/A |
| Defendant State Farm Fire and Casualty Company's Motion to Dismiss Plaintiff's Second Amended Complaint, filed August 21, 2020 | N/A |
| Defendant State Farm Fire and Casualty Company's Motion to Strike Class Allegations, filed September 14, 2020 | N/A |
| Plaintiffs' Motion for Leave to File Third Amended Class Action Complaint to Add New Party Plaintiff, filed September 16, 2020 | N/A |
| State Farm Fire and Casualty Company's Supplement to Its Objections and Responses to Plaintiff's First Set of Interrogatories (Nos. 6-9), dated October 6, 2020 | N/A |
| Plaintiff's Brief in Opposition to Defendant's Motion to Strike Class Allegations, filed October 12, 2020 | N/A |
| Defendant State Farm Fire and Casualty Company's Reply Brief in Support of Its Motion to Strike Class Allegations, filed October 30, 2020 | N/A |
| State Farm Fire and Casualty Company's Second Supplement to Its Objections and Responses to Plaintiff's First Set of Interrogatories (Nos. 6-9), dated November 13, 2020 | N/A |
| Deposition Transcript of Donald Vinciguerra dated December 4, 2020 | N/A |
| Deposition Errata Sheet of Donald Vinciguerra signed January 6, 2021 | N/A |
| Deposition of Tyler McKitterick dated December 4, 2020 | N/A |
| Deposition Errata Sheet of Tyler McKitterick signed January 6, 2021 | N/A |
| Deposition Transcript of Tom Moss dated December 9, 2020 | N/A |
| Deposition Errata Sheet of Tom Moss signed January 29, 2021 | N/A |
| Deposition Transcript of Mark Jacoby dated January 15, 2021 | N/A |
| Deposition Transcript of Alice Sandvick dated January 28, 2021 | N/A |
| Deposition Transcript of Charles Cranfield dated January 13, 2021 | N/A |
| Expert Report of Toby Johnson | N/A |
| Toby Johnson Curriculum Vitae | N/A |
| Expert Report of Michael J. Berryman | N/A |
| Charles Cranfield's Xactimate Estimate provided by Metro Public Adjustment Inc. | METRO-0000209 - METRO-0000227 |
| Charles Cranfield State Farm Homeowners Policy No. 70-N6-7546-3 effective August 15, 2014 to August 15, 2015 | SFCRANFIELD00000001 - SFCRANFIELD00000098 |
| Charles Cranfield's State Farm claim file, Claim Number: 35-618J-796 | SFCRANFIELD00000099 - SFCRANFIELD00000431 |
| Declaration of Lisa O'Toole | SFCRANFIELD00004155 - SFCRANFIELD00004159 |
| Excel Spreadsheet Provided by State Farm | SFCRANFIELD00005461 |
| Excel Spreadsheet (Data Report) Provided by State Farm | SFCRANFIELD00005462 |
| Claim Number: 35-0032-H22 | SFCRANFIELD00005463 - SFCRANFIELD00005719 |
| Claim Number: 35-0056-J40 | SFCRANFIELD00005720 - SFCRANFIELD00006602 |
| Claim Number: 35-0058-9V1 | SFCRANFIELD00006603 - SFCRANFIELD00006762 |
| Claim Number: 35-0091-2V1 | SFCRANFIELD00006763 - SFCRANFIELD00006938 |
| Claim Number: 35-00B6-95P | SFCRANFIELD00006939 - SFCRANFIELD00007075 |
| Claim Number: 35-00G5-97V | SFCRANFIELD00007076 - SFCRANFIELD00008072 |
| Claim Number: 35-00H6-60T | SFCRANFIELD00008073 - SFCRANFIELD00008281 |
| Claim Number: 35-0121-C93 | SFCRANFIELD00008282 - SFCRANFIELD00008498 |
| Claim Number: 35-0129-8S9 | SFCRANFIELD00008499 - SFCRANFIELD00008780 |
| Claim Number: 35-0143-D24 | SFCRANFIELD00008781 - SFCRANFIELD00009063 |
| Claim Number: 35-0283-5X8 | SFCRANFIELD00009064 - SFCRANFIELD00009188 |
| Claim Number: 35-0352-G98 | SFCRANFIELD00009189 - SFCRANFIELD00009763 |
| Claim Number: 35-0415-Q80 | SFCRANFIELD00009764 - SFCRANFIELD00009866 |
| Claim Number: 35-0570-H01 | SFCRANFIELD00009867 - SFCRANFIELD00010022 |
| Claim Number: 35-0634-3N7 | SFCRANFIELD00010023 - SFCRANFIELD00010216 |
| Claim Number: 35-0693-1W2 | SFCRANFIELD00010217 - SFCRANFIELD00010422 |
| Claim Number: 35-0759-L40 | SFCRANFIELD00010423 - SFCRANFIELD00010645 |
| Claim Number: 35-0772-F08 | SFCRANFIELD00010646 - SFCRANFIELD00010937 |
| Claim Number: 35-0949-9P9 | SFCRANFIELD00010938 - SFCRANFIELD00011146 |
| Claim Number: 35-0956-7X8 | SFCRANFIELD00011147 - SFCRANFIELD00011319 |

Confidential and Proprietary - Produced Pursuant to Protective Order

Cranfield v. State Farm Fire and Casualty Company                                                           **Appendix B**
Documents Reviewed and Considered

| Document | Bates Range |
| --- | --- |
| Claim Number: 35-0964-8J4 | SFCRANFIELD00011320 - SFCRANFIELD00011561 |
| Claim Number: 35-0972-7J4 | SFCRANFIELD00011562 - SFCRANFIELD00012018 |
| Claim Number: 35-1011-0Q7 | SFCRANFIELD00012019 - SFCRANFIELD00012238 |
| Claim Number: 35-1057-0R3 | SFCRANFIELD00012239 - SFCRANFIELD00012658 |
| Claim Number: 35-1099-K75 | SFCRANFIELD00012659 - SFCRANFIELD00012901 |
| Claim Number: 35-1104-P70 | SFCRANFIELD00012902 - SFCRANFIELD00013226 |
| Claim Number: 35-1242-6X6 | SFCRANFIELD00013227 - SFCRANFIELD00013421 |
| Claim Number: 35-1245-3S1 | SFCRANFIELD00013422 - SFCRANFIELD00013631 |
| Claim Number: 35-1296-5S5 | SFCRANFIELD00013632 - SFCRANFIELD00013718 |
| Claim Number: 35-1414-8S0 | SFCRANFIELD00013719 - SFCRANFIELD00013997 |
| Claim Number: 35-1460-5R8 | SFCRANFIELD00013998 - SFCRANFIELD00014509 |
| Claim Number: 35-1478-2V0 | SFCRANFIELD00014510 - SFCRANFIELD00014782 |
| Claim Number: 35-1934-M25 | SFCRANFIELD00014783 - SFCRANFIELD0001 5075 |
| Claim Number: 35-2576-L71 | SFCRANFIELD00015076 - SFCRANFIELD00015349 |
| Claim Number: 35-2630-V95 | SFCRANFIELD00015350 - SFCRANFIELD00015481 |
| Claim Number: 35-2975-K89 | SFCRANFIELD00015482 - SFCRANFIELD00015661 |
| Claim Number: 35-3271-P83 | SFCRANFIELD00015662 - SFCRANFIELD00016002 |
| Claim Number: 35-3491-K69 | SFCRANFIELD00016003 - SFCRANFIELD00016265 |
| Claim Number: 35-5K52-551 | SFCRANFIELD00016266 - SFCRANFIELD00016501 |
| Claim Number: 35-5X70-983 | SFCRANFIELD00016502 - SFCRANFIELD00016710 |
| Claim Number: 35-643L-299 | SFCRANFIELD00016711 - SFCRANFIELD00016827 |
| Claim Number: 35-646X-383 | SFCRANFIELD00016828 - SFCRANFIELD00017172 |
| Claim Number: 35-649R-084 | SFCRANFIELD00017173 - SFCRANFIELD00017333 |
| Claim Number: 35-663S-566 | SFCRANFIELD00017334 - SFCRANFIELD00017451 |
| Claim Number: 35-665W-560 | SFCRANFIELD00017452 - SFCRANFIELD00017733 |
| Claim Number: 35-669D-824 | SFCRANFIELD00017734 - SFCRANFIELD00017993 |
| Claim Number: 35-672N-764 | SFCRANFIELD00017994 - SFCRANFIELD00018088 |
| Claim Number: 35-676W-137 | SFCRANFIELD00018089 - SFCRANFIELD00018317 |
| Claim Number: 35-676W-446 | SFCRANFIELD00018318 - SFCRANFIELD00018492 |
| Claim Number: 35-676Z-492 | SFCRANFIELD00018493 - SFCRANFIELD00018705 |
| Claim Number: 35-677R-684 | SFCRANFIELD00018706 - SFCRANFIELD00018951 |
| Claim Number: 35-677T-940 | SFCRANFIELD00018952 - SFCRANFIELD00019128 |
| Claim Number: 35-688J-404 | SFCRANFIELD00019129 - SFCRANFIELD00019299 |
| Claim Number: 35-690Q-424 | SFCRANFIELD00019300 - SFCRANFIELD00019432 |
| Claim Number: 35-691K-375 | SFCRANFIELD00019433 - SFCRANFIELD00019516 |
| Claim Number: 35-6B40-749 | SFCRANFIELD00019517 - SFCRANFIELD00019629 |
| Claim Number: 35-6F07-767 | SFCRANFIELD00019630 - SFCRANFIELD00019751 |
| Claim Number: 35-6F43-685 | SFCRANFIELD00019752 - SFCRANFIELD00020377 |
| Claim Number: 35-6F98-486 | SFCRANFIELD00020378 - SFCRANFIELD00020525 |
| Claim Number: 35-6G93-913 | SFCRANFIELD00020526 - SFCRANFIELD00020669 |
| Claim Number: 35-6J37-486 | SFCRANFIELD00020670 - SFCRANFIELD00021100 |
| Claim Number: 35-6M27-437 | SFCRANFIELD00021101 - SFCRANFIELD00021253 |
| Claim Number: 35-6M98-285 | SFCRANFIELD00021254 - SFCRANFIELD00021496 |
| Claim Number: 35-6Q50-898 | SFCRANFIELD00021497 - SFCRANFIELD00021720 |
| Claim Number: 35-6Q95-351 | SFCRANFIELD00021721 - SFCRANFIELD00021948 |
| Claim Number: 35-6R01-251 | SFCRANFIELD00021949 - SFCRANFIELD00022436 |
| Claim Number: 35-6R88-104 | SFCRANFIELD00022437 - SFCRANFIELD00022707 |
| Claim Number: 35-6S56-505 | SFCRANFIELD00022708 - SFCRANFIELD00022823 |
| Claim Number: 35-6S56-824 | SFCRANFIELD00022824 - SFCRANFIELD00023010 |
| Claim Number: 35-6S58-113 | SFCRANFIELD00023011 - SFCRANFIELD00023349 |
| Claim Number: 35-6S63-845 | SFCRANFIELD00023350 - SFCRANFIELD00023496 |
| Claim Number: 35-6T15-515 | SFCRANFIELD00023497 - SFCRANFIELD00023702 |
| Claim Number: 35-6V73-102 | SFCRANFIELD00023703 - SFCRANFIELD00023905 |
| Claim Number: 35-6W07-740 | SFCRANFIELD00023906 - SFCRANFIELD00024047 |
| Claim Number: 35-6W93-782 | SFCRANFIELD00024048 - SFCRANFIELD00024309 |
| Claim Number: 35-6Z34-404 | SFCRANFIELD00024310 - SFCRANFIELD00024856 |
| Claim Number: 35-707H-509 | SFCRANFIELD00024857 - SFCRANFIELD00025011 |
| Claim Number: 35-713K-818 | SFCRANFIELD00025012 - SFCRANFIELD00028535 |
| Claim Number: 35-718G-675 | SFCRANFIELD00028536 - SFCRANFIELD00028712 |
| Claim Number: 35-721W-306 | SFCRANFIELD00028713 - SFCRANFIELD00028853 |
| Claim Number: 35-724Q-098 | SFCRANFIELD00028854 - SFCRANFIELD00029079 |
| Claim Number: 35-731W-528 | SFCRANFIELD00029080 - SFCRANFIELD00029255 |
| Claim Number: 35-751L-086 | SFCRANFIELD00029256 - SFCRANFIELD00029517 |
| Claim Number: 35-753Q-400 | SFCRANFIELD00029518 - SFCRANFIELD00029774 |
| Claim Number: 35-799N-040 | SFCRANFIELD00029775 - SFCRANFIELD00030021 |

Confidential and Proprietary - Produced Pursuant to Protective Order

Cranfield v. State Farm Fire and Casualty Company

**Appendix B**

Documents Reviewed and Considered

| Document | Bates Range |
|---|---|
| Claim Number: 35-7D03-156 | SFCRANFIELD00030022 - SFCRANFIELD00030191 |
| Claim Number: 35-7D82-848 | SFCRANFIELD00030192 - SFCRANFIELD00030524 |
| Claim Number: 35-7F27-735 | SFCRANFIELD00030525 - SFCRANFIELD00030825 |
| Claim Number: 35-7G19-045 | SFCRANFIELD00030826 - SFCRANFIELD00030926 |
| Claim Number: 35-7J05-204 | SFCRANFIELD00030927 - SFCRANFIELD00031189 |
| Claim Number: 35-7M57-839 | SFCRANFIELD00031190 - SFCRANFIELD00031488 |
| Claim Number: 35-7S48-653 | SFCRANFIELD00031489 - SFCRANFIELD00031683 |
| Claim Number: 35-7S76-204 | SFCRANFIELD00031684 - SFCRANFIELD00031862 |
| Claim Number: 35-7V79-644 | SFCRANFIELD00031863 - SFCRANFIELD00032222 |
| Claim Number: 35-7X54-257 | SFCRANFIELD00032223 - SFCRANFIELD00032453 |
| Claim Number: 35-7Z10-784 | SFCRANFIELD00032454 - SFCRANFIELD00032798 |
| Claim Number: 35-7Z22-757 | SFCRANFIELD00032799 - SFCRANFIELD00033020 |
| Claim Number: 35-803Q-791 | SFCRANFIELD00033021 - SFCRANFIELD00033143 |
| Claim Number: 35-806R-486 | SFCRANFIELD00033144 - SFCRANFIELD00033494 |
| Claim Number: 35-841J-166 | SFCRANFIELD00033495 - SFCRANFIELD00033671 |
| Claim Number: 35-844T-534 | SFCRANFIELD00033672 - SFCRANFIELD00033863 |
| Claim Number: 35-859K-915 | SFCRANFIELD00033864 - SFCRANFIELD00034272 |
| Claim Number: 35-876N-143 | SFCRANFIELD00034273 - SFCRANFIELD00034481 |
| Claim Number: 35-880W-400 | SFCRANFIELD00034482 - SFCRANFIELD00034626 |
| Claim Number: 35-890N-116 | SFCRANFIELD00034627 - SFCRANFIELD00034826 |
| Claim Number: 35-897F-851 | SFCRANFIELD00034827 - SFCRANFIELD00035082 |
| Claim Number: 35-8B93-264 | SFCRANFIELD00035083 - SFCRANFIELD00035206 |
| Claim Number: 35-8C56-728 | SFCRANFIELD00035207 - SFCRANFIELD00035403 |
| Claim Number: 35-8D93-363 | SFCRANFIELD00035404 - SFCRANFIELD00035530 |
| Claim Number: 35-8F35-461 | SFCRANFIELD00035531 - SFCRANFIELD00035667 |
| Claim Number: 35-8J40-604 | SFCRANFIELD00035668 - SFCRANFIELD00035787 |
| Claim Number: 35-8K60-794 | SFCRANFIELD00035788 - SFCRANFIELD00035989 |
| Claim Number: 35-8K65-823 | SFCRANFIELD00035990 - SFCRANFIELD00036234 |
| Claim Number: 35-8K82-243 | SFCRANFIELD00036235 - SFCRANFIELD00036412 |
| Claim Number: 35-8L82-082 | SFCRANFIELD00036413 - SFCRANFIELD00036798 |
| Claim Number: 35-8M89-069 | SFCRANFIELD00036799 - SFCRANFIELD00037003 |
| Claim Number: 35-8S17-510 | SFCRANFIELD00037004 - SFCRANFIELD00037286 |
| Claim Number: 35-8S40-568 | SFCRANFIELD00037287 - SFCRANFIELD00037387 |
| Claim Number: 35-8V21-440 | SFCRANFIELD00037388 - SFCRANFIELD00037542 |
| Claim Number: 35-8X69-335 | SFCRANFIELD00037543 - SFCRANFIELD00037634 |
| Claim Number: 35-8Z89-360 | SFCRANFIELD00037635 - SFCRANFIELD00037758 |
| Claim Number: 35-906M-445 | SFCRANFIELD00037759 - SFCRANFIELD00041258 |
| Claim Number: 35-906N-338 | SFCRANFIELD00041259 - SFCRANFIELD00041417 |
| Claim Number: 35-913S-730 | SFCRANFIELD00041418 - SFCRANFIELD00041838 |
| Claim Number: 35-915D-378 | SFCRANFIELD00041839 - SFCRANFIELD00042183 |
| Claim Number: 35-918M-795 | SFCRANFIELD00042184 - SFCRANFIELD00042477 |
| Claim Number: 35-922M-106 | SFCRANFIELD00042478 - SFCRANFIELD00042668 |
| Claim Number: 35-935V-387 | SFCRANFIELD00042669 - SFCRANFIELD00042901 |
| Claim Number: 35-944G-500 | SFCRANFIELD00042902 - SFCRANFIELD00043193 |
| Claim Number: 35-959N-136 | SFCRANFIELD00043194 - SFCRANFIELD00043564 |
| Claim Number: 35-968W-134 | SFCRANFIELD00043565 - SFCRANFIELD00043762 |
| Claim Number: 35-979Z-373 | SFCRANFIELD00043763 - SFCRANFIELD00044174 |
| Claim Number: 35-9B81-340 | SFCRANFIELD00044175 - SFCRANFIELD00044355 |
| Claim Number: 35-9D86-560 | SFCRANFIELD00044356 - SFCRANFIELD00044611 |
| Claim Number: 35-9F38-501 | SFCRANFIELD00044612 - SFCRANFIELD00044720 |
| Claim Number: 35-9G15-108 | SFCRANFIELD00044721 - SFCRANFIELD00044854 |
| Claim Number: 35-9J17-885 | SFCRANFIELD00044855 - SFCRANFIELD00045027 |
| Claim Number: 35-9J58-288 | SFCRANFIELD00045028 - SFCRANFIELD00045257 |
| Claim Number: 35-9J66-398 | SFCRANFIELD00045258 - SFCRANFIELD00045577 |
| Claim Number: 35-9N48-599 | SFCRANFIELD00045578 - SFCRANFIELD00045823 |
| Claim Number: 35-9N94-601 | SFCRANFIELD00045824 - SFCRANFIELD00045917 |
| Claim Number: 35-9P45-268 | SFCRANFIELD00045918 - SFCRANFIELD00046723 |
| Claim Number: 35-9Q18-866 | SFCRANFIELD00046724 - SFCRANFIELD00046903 |
| Claim Number: 35-9S33-197 | SFCRANFIELD00046904 - SFCRANFIELD00047248 |
| Claim Number: 35-9V97-100 | SFCRANFIELD00047249 - SFCRANFIELD00047583 |
| Claim Number: 35-9W57-479 | SFCRANFIELD00047584 - SFCRANFIELD00047774 |
| Claim Number: 35-9W59-330 | SFCRANFIELD00047775 - SFCRANFIELD00048105 |
| Claim Number: 35-9X17-955 | SFCRANFIELD00048106 - SFCRANFIELD00048340 |
| Claim Number: 35-9X96-590 | SFCRANFIELD00048341 - SFCRANFIELD00048484 |

**Confidential and Proprietary - Produced Pursuant to Protective Order**

**Cranfield v. State Farm Fire and Casualty Company**  <u>**Appendix B**</u>
**Documents Reviewed and Considered**

| Document | Bates Range |
|---|---|
| Public Sources: | |
| Revsine, Collins, and Johnson. Financial Reporting and Analysis 3rd Edition. Chapter 10. Pearson Education, Inc., 2005 | N/A |
| "Chapter 27: The Cost Approach." The Appraisal of Real Estate, 14th Edition. Illinois:  The Appraisal Institute 2013 | N/A |
| Internal Revenue Service - U.S. Internal Revenue Code:  Tax Standards 26 U.S. Code § 167 – Depreciation | N/A |
| Internal Revenue Service - U.S Internal Revenue Code:  Publication 527 – Residential Rental Property | N/A |
| Internal Revenue Service - U.S Internal Revenue Code:  Publication 587 – Business Use of Your Home | N/A |
| Internal Revenue Service - U.S Internal Revenue Code:  Publication 551 – Basis of Assets | N/A |
| Financial Accounting Standards Board - Accounting Standards Codification:  ASC 330-10 Inventory | N/A |
| Financial Accounting Standards Board - Accounting Standards Codification:  ASC 360-10 Property, Plant and Equipment | N/A |
| Financial Accounting Standards Board - Accounting Standards Codification:  26 U.S. Code § 263A | N/A |
| Code of Federal Regulations (CFR) - Title 48:  Federal Acquisition Regulations System, Part 9904 – Cost Accounting Standards | N/A |
| Kieso, Weygandt, and Warfield. Intermediate Accounting 13th Edition. Chapter 10. John Wiley & Sons, 2010 | N/A |
| Kieso, Weygandt, and Warfield. Intermediate Accounting 13th Edition. Chapter 11. John Wiley & Sons, 2010 | N/A |
| Pyle, William W. and John Arch White. Fundamental Accounting Principles, 7th Edition. Illinois: Irwin, 1975 | N/A |
| Chatfield, Michael and Dennis Neilson. "Chapter 3:  Cost Allocation." Cost Accounting. Harcourt Brace Jovanovich, Inc., 1983 | N/A |
| Mitchell Franklin, Patty Graybeal, and Dixon Cooper. "Chapter 4: Job Order Costing." Principles of Accounting, Volume 2: Managerial Accounting. XanEdu Publishing Inc., 2019 | N/A |
| Xactware's Pricing Data Overview | N/A |