UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

CHARLES CRANFIELD, individually and )
on behalf of all other Ohio residents )
similarly situated, )          No. 1:16-cv-01273-CAB
)
         Plaintiff, )          Hon Christopher A. Boyko
   v. )
)
STATE FARM FIRE AND CASUALTY )
COMPANY, )
)
         Defendant. )

# EXHIBIT I



**Berryman**

426 N.W. 5TH
Oklahoma City, OK  73102
Office: (405) 235-4646
Fax: (405) 235-3311
Email:  mberryman@berrymanokc.com

Confidential Pursuant to Protective Order

March 11, 2021

Joseph A. Cancila, Jr.
Riley Safer Holmes & Cancila, LLP
Three First National Plaza
70 West Madison Street, Suite 2900
Chicago, Illinois 60602

**Re:**  **Charles Cranfield, individually and on
behalf of all others similarly situated,
Plaintiff,**

**v.**

**State Farm Fire & Casualty Company,
Defendant
United States District Court
Northern District of Ohio
Eastern Division
Case No. 1:16-cv-01273-CAB**

Dear Mr. Cancila:

The following report details to date my pertinent observations, opinions and conclusions and can be changed only in writing by the undersigned.  In forming my opinions I utilized my thirty-nine (39) years of experience as a construction general contractor as well as my formal education, training and knowledge previously acquired.  I reserve the right to supplement this report to address additional information made available to me and to provide illustrative exhibits at a later date.

## DOCUMENTS REVIEWED

- Opinion and Order Granting State Farm's Motion to Dismiss
- State Farm's Answer, Additional Defenses, and Jury Demand
- Second Amended Class Action Complaint

Confidential Pursuant to Protective Order

Charles Cranfield, et al. v. State Farm Fire & Casualty Company                    March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division                                          Page 2

- Plaintiff's Motion for Leave to file Third Amended Class Action Complaint to Add New Party Plaintiff
- Charles Cranfield Claim file 35-618J-796 bates stamped SFCRANFIELD00000099 – SFCRANFIELD0000431
- Stipulated Protective Order
- Toby Johnson expert report
- Per Curiam Opinion in *Cranfield v. State Farm*, filed March 23, 2020
- Opinion in *Hicks v. State Farm*, filed July 10, 2020
- Plaintiff's Responses to State Farm's First Set of Interrogatories
- Plaintiff's Responses to State Farm's First Set of Requests to Produce
- Claim file 35-9J58-288,   bates number SFCRANFIELD00045028-00045257
- Claim file 35-897F-851,   bates number SFCRANFIELD00034827-00035082
- Claim file 35-9X17-955,   bates number SFRCRANFIELD00048106-00048340
- Claim file 35-1104-P70,   bates number SFCRANFIELD00012902-00013226
- Claim file 35-8S40-568,   bates number SFCRANFIELD00037287-00037387
- Claim file 35-00G5-97V,  bates number SFCRANFIELD00007076-00008072
- Claim file 35-7X54-257,   bates number  SFCRANFIELD00032223-00032453
- Claim file 35-0056-J40,   bates number SFCRANFIELD00005720-00006602
- Deposition of Charles Cranfield taken 1/13/21
- Excel spreadsheet bates stamped SFCRANFIELD00005462

## **QUALIFICATIONS**

In the course of my career as a general contractor/consultant I have examined several hundred structures for damages.  In the regular course of business, I estimated the construction cost and outlined the scope of work that was an integral part of my firm's offers to contract for needed property restoration.  My firm has provided property restoration services on hundreds of structures where damages were covered by insurance policies issued by at least twenty (20) different insurance carriers.  I have performed construction work in twenty-two (22) states, including Ohio.  I have also held contractor licenses in approximately 19 states at different points during my career.  I utilize the Xactimate software estimating system and have done so for more than twenty (20) years.  I have interfaced with insurance professionals and developed a keen understanding of the customary means, methods and pricing for the restoration of damaged real property.

On more than 1,250 occasions, my firm has been hired by property owners, property management companies, insurance carriers and others to inspect and render opinions on the nature, extent and cost to restore property damages. I have written hundreds of reports and offered sworn testimony at deposition and/or trial on more than 175 occasions concerning an extensive variety of construction/restoration issues, including the issues alleged in the present matter. In the course of my work, I have been designated as an expert witness on building and construction estimating matters pending in courts across the country. My testimony has never been excluded by any court.

## ISSUE

The Plaintiff in this matter, Charles Cranfield (Cranfield), claims he received an inadequate payment under his State Farm Fire & Casualty Company (State Farm) insurance policy for damages that occurred to his property. Cranfield contends the underpayment occurred because State Farm applied depreciation to not only material, but also non-material (including labor), components of unit prices in the State Farm replacement cost estimate for his loss, and further contends that non-material costs included in such unit prices should not be depreciated when calculating ACV payments.

## REVIEW AND ANALYSIS OF REPAIR ESTIMATING

The State Farm adjuster for Cranfield's residential property claim used Xactimate to estimate his damages. Xactimate is a widely utilized construction estimating software system developed by Xactware Solutions, Inc. (Xactware). A property reconstruction estimate is a projection of the anticipated future costs to restore damages. It should be viewed only as a reasonable approximation of the probable costs to accomplish the work and its formulation is not an exact science. Although a reconstruction estimate is a useful tool to advance the process of property reconstruction, there is no single or "right" work scope or estimate total. Instead, the estimate must be viewed as a good starting point. Due to the nature of the individual repair elements that must be assessed, every damage estimate and the components that comprise it, must be analyzed on a site-specific basis.

It is standard practice in the insurance restoration industry for the estimated cost of a property's repair or replacement to be expressed as the "replacement cost value," or RCV. Routinely, "depreciation" is also applied. Depreciation is understood to be the decrease in the value of a building component, e.g., a door, a cabinet, or a roof, due to age, condition, extent of wear, obsolescence, and other considerations. The depreciation is then deducted from the RCV to determine the "actual cash value," or ACV, of the property damage.[1] Usually, ACV is calculated using the following general process:

---

[1] (Replacement Cost Value (RCV) – Depreciation = Actual Cash Value (ACV).

Charles Cranfield, et al. v. State Farm Fire & Casualty Company                    March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division                                         Page 4

- An RCV is calculated by multiplying the quantity of a building component/system, e.g., a shingle roof, by a reasonable market unit cost.[2]

- The total RCV for each repair task is multiplied by a depreciation factor, or percentage, to arrive at the projection of ACV.[3]

Many variables can play into the formulation of a damage estimate; consequently, the damage estimate is just that—an estimate.  In fact, many elements prevent an estimate from accurately projecting actual repair costs in every situation, including:

1) **Slight variations in room and component measurements.**  The variations in measurements of interior rooms and a myriad of other interior components, such as cabinet lengths, electrical and plumbing fixtures, etc. will occur in most estimates.  Likewise, the measurements of exterior components, such as soffit and fascia sizes, brick and siding, etc. will be assessed and recorded with some variance.  Sometimes estimates overstate line item quantities that cause the RCV to be too high.  For instance, it is not unusual for:

   - Inaccurate measurements of damaged components to be recorded, e.g., excessive quantities of roof shingles; and/or

   - Data input errors to appear on an estimate, such as the inadvertent omission or duplication of work items or the improper quantification of construction components.

   Plaintiff's designated expert, Mr. Johnson, did not account for these issues in his written report.

2) **The required scope of work needed to restore the property.**  Qualified insurance adjusters and construction company estimators often see the work needs differently, depending on their background, training and experience.  Some differences will exist among estimators on the methods of accomplishing the required work.  Hence, it would be expected that tasking five (5) experienced estimators with assessing/estimating property damages at the site will produce five (5) differing scopes of work and estimate totals; yet, none of the estimates could be characterized as "right" and the others "wrong."  The prospect of substantial differences in estimates

---

[2] Example:  Replace 2,000 SF of shingle roof system at $1.45/Square foot  =  $2,900.00 RCV.

[3] Example:  A 10-year old roof shingle system with an expected lifespan of 25 years presents itself with normal wear.  The RCV (refer to footnote #2, above) is multiplied by a depreciation factor or percentage derived from the equation of age/expected lifespan or 10 years/25 years = 40% in this example.  Thus, $2,900.00 RCV x 40% renders $1,160.00 in depreciation.  This depreciation is then deducted from the RCV to determine the resulting ACV.  Thus, $2,900.00 – 1,160.00 = $1,740.00 ACV. Typically, the insurer then applies the policyholder's deductible to the ACV amount before issuing a payment on the claim.

Confidential Pursuant to Protective Order

Charles Cranfield, et al. v. State Farm Fire & Casualty Company                        March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division                                            Page 5

is not necessarily indicative of substandard workmanship or the use of inferior materials. Moreover, in almost all instances the full nature, extent and cost to accomplish the needed work cannot be known until the work starts and repair professionals are engaged.

Sometimes restoration work that is reasonably anticipated at the time the estimate is written is later found to be unnecessary. This can lead to an artificially high RCV and ACV. Some general examples include:

- Sometimes the anticipated work scope, thought to be correct based on observations made at the time the estimate was written, is reduced, e.g., a smoke covered bathtub originally estimated for replacement is instead restored by cleaning for a fraction of the original estimated cost.

- The removal and replacement of cabinets, initially seen as a requirement to access the damaged sheetrock behind them, are later easily removed/reset, saved and reused because they were discovered to be modularized, shop-built models and not custom, field-built cabinets.

- The removal of roofing felt during a re-roof. Most often, this material is estimated for replacement along with the shingles. Sometimes, after the work begins, the contractor determines that replacement of this component is unnecessary.

- Wet carpet, thought to need replacement at the time of initial inspection, is later found to only need restoration by virtue of cleaning using conventional methods. A substantial savings and reduction of the actual RCV and ACV would occur.

- The replacement of baseboard to facilitate carpet replacement when it was later determined that the carpet could be replaced with the existing, undamaged baseboard in place.

These and a host of other sensible changes that usually occur during the work cause meaningful reductions in the actual costs, but cannot be identified as appropriate until the work is in process. It is common for supplemental estimates, or adjustments, to be made to the RCV and the ACV as the rebuilding process proceeds.[4]

---

[4]The formulation of a construction estimate for the repair of a damaged home is a vehicle for approximating the projected funds required to accomplish such restoration. The estimate should be viewed as the starting point for the restoration process because it is common in the reconstruction industry for additional damages or construction needs to be identified and/or considered as the process progresses. In these cases supplement estimates are often written, if necessary. Such supplemental estimates usually change the estimated RCV and ACV.

Charles Cranfield, et al. v. State Farm Fire & Casualty Company                    March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division                                      Page 6

3) **Determination of the grade of materials.**  The selection of quality or "grade" of materials can significantly affect the RCV, depreciation application and ACV.  For instance, damaged wood flooring may be "standard" grade, "high" grade or "premium" grade—each with a different estimated cost.  It is an industry standard for a restoration contractor or insurance adjuster to make his "best determination" of the grade of certain materials, such as wood flooring, carpet, light fixtures, appliances, special paint finishes, etc. upon inspection and initial estimate.  But, many times it is not possible to make an accurate determination of material grades when the estimate is written.  Instead, project work often must begin before specialized trade contractors will become involved in the restoration process and bring their expertise.  Only then can the grade of the material, and cost, be known with certainty.  Mr. Johnson's written report in this matter fails to address this reality of property repair and reconstruction.

4) **Unit pricing fluctuations for work components, e.g., shingles, guttering and painting and baseboard.**  Xactimate provides pricing databases that include most, but not all, of the unit pricing necessary to formulate an estimate.  Xactimate obtains routine feedback from a wide variety of data sources and uses a proprietary cluster analysis algorithm to develop a "range of cost" for a particular item, such as roof shingles.[5]  The unit price is simply the best representation of the identified "range of cost"; consequently, the actual cost of any item may be higher or lower than what was published.  Xactimate cautions that the differences that naturally exist in the size, location, complexity and accessibility of a damaged structure will cause the actual market unit cost to vary from Xactimate's published unit price.  Also, actual market pricing will vary due to the repair contractor's business overhead structure, perceived quality, and level of service offered.[6]   The unit pricing provided by Xactimate, or any source for that matter, is a projection of potential cost and cannot be viewed as an absolute.  The projection may in fact overestimate the actual RCV.  When that happens, the ACV will also be overestimated.  The magnitude of the overage may even offset any amount of depreciation applied to non-material items.

Further, unit pricing can vary from time-to-time with the same contractor, e.g., roofing contractor, working in the same venue, *but at a different point in time.*  It would be difficult to determine whether this was caused by changes in labor, materials, or both.  In my experience, different roofing contractors will charge different prices to replace the same shingle roof system in the same locale during the same week.  The data points and the resulting range can fluctuate from day-to-day based on a host of dynamic market conditions such as supply and demand, the overhead structures of

---

[5] "Pricing Research Methodology," published by Xactware Solutions, dated 2/6/18, available at
https://www.xactware.com/globalassets/us/pdf/brochures/pricing-research-methodology.pdf.
[6] "Pricing Methodology Summary," published by Xactware Solutions, dated 2/6/18, available at
https://www.xactware.com/globalassets/us/pdf/brochures/pricing-research-methodology.pdf.

individual companies, vendor workloads/backlogs, etc. None can be considered inaccurate, but all represent *actual cost.*

5) **How the work will actually be performed.** A contractor's access to the work items, phasing needs, and other nuances affect the projections of anticipated costs and often cannot be fully understood until the work begins or is well underway. This assessment will vary among estimators and at any rate is ultimately determined by the entity that will eventually perform the work. As is almost always the case, it is also difficult to know at the time the estimate is being created how the work items will be grouped and performed. For instance, in the replacement of a roof system, one vendor may perform many seemingly unrelated tasks, e.g., roof replacement, furnace cap replacement, satellite dish detach/reset, decking replacement, guttering removal/reset, in a "package deal" and at a lower cost than the "sum of the pieces" estimated. This typical occurrence causes the RCV and ACV to be overstated, and a fact that Johnson's written report does not address. It should be noted that often a single vendor will perform all repairs for less than estimated RCV and occasionally for less than the estimated ACV.

6) **Economy-of-scale or lack thereof.** Neither Xactimate nor any other estimating program I have used provides a mechanism for reducing the anticipated per unit cost as the volume of a restoration task increases or for cost savings that can be created in the grouping of slightly different tasks e.g., applying texture followed by painting; consequently, actual labor and material costs can be lower than the estimated RCV. For instance, it is common knowledge that the cost per square foot for painting 10,000 square feet of interior wall surface will likely be less expensive than the cost per square foot to paint 1,000 square feet of wall surface. In this manner, the Xactimate estimate for painting wall surfaces may be greater than what will actually be required to accomplish the work. The possible impact of a lower actual cost driven by economy-of-scale usually cannot be known at the time the estimate is written. Again, Johnson's written report does not address this fact.

7) **Efficiency.** The work will actually be performed by individuals that vary in skill, experience and capabilities that affect their business operations and efficiency. These elements, and their effect on the actual labor and material costs versus the estimated costs, cannot be known by any adjuster/estimator. Johnson's written report does not address this issue, either.

8) **Proportions of labor versus material within the Xactimate unit prices.** Xactimate pricing also projects how much labor and material costs are wrapped up within the published unit price, but again, this is a projection. Due to the fluid nature of construction market labor and material prices, the actual proportions of labor and material that make-up an actual market price

for a task are usually different from those found within Xactimate's unit price. Only by first learning the total *actual cost* of labor after the job is completed would one be able to measure the effect of "labor depreciation," or other non-material depreciation, if any, on the sufficiency of the initial, estimated ACV figure paid to the insured.[7]  On this issue as well, Johnson's written report is silent.

9) **Record keeping of labor and material costs.**  Contractors rarely track accurately, and many times do not track at all, the division of labor and material costs.  One reason is the general lack of need.  Tracking all legitimate business costs, regardless of their segregation, is all that a contractor needs to file business tax returns and determine profit or loss. Since labor and materials are equal in the calculation of profitability, segregating and tracking them accurately, or at all, is usually of little importance or priority to a contractor.  In most cases it can be difficult to know with meaningful accuracy the segregation of these costs.  Johnson agreed that this is a common issue.

Sometimes, actual repairs are completed at a cost substantially less than the originally estimated RCV.  That does not mean, however, that the repairs necessarily were performed in a substandard manner or with substandard materials, for it again is contrary to my longstanding experience that a damage estimate cannot be treated as a definitive statement of actual cost to repair.  When the *actual* repair cost becomes known, it is necessarily a more accurate statement of repair cost than the Xactimate *estimated* repair cost.  Moreover, an insured has no need to choose a substandard contractor or substandard materials where, as is the case with State Farm, the insured may receive reimbursement of the full, reasonable cost to complete repair (less the insured's deductible) simply by turning in documentation of the costs incurred.  And as stated below, the ACV payment issued in my experience is fully sufficient for an insured to retain a contractor and make any initial payment necessary for work to begin.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>REVIEW AND ANALYSIS OF THE PLAINTIFF'S CLAIM</u>

I reviewed the documents outlined above in order to form opinions concerning:

1) The nature and extent of the damages that occurred at Plaintiff's property.

---

[7] Mr. Johnson uses the term "labor depreciation" to encompass depreciation applied to the labor and other non-material components of unit prices in Xactimate, which prices are used as the basis to calculate the estimated replacement cost of damaged property.  *See* Johnson Report, at ¶ 17.  I have taken that same approach in this report unless otherwise indicated.

2)  Plaintiff's claims in this matter.


## File Review

A representative of Metro Public Adjusting, Inc. (Metro), a public adjustment firm, filed an insurance claim on behalf of Charles and Paula Cranfield (Cranfield), the apparent owners of the property located at 2519 Richmond Road, Beachwood, Ohio.  The insurance claim arose from interior water damages within the home caused by ice damming.  The property was insured by State Farm under policy #70-N6-7546-3.  The reported date of loss was 10/14/14.  State Farm assigned the claim #35618J796 and inspected the property damage on 3/25/15. Other relevant background information and observations include:

1.  Cranfield's residential structure was damaged by water bypassing the roof system and entering the home's interior. Cranfield testified that the water damage was ongoing for about a year, the water damage issues worsened over time, and he did not hire anybody to repair the issues prior to making a claim but did things such as put cloth or fabric in the holes caused by the water damage to block the water.[8] Generally, the drywall, texture and paint at the ceilings and/or walls in some rooms were affected.  The home's exterior, including the roof system, were unaffected.

2.  Claim file photography and notes demonstrate the nature and extent of the damages.  State Farm's initial damage restoration estimate, dated 3/25/15, established and estimated "RCV" of $3,563.29. State Farm applied $1,348.57 in depreciation which resulted in an estimated "ACV" of $2,214.72.  State Farm subtracted a $1,854.00 policy deductible and issued a net ACV payment of $360.72 on 3/25/15.

---

[8] January 13, 2021 Deposition of Charles Cranfield, *Charles Cranfield v. State Farm Fire & Casualty Company*, U.S.D.C. Northern District of Ohio, Eastern Division, Case No. 1:16-cv-01273 ("Cranfield Dep.") at 59:13-61:2, 73:1-76:20, 141:22-146:13.

Case: 1:16-cv-01273-CAB  Doc #: 109-9  Filed: 04/05/21  11 of 47.  PageID #: 4099

Confidential Pursuant to Protective Order

Charles Cranfield, et al. v. State Farm Fire & Casualty Company                    March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division                                    Page 10



CRANFIELD, CHARLES                                                                      35-618J-796

| | | | |
|---|---|---|---|
| Insured: | CRANFIELD, CHARLES | Estimate: | 35-618J-796 |
| Property: | 2519 Richmond Rd | Claim Number: | 35618J796 |
| | Beachwood, OH 44122-1766 | Policy Number: | 70-N6-7546-3 |
| Cellular: | 216-387-2407 | Price List: | OHCL28_OCT14 |
| Type of Loss: | Water Damage | | Restoration/Service/Remodel |
| Deductible: | $1,854.00 | | |
| Date of Loss: | 10/14/2014 | | |
| Date Inspected: | 3/23/2015 | | |

### Summary for Coverage A - Dwelling - 37 Water Damage and Freezing

| | |
|---|---:|
| Line Item Total | 3,514.84 |
| Material Sales Tax | 48.45 |
| Replacement Cost Value | 3,563.29 |
| Less Depreciation (Including Taxes) | (1,348.57) |
| Less Deductible | (1,854.00) |
| Net Actual Cash Value Payment | $360.72 |

### Maximum Additional Amounts Available If Incurred:

| | | |
|---|---:|---:|
| Total Line Item Depreciation (Including Taxes) | 1,348.57 | |
| Replacement Cost Benefits | | 1,348.57 |
| Total Maximum Additional Amount Available If Incurred | | 1,348.57 |
| Total Amount of Claim If Incurred | | $1,709.29 |

Sandvick, Alice
440-213-8230

ALL AMOUNTS PAYABLE ARE SUBJECT TO THE TERMS, CONDITIONS AND
LIMITS OF YOUR POLICY.

3. State Farm calculated depreciation based upon the age of damaged components, e.g. drywall, texture, etc., being twelve (12) years old, since it was understood that Cranfield purchased the home in 2003, twelve (12) years prior to the date of loss.[9]

4. State Farm utilized the Xactimate software system to estimate the property loss. The unit pricing database used in the estimate, OHCL28_OCT14, was appropriate considering the property's geographic location and the date of the loss. The estimate was based upon a reasonable projection of the cost to address the home's damages.

5. As noted above, Cranfield hired Metro to represent him in connection with his insurance claim.[10] Almost eight (8) months transpired with no communication from Cranfield before Metro contacted State Farm on 11/16/15 and requested the loss be submitted to the Appraisal process as outlined in the insurance policy. State Farm advised Metro the loss did not qualify for the Appraisal process.

6. Later, State Farm received a letter dated 12/18/15 from Metro requesting State Farm's consideration of additional ancillary work items Metro believed

---

[9] SFCRANFIELD00000132.
[10] Cranfield Dep. at 58:18-21.

were necessary to accomplish the envisioned work, e.g. masking, prep and floor protection for the paint process. Based upon certain additions, State Farm issued a supplemental damage estimate, dated 1/7/16. The estimated RCV was revised to $4,044.86 and the estimated ACV was increased to $2,696.29. State Farm made a supplemental payment to Cranfield. As explained earlier in this report, such supplemental estimates are a common industry practice.



CRANFIELD, CHARLES        35-618J-796

| Insured: | CRANFIELD, CHARLES | Estimate: | 35-618J-796 |
| Property: | 2519 Richmond Rd | Claim Number: | 35618J796 |
| | Beachwood, OH 44122-1766 | Policy Number: | 70-N6-7546-3 |
| Cellular: | 216-387-2407 | Price List: | OHCL28_OCT14 |
| Type of Loss: | Water Damage | | Restoration/Service/Remodel |
| Deductible: | $1,854.00 | | |
| Date of Loss: | 10/14/2014 | | |
| Date Inspected: | 3/23/2015 | | |

**Summary for Coverage A - Dwelling - 37 Water Damage and Freezing**

| Line Item Total | 3,982.23 |
| Material Sales Tax | 62.63 |
| Replacement Cost Value | 4,044.86 |
| Less Depreciation (Including Taxes) | (1,348.57) |
| Less Deductible | (1,854.00) |
| Less Prior Claim Payment | (360.72) |
| Net Actual Cash Value Payment | $481.57 |

**Maximum Additional Amounts Available If Incurred:**

| Total Line Item Depreciation (Including Taxes) | 1,348.57 | |
| Replacement Cost Benefits | | 1,348.57 |
| Total Remaining Maximum Additional Amount Available If Incurred | | 1,348.57 |
| Total Amount of Claim If Incurred | | $2,190.86 |

Sandvick, Alice
440-213-8230

**ALL AMOUNTS PAYABLE ARE SUBJECT TO THE TERMS, CONDITIONS AND LIMITS OF YOUR POLICY.**

7. There is no indication in State Farm's claim file that Cranfield ever selected a contractor(s) to perform the repair work or had the repair work performed. Cranfield submitted no repair contractor estimates for State Farm's consideration. Cranfield submitted no receipts for expenditures for any repair labor and/or materials. It appears Cranfield submitted no claim for the replacement cost benefits (RCB) that were available as expressed within State Farm's damage estimate.

8. Cranfield testified that he does not have his records related to his Beachwood property because water damage destroyed his file. Further, he does not recall what he did with his payments from State Farm. When he moved out of the Beachwood property, there were still damages. He recalled performing some repairs but has no invoices and believes he paid

cash, and that any contractors or handymen he hired to assist him were paid after the work was done.[11]

*************************************************************************************

## OPINIONS

**_Opinion #1:_** *I understand that Plaintiff Cranfield challenges the sufficiency of the ACV payment that he received from State Farm. I have been asked to assess and respond to that contention. It has been my experience, both in respect to the Cranfield matter and in most property losses, that it is not possible to simply review the estimate on its face in order to determine if the RCV, ACV, or depreciation were appropriate given the facts of the loss. In order to make that determination, I would need to re-examine all components and processes that went into the estimate's formulation, including the scope of repair identified, the measurements taken, judgments made regarding depreciation applied, and the grade of materials selected for repair. That work would be required regardless of whether the insured has undertaken any repairs to the damaged structure or portions thereof. The necessary review would also require a physical inspection of the property. I could not do that inspection here because Mr. Cranfield no longer owns the subject policy. But I explain herein the purpose the inspection would accomplish. For properties where repairs were completed, the work would also include confirming measurements, comparing the estimate values to the scope of repairs actually performed and the grade of materials as installed, and securing information from the policyholder and/or the construction vendors so that the cost of completed repairs (as well as an appropriate time and materials breakdown, if available) could be compared to the costs estimated before repair.*

1.1.     As outlined earlier in this report, an estimate is a projection of future anticipated cost. It is an estimate, and in the property restoration industry it first seeks to project the expected cost to repair and restore damaged property, or RCV. It is rarely a perfect expression of the actual cost. Upon this best effort projection, the depreciation is applied to arrive at an expression of ACV; consequently, the application of depreciation is too, just an estimate or projection. An overstated RCV can lead to an overstated ACV.

1.2.     The estimate must be viewed as a starting point, but regardless of the initially calculated RCV and ACV, the end goal is to develop an appropriate estimate of the reasonable and necessary cost to restore the property with a similar grade of materials.

1.3.     Plaintiff theorizes that the depreciation of non-material items had a negative effect in his loss. To test that assertion as it relates to his total claim

---

[11] Cranfield Dep. at 51:12:54:24, 56:1-12, 108:20-22, 109:21:25, 112:20-118:11, 244:4-12.

Charles Cranfield, et al. v. State Farm Fire & Casualty Company      March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division      Page 13

payment and/or the non-material component of his ACV payment, I would need to conduct a review of all aspects that went into the formulation of the estimate.  In addition, where repairs have been undertaken, I would also need to determine the *actual costs* versus *estimated costs* expended for each task, along with a breakdown of labor and material expended.[12]  For any claim, I would start with the steps set out below.

**1.4.** First, I would review the State Farm estimate and claim file.  The objective would be to first determine the general nature and extent of the damages.  The suitability of the estimate's Xactimate pricing database would be verified for proper venue and timeframe.

**1.5.** The claim file notes would be checked for indications of how the work transpired and what adjustments were made to the damage estimate as the work proceeded.  Records of actual costs, if available and in a format that offered the needed detail, would be reviewed and compared to the estimated cost to measure the impact on the depreciation calculated on labor and materials.

**1.6.** After reviewing the claim file materials, my next step would be to perform a site inspection to determine what work was actually needed and to confirm the estimate entries made by the adjuster. I could not do that inspection here because Mr. Cranfield no longer owns the subject policy.  But I explain herein the purpose the inspection would accomplish.

**1.6.1.** A property inspection performed in the manner described above is important even if needed the insured has not yet undertaken repairs.  For instance, the quantity of materials estimated by a repair vendor can vary with those in the insurance company's estimate and this calls for a mathematical adjustment to the repairman's estimate, the carrier's estimate, or both.  Discussion, field measurements and computations would be required to make these reconciling adjustments before any determination of claim underpayment due to "labor depreciation" could be made.

**1.6.2.** Sometimes the repairman's estimate and the insurance company's estimate both mistakenly include the replacement of items that were not present at the time of the loss; consequently, they contribute to inflating the estimated RCV and the ACV.  Again, the RCV and ACV first would need to be mathematically adjusted to correct this type of error.

**1.6.3.** On occasion one or more components of a loss, such as a home's roof shingles, are not depreciated to the extent of their age or worn condition.  This causes the applied depreciation associated with replacing those

---

[12] Full claim specific/site specific information, however, often falls short of producing what is required to determine the actual labor and material costs a policyholder has incurred to complete repair.  At the very least, the actual repair records would be needed to make that determination.

components to be understated. Consequently, it results in the ACV being higher than it should be and warrants correction.

**1.6.4.** Further uncertainty results because repair estimates often do not provide adequate information about the extent and purpose of the work described. It is common that not all work estimated by the repairman is necessitated by the covered loss. Many times additional work, unrelated to the loss, is estimated solely at the policyholder's discretion. These unknowns would have to be determined to accurately measure the potential influence of labor depreciation under the Plaintiff's theory.

**1.7.** Likewise, a site inspection would be needed for claims where the insured has pursued repairs.[13] In such cases, insurers often apply prior ACV amounts that were overstated against later claims by the insured for RC benefits.

**1.7.1.** Inspection of completed repairs would begin with identification of whether the repair is complete and the contribution of work not covered under the policy. For example, in a roof loss there may be the need for the replacement of rotted decking, which is wear and tear and not storm related. At other times certain items, e.g. roof ventilation, are upgraded at the discretion of the policyholder. The new plywood and ventilation are upgrades and they would first have to be quantified by climbing the roof and taking field measurements so they could be deducted. In the case of the decking it would be especially difficult to determine the extent of the work performed since it would be concealed by the shingles. A discussion with the policyholder's roofing contractor would likely be needed so that the cost of the extraneous repairs could be extracted from the contractor's estimate.

**1.7.2.** The inspection would also consider instances where the policyholders' repairs as completed do not match the scope of repair in the adjuster's estimate. Often, and sometimes long after the Xactimate estimates are completed and ACV tendered, policyholders change the scope of work. They choose to not address certain items (either due to discretion or after learning that same are unnecessary), alter the restoration approach, and/or add, downgrade or upgrade certain items. This makes comparison of the contractor's charges and the estimated work difficult, as the contractor's documentation will not match the policyholder's estimate.

---

[13] Only a site inspection would reveal the repairs that were actually required (versus estimated or originally thought to be required before the work started) and the work actually performed. Such an inspection would require taking detailed measurements of all affected components to determine: components damaged, but not repaired; components actually repaired; work performed unrelated to the loss; and, the quality of the repair materials to see if they are of similar grade to the previously installed materials. Usually photographs and detailed notes are recorded and on occasion samples are taken. Additional information from the policyholder and/or vendors would likely be needed for supporting background. These observations would then need to be compared to what was originally estimated.

Confidential Pursuant to Protective Order

Charles Cranfield, et al. v. State Farm Fire & Casualty Company                    March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division                                      Page 15

**1.7.3.**  A common industry practice significantly stymies the determination of actual costs for loss-related repairs even when appropriate comparisons can be made to the contractor's work and the estimated scope of repair: restoration contractor bid proposals and invoices are many times submitted to policyholders in a "lump sum" format without much, if any, detail or itemization.

**1.7.4.**  Most often, contractor estimates and invoices have no breakdown of labor and materials on their face; hence, such "lump sum" pricing can make it very difficult, if not impossible in many instances, to determine the amount that a policyholder actually paid for the labor component of a contractor's charges for repair.  Such a separate statement of labor pricing is often absent because contractors often view it as proprietary and they are reluctant to reveal it.  Even if the material/labor breakdown is shown, this too would be an estimate on the contractor's part.  Instead, actual costs would need to be determined by looking at his labor time cards, material trade invoices, cancelled checks, etc. This requires the unlikely assumption that such records are accurate, complete, or even segregated by job.  As discussed previously, many contractors see little, if any, benefit in keeping such deliberate records segregated by job.  At bottom, an attempt to utilize contractor proposals and/or invoices to help determine actual labor and material cost can yield little benefit.

**1.7.5.**  My experience suggests that many construction vendors often have poor and unreliable internal cost accounting and cannot provide an accurate expression of the actual labor and material costs for work performed. Without this information, a proper assessment of actual labor costs would be thwarted, making it impossible to determine whether State Farm's ACV payment covered the full cost of labor needed to <u>complete</u> repairs, despite "labor depreciation."  To the extent that some necessary records are available, they would come from one or more construction vendors involved in a property's restoration.  However, the analysis of the records would require fact specific discussions with the policyholder and the various construction vendors, and a review of their supporting source documents, such as material invoices, purchase orders, warehouse inventory tickets, time cards, mileage logs, etc.  Hence, although Xactimate can provide an *estimate of projected* RCV and ACV, the breakdown of the *actual cost* of labor and materials most often will be difficult to determine even after reviewing additional documentation.

**1.7.6.**  Likewise, when a contractor's estimate or invoice has some level of task breakdown, it is usually difficult to match the contractor's line item costs with the line items found within an Xactimate estimate.  Such comparison is made difficult due to:

- Differences in terminology--workmen sometimes refer to an item differently than does Xactimate.

- Grouping of certain components by the contractor into a single line when Xactimate may express them in several line items. It is often difficult to know with accuracy which individual Xactimate line items correspond with the contractor's single line expression.

- Uncertainty as what specific components are and are not in the contractor's line item expression. The language used by tradesmen often lacks the precision for one to determine with accuracy their match-up with Xactimate estimate line items.

These difficulties can only be overcome with clarifying conversations with the contractor, policyholder and sometimes individual subcontractors post-construction. More often than not, such conversations would be dependent upon mental recall with varying degrees of reliability.

**1.7.7.** Even if a contractor had records of the labor and materials used, they would need to be discussed, analyzed and adjusted to remove the contribution of the non-covered elements and any discretionary changes that a policyholder may have made to the work.

**1.7.8.** Subcontractors utilized by a repair contractor would need to be identified and consulted. Again, often a subcontractor does not itemize his/her labor vs. material costs. The difficulty in obtaining this information would compound the complications in comparing *projected* labor costs with *actual* labor costs.

*********************************************************************************

***Opinion #2:*** *Generally, it has been my experience as a restoration general contractor that the ACV tendered by an insurance carrier is sufficient for beginning property restoration work. Except for the industry standard payment of the insurance policy deductible, it would not be necessary in my experience for a policyholder to come out of pocket with funds to start or pursue the property restoration work. At any rate, the completion of repair work is not always the determining factor for triggering the full payment of the RCV, as often the depreciation can be released when work is well underway or a contract for restoration has been signed by the policyholder.*

**2.1.** It is a common industry practice for restoration contractors to begin restoration work even before the ACV is tendered. Oftentimes, contractors begin work with no upfront payment or a modest upfront payment and/or progress payment(s) that are less than the estimated ACV.

**2.2.** Routinely, contractors accept all or a portion of the ACV as progress payment(s) and collect their contract balance when additional payment is

made by the insurance carrier. Indeed, it is not unusual for an insured to simply sign over an ACV draft to the insured's chosen contractor. Restoration contractors are knowledgeable about the customary format used by most property insurance carriers in the disbursement of funds following an insured loss. The phrase "payment due upon completion," and the like, are regularly interpreted and understood by restoration contractors to mean "when the work is completed and the depreciation funds have been remitted."

2.2.1.  Other than the standard payment of the deductible, I know of no instance where the policyholder has come out of pocket with funds to pay for my services and waited for reimbursement from their insurance carrier.

2.3.  In my career, I have regularly started property restoration work with no upfront payment and pursued the work with progress payments based upon work completed. I have routinely collected my final payment for all work when the additional payment(s), including the depreciation, are paid to the policyholder.

2.4.  Oftentimes, insurance carriers will release the balance of the RCV when the repair work is well underway and/or the policyholder has signed a contract for the needed work. Based upon my industry experience, this provision is routinely expressed in the State Farm damage estimates.

2.5.  In my experience, the amount of depreciation is almost always immaterial in those instances where the property owner chooses to move forward and restore the damaged property.

2.6.  As previously discussed, a number of variables often cause the RCV and the ACV to be overstated. Based upon my experience as a restoration contractor, the required work sometimes can be performed for less than the RCV.

2.7.  On occasion, I have seen the required work performed in its entirety for less than the ACV. On these occasions the ACV payment was sufficient to fully restore the property damages even without an insurance carrier's release of any additional payment.

************************************************************************************

**Opinion #3:**  *Over the course of my experience as a restoration contractor I have seen both the labor and material components of restoration work tasks depreciated in the determination of ACV as a common practice. The Plaintiff in this matter alleges the costs of labor do not depreciate in value over time; however, this fails to acknowledge that in property restoration tasks, "labor and materials" are inseparable and only meaningful when considered together. When the component*

Confidential Pursuant to Protective Order

*systems of a damaged structure experience age, wear and tear, the entire systems depreciate, both labor and materials.*

**3.1.** My direct experience suggests that the depreciation of the labor and material components of restoration tasks in determining the ACV is a common practice and industry standard. In working in and around the property restoration industry, addressing property damages caused by numerous perils, including but not limited to wind, hail, water, fire and mold contamination, I have seen this methodology used routinely.

**3.2.** It should be understood that often the tasks needed to restore property damages, such as replacing the roof or replacing the electrical wiring, address completed assemblies and/or systems. The assemblies and systems, although they are certainly comprised of materials, only come into being and perform as intended when labor is expended in a deliberate manner to create them. A few examples include:

- Replacement of a damaged asphalt composition roof. A roof's intended purpose is to function as a system to shed water. A typical roof system is most often comprised of shingles, roof felt, nails, roof jacks, sealants, etc.; yet these materials are just that—materials. These materials, in and of themselves, do not comprise a roof system. As individual components the shingles, nails, and roof jacks do not shed water. The construction of a roof system, and the reasonable expectations of its intended performance, do not arise until and unless labor is expended in a skillful and intentional manner to situate the materials in a specific way to create the desired system. Labor and materials used in the creation of a roof system are inseparable.

- Replacement of interior sheetrock wall board. This element is common in almost all structures and functions as the typical wall surface. It is an assembly of components consisting of gypsum wallboard, nails, drywall tape and finish compound. All of these materials are part of accomplishing the intended work; yet, considered individually, none of these materials are the end product nor will they alone produce the intended result. Only the application of labor---provided in a skillful, sequenced and deliberate manner---will produce the desired and expected result: restoring the damaged wall board to its pre-loss condition. Materials, without labor to accomplish the assembly, mean little in this context. Interior sheetrock wallboard is an assembly and the labor needed to bring it into being is just as integral to its creation as the materials.

- Replacement of guttering and downspouts. Again, these components function as a designed *assembly and system* that depends on the proper incorporation of materials and labor. Neither the labor nor the materials alone will accomplish the intended purpose of the gutter/downspout system. Only the careful combination of the two will suffice.

3.3.   It has been my experience that roofs, sheetrock wall board, guttering/downspouts and most other aspects of structures experience normal wear and tear in the course of their life and depreciate in value over time.  It is not simply the materials that depreciate.  Instead, it is the system or assembly that wears in the aggregate—both materials and labor—because the system exists by virtue of the labor expended to create it.  Just as labor cannot be divorced from the materials in the creation of the system or assembly, it cannot be viewed separately from the materials in determining the degree of wear and tear suffered by the system.

3.4.   The assessment of depreciation on repair materials, but not on repair labor, is also counterintuitive when one considers that almost all building materials are themselves comprised of both raw materials and the labor required to manufacture them.

   - As one example, currently many cabinets used in homes and businesses are manufactured in a factory, aka "pre-manufactured" cabinets.  These types of cabinets are built using factory labor and wood materials.  The cabinets are crated and sent to the jobsite where an on-site carpenter uncrates them and provides the labor to install them into the home or business.  Plaintiff apparently contends that the cabinets that arrive in the crate are purely "materials" and, as a result, can be depreciated in full.  In fact, however, the cabinets are actually assembled through the careful and deliberate incorporation of both "labor and materials."  Plaintiff claims materials, e.g. cabinets, can be depreciated, while the site carpenter's labor cannot.  But, this ignores the fact that the pre-manufactured cabinets were also assembled in the factory through incorporated labor and materials.  There is no logical reason why one type of labor should be depreciated and the other should not.

   - In this regard, it is also worth noting that many cabinets are "job-built."  Job-built cabinets produce the same end result (a functional storage spot for household goods and appliances) but, unlike pre-manufactured cabinets, all the labor required to construct the job-built cabinet and install it is provided at the job site by the carpenter.  Proportionately, job-built cabinets require a larger expenditure for site labor and a lower expenditure for material.  Conversely, proportionately, pre-manufactured cabinets require a larger expenditure on material (since the cabinet arrives at the job already having been fully built in the factory) and a lower expenditure for labor (since the site carpenter's only role is to mount the finished cabinet on the wall).

3.5.   Despite the commonly occurring differences in property damage repairs concerning the point in the process at which labor actually gets expended (i.e. more labor in the factory and less on the jobsite, or vice versa), Plaintiff apparently believes that labor expended on the job site does not deprecate in value and should not be depreciated in the estimation of ACV.  Yet,

Charles Cranfield, et al. v. State Farm Fire & Casualty Company                              March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division                                                      Page 20

simultaneously Plaintiff apparently contends that labor expended in the creation of factory-built materials does depreciate and should be depreciated in the estimation of ACV.  This is an unreasonable and arbitrary notion of depreciation.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


## <u>REVIEW AND ANALYSIS OF OTHER EXEMPLAR CLAIMS</u>

I am providing the following examples from several State Farm claim files to demonstrate how variables can play into the formulation of a damage estimate. The following summaries show how the *actual cost* of restoration work that was required and/or performed can vary greatly from the *estimated cost.*  They show that, whether or not labor and other non-material items are depreciated, the initial ACV payment on occasion will be sufficient to cover the *actual cost* of the work performed for necessary repairs.  These examples reveal the challenges of matching the *estimated cost* of labor and materials with the *actual cost* of labor and materials for the purpose of measuring any potential impact of non-material depreciation.  In some cases, that task can be nearly impossible.


## I.   <u>Claim # 35-9J58-288, Bates SFCRANFIELD00045028-00045257</u>

Date of Loss:     10/27/16
Location:          Wheelersburg, Ohio
Nature:            Fire damage


State Farm's initial Xactimate estimate, dated 11/3/16[14]:
RCV:              $7,905.49
Depreciation:     $1,271.87
ACV:              $6,633.62

State Farm's final Xactimate estimate, dated 3/2/17[15]
RCV:              $7,905.49
Depreciation:     $1,043.60
ACV:              $6,861.89

---

[14] SFCRANFIELD00045091-00045098.
[15] SFCRANFIELD00045193-00045200.

Confidential Pursuant to Protective Order

Charles Cranfield, et al. v. State Farm Fire & Casualty Company                    March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division                                      Page 21

- This claim involved fire damages to the exterior siding, skirting, windows and ancillary items of a mobile home.

- State Farm utilized Xactimate and standard database pricing to estimate the loss.

- To test the impact of labor depreciation one would need to make a detailed review of the State Farm Claim File History Information (SFCFHI), pages 1-11, to understand the fact patterns of this loss.[16]

- State Farm provided an initial damage estimate on 11/6/16 and made an initial ACV payment of $6,133.62.  The next day, the policyholder received a written bid proposal from McGuire Contracting, LLC (McGuire) to perform a significant portion of the required repair work for $3,100.  However, the proposal was not submitted to State Farm until approximately four (4) months later, 3/2/17.[17]

---

[16] SFCRANFIELD00045043-00045053.
[17] SFCRANFIELD00045125-00045129.

Charles Cranfield, et al. v. State Farm Fire & Casualty Company          March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division                            Page 22

---

# PROPOSAL

## McGuire Contracting, LLC

398 Rigrish Rd.
Portsmouth, Ohio 45662
740-357-0358

| Proposal Submitted To: | Work to be performed at: |
|---|---|
| Name: ███████████████ | Address: Same |
| Address: ███████████████ | Date of Plans: 11/7/16 |
| Phone No: ███████████████ | Architect: |

We hereby propose to furnish the materials and perform the labor necessary for the completion of

Remove and install 6 Sq. of Dutchlap Double 4½"
white vinyl siding.
Remove and install 2 Sq. of white underpenning.
Remove and install 3 30" windows.

Pd. $1600 → $2600
12/6/16

All material is guaranteed to be as specified, and the above work to be performed in accordance with the drawings and specifications submitted for above work and completed in a substantial workmanlike manner for the sum of

Dollars ($ 3100 )

with payments to be made as follows. ½ to start
½ at Finish

Any alteration or deviation from above specifications involving extra costs will be executed only upon written order, and will become an extra charge over and above the estimate. All agreements contingent upon strikes, accidents, or delays beyond our control. J. M.

Respectfully submitted  Jody McGuire

Per  McGuire Cont.

Note- This proposal may be withdrawn by us if not accepted within _____ days.

## ACCEPTANCE OF PROPOSAL

The above prices, specifications and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified. Payments will be made as outlined above.

Signature  Jody McGuire

Date 12/6/16    Signature ███████████████

---

- On its face, the McGuire proposal appears to cover the majority of the line items shown in the State Farm estimate. Those six (6) line items in the State Farm estimate that align with the work expressed in the McGuire proposal provided an RCV of $6,131.90 and an ACV of $5,114.17; consequently, the

Confidential Pursuant to Protective Order

Charles Cranfield, et al. v. State Farm Fire & Casualty Company                    March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division                              Page 23

initial State Farm estimated RCV and ACV were significantly higher than what was actually needed to effectuate the majority of the repairs.[18]

- Further, the ACV payment was sufficient to *perform all the needed repairs,* regardless of non-material depreciation. The total ACV needed for all repairs was $6,861.89.[19] Considering McGuire performed a substantial portion of the work for only $3,100.00, it left $3,761.89 for the balance of the needed repairs.[20] The RCV of the remaining repairs was only $1,773.59; consequently, the ACV payment alone, without the policyholder deductible, was more than enough to accomplish the repairs, regardless of non-material depreciation.[21]

- It should also be noted that repair contractors do not routinely itemize each and every ancillary component of work to be performed. For instance, the replacement of the exterior light fixture which was affixed to the replaced siding and the home's exterior door and lockset which were situated within the replaced siding were likely also addressed as part of McGuire's work. This likelihood results from how the light, door and lockset interface with the damaged siding. For this reason, it seems reasonable that McGuire actually did more work than was listed on his proposal; consequently, State Farm's estimated RCV and ACV were further overestimated.

- McGuire's proposal outlined a payment provision of "½ to start, ½ to finish," or stated differently, $1,550 to start and $1,550 to finish. This illustrates a point made previously in this report that often the initial estimated ACV is sufficient to start the work. Here the policyholder received an initial estimated ACV of $6,133.62. Even without the standard payment of the insurance deductible, $500.00 in this matter, the homeowner had ample ACV money to get the work started without having to come out of pocket with additional funds.

- Upon receipt of the McGuire estimate, State Farm revised its damage estimate, dated 3/2/17. The estimated RCV remained $7,905.49, but the ACV was increased to $6,861.89. The homeowner was paid an additional $228.27. Including the standard $500.00 insurance deductible, the homeowner had $6,861.89 available to perform work with an actual cost that was substantially less.

- McGuire's proposal is in "lump sum" format and provides no segregation of labor and material costs. As discussed above, this "lump sum" approach by repair contractors is the common practice. Absent a breakdown of labor

---

[18] $6131.90 State Farm estimated RCV > $3,100 McGuire repairs. Also, State Farm estimated $5,114.17 ACV > $3,100 McGuire repairs.
[19] SFCRANFIELD00045198
[20] Estimated ACV $6,861.89 – McGuire $3,100.00 = $3,761.89 balance available (including the policyholder's $500.00 deductible).
[21] ACV balance $3,761.89 – policyholder's deductible $500.00 = $3,261.89 > $1,773.59 needed.

Charles Cranfield, et al. v. State Farm Fire & Casualty Company
U.S.D.C., Northern District of Ohio, Eastern Division

March 11, 2021
Page 24

and material costs there is no way to make any comparison of McGuire's *actual* labor and *actual* material costs with State Farm's respective *estimated* costs with the proposal. A review of McGuire's records, assuming that they are available and in a format that lends itself to meaningful comparison, would be required.

- As discussed previously in this report, the variables that exist in the estimating process caused the State Farm estimate to have materially overstated the cost to complete the repairs. In this loss it appears that the insured was paid the full cost of repair through the initial ACV payment only, fitting this type of fact pattern. Whether or not non-material items were depreciated with the ACV payment had no bearing on the policyholder's ability to complete the repair for the total claim payment, even without the homeowner's payment of the deductible.

- This loss shows the need to carefully review each policyholder's assertion that State Farm's initial ACV payment resulted in a supposed "underpayment" due to the application of non-material depreciation.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## II.    Claim # 35-1104-P70.  Bates SFCRANFIELD00012902-00013226.

Date of Loss:      8/11/17
Location:           University Heights, Ohio
Nature:             Wind damage

State Farm's initial Xactimate estimate, dated 8/24/17[22]
RCV:                   $15,082.13
Depreciation:           6,024.59
ACV:                   $ 9,057.54

State Farm's final Xactimate estimate, dated 11/2/17[23]
RCV:                   $11,866.94
Depreciation:        $   291.54
ACV:                   $11,575.40

---

[22]SFCRANFIELD00013108-00013117.
[23]SFCRANFIELD00013097-00013107.

Confidential Pursuant to Protective Order

Charles Cranfield, et al. v. State Farm Fire & Casualty Company                    March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division                                       Page 25

- This claim arose as the result of a storm that damaged the home's roof and garage walls and ceiling.  It is a relatively common property damage loss.

- State Farm utilized Xactimate and standard database pricing to estimate the loss.

- In order to evaluate the impact of labor depreciation one would need to make a detailed review of the State Farm Claim File History Information (SFCFHI), pages 1-7, to understand the fact patterns of this loss.[24]

- State Farm provided an initial damage estimate, dated 8/24/17, and made an initial ACV payment of $$6,526.54.

- One week later, the policyholder received a written bid proposal from Absolute Roofing and Construction, Inc. (Absolute) to remove and replace the home's roof, including the required ancillary items, e.g. ice and water shield, drip edge metal, apron flashing, step flashing, ridge vent, etc. for $11,000. The $11,000 "lump sum" was considerably lower than the sum of the corresponding items estimated by State Farm:  $13,942.46.[25]

---

[24]SFCRANFIELD00012915-00012921.
[25] SFCRANFIELD00012981.

Confidential Pursuant to Protective Order

Charles Cranfield, et al. v. State Farm Fire & Casualty Company                    March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division                              Page 26



- Absolute's contract proposal outlined a payment provision of "1/3 down, balance upon completion"; consequently, Absolute offered to start the work for the homeowner's initial payment of $3,630.00.  Again, this demonstrates

Confidential Pursuant to Protective Order

Charles Cranfield, et al. v. State Farm Fire & Casualty Company                    March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division                                             Page 27

a point made previously in this report that often the initial estimated ACV is sufficient to start the work.   Here the policyholder received an initial estimated ACV of $6,526.54.  Even without the payment of the insurance deductible, $2,531.00 in this matter, the homeowner had ample ACV money to get the work started without having to come out of pocket with additional funds.

- But, there is a greater differential between Absolute's contract proposal and State Farm's estimated RCV than is readily apparent.   Absolute's offer includes an upgrade to the property to correct "bad wood siding, up to 40 feet" (refer to yellow highlighting, above).  Since none of the four (4) locations of bad siding listed resulted from storm damages, they need to be mathematically removed from Absolute's proposal in order to make an apples-to apples comparison with State Farm's estimated RCV.  Such an adjustment would need to be made before one could accurately measure any impact of labor depreciation.  Since such information is not available in the claim materials, a detailed inquiry would need to be made of Absolute so the value of these non-storm, discretionary upgrades could be deducted from Absolute's proposal.  And this assumes Absolute would be willing or able to make such a segregation of their value.  Absolute's offer to perform additional, non-storm related work illustrates a common occurrence in the property restoration industry:  homeowners often upgrade, downgrade or otherwise change by addition or deletion the project scope of work.  Such changes affect any attempt to accurately measure the impact of labor depreciation, if any.

- Approximately three (3) months after the date of loss, the homeowner submitted Absolute's contract to State Farm.   State Farm reduced its damage estimate, dated 11/2/17, to $11,866.44 RCV and 11,575.40 ACV. An additional payment of $2,517.86 was made to the homeowner.

- Absolute's proposal is in "lump sum" format and provides no segregation of labor and material costs.  As discussed above, this "lump sum" approach by repair contractors is the common practice.  Absent a breakdown of labor and material costs, there is no way to make any comparison of Absolute's *actual* labor and *actual* material costs with State Farm's respective *estimated* costs with the proposal.  A review of Absolute's records, assuming that they are available and in a format that lends itself to meaningful comparison, would be required.

- As discussed previously in this report, the variables that exist in the estimating process caused the State Farm estimate to have materially overstated the cost to accomplish the roof repairs.  In this matter the insured appears to have been paid exactly what was needed to replace the roof. Whether or not non-material items were depreciated with the ACV payment had no bearing on the policyholder's ability to complete the roof replacement.

Confidential Pursuant to Protective Order

Charles Cranfield, et al. v. State Farm Fire & Casualty Company     March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division     Page 28

- Absolute's proposal is the only *actual* cost information available in this loss. In order to test the impact of labor depreciation one would first need to know the *actual* cost of any other repair work that was performed and compare it to the *estimated* cost, without depreciation applied to labor. The work performed and its actual costs can only be known by inspecting the site and/or procuring appropriate information from the insured and/or any other repair vendors.

- Even though this information is not readily available without further inquiry, we see that the balance of the work consisted of relatively simple repairs at the garage interior that included wallboard repair and painting. The total estimated RCV of these tasks was $866.94[26]: This $866.94 is comprised of $656.03 in itemized tasks, plus an additional $210.91 estimated due to a plaster "minimum," a software driven, imputed value added in anticipation that two vendors would perform this minor work.

### Trade Summary
Includes all applicable Tax, General Contractor O&P, and Labor Minimums

| DESCRIPTION | LINE ITEM QTY | REPL. COST TOTAL | ACV | NON-REC. DEPREC. | MAX ADDL. AMT AVAIL. |
|---|---|---|---|---|---|
| **CON    CONTENT MANIPULATION** | | | | | |
| Content Manipulation charge - per hour | 3.00 HR | $112.50 | $112.50 | $0.00 | $0.00 |
| **TOTAL CONTENT MANIPULATION** | | **$112.50** | **$112.50** | **$0.00** | **$0.00** |
| **DMO    GENERAL DEMOLITION** | | | | | |
| Haul debris - per pickup truck load - including dump fees | 0.25 EA | $29.11 | $29.11 | $0.00 | $0.00 |
| **TOTAL GENERAL DEMOLITION** | | **$29.11** | **$29.11** | **$0.00** | **$0.00** |
| **PLA    INTERIOR LATH & PLASTER** | | | | | |
| R&R Two coat plaster over 1/2" gypsum core blueboard | 4.00 SF | $24.79 | $24.79 | $0.00 | $0.00 |
| Plaster labor minimum | 1.00 EA | $210.91 | $210.91 | $0.00 | $0.00 |
| **TOTAL INTERIOR LATH & PLASTER** | | **$235.70** | **$235.70** | **$0.00** | **$0.00** |
| **PNT    PAINTING** | | | | | |
| Paint the walls and ceiling - one coat | 1,082.64 SF | $485.89 | $194.35 | $0.00 | $291.54 |
| Seal the surface area w/latex based stain blocker - one coat | 9.00 SF | $3.74 | $3.74 | $0.00 | $0.00 |
| **TOTAL PAINTING** | | **$489.63** | **$198.09** | **$0.00** | **$291.54** |

As explained earlier in this report, this "minimum labor" feature for work tasks is a function of the Xactimate programming *and not intended to be an expression of how the work will be organized and performed.* Since wallboard repair and painting are related and often performed by the same entity, it is highly likely that only one vendor would perform this package of work to gain necessary critical economic mass and practicality. This programming feature caused the estimate to be higher than the probable

---

[26] (Content manipulation $112.50 + Demolition $29.11 + Lathe and Plaster $235.70 (includes the $210.91 "minimum" charge) + Painting $489.63 = $866.94.

Confidential Pursuant to Protective Order

Charles Cranfield, et al. v. State Farm Fire & Casualty Company
U.S.D.C., Northern District of Ohio, Eastern Division

March 11, 2021
Page 29

actual cost. Thus, one vendor doing the remainder of the work would likely render savings of as much as $210.91, or portion thereof, of the software imputed value. It is likely that this overestimation would offset any impact of non-material depreciation in this claim and provided the insured with the funds needed to fully complete repairs.

- The facts of this loss demonstrate that whether or not non-material items were depreciated had no bearing on the policyholder's ability to complete repair for the total claim payment received.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## III.  Claim # 35-8S40-568, Bates SFCRANFIELD 00037287-00037387

Date of Loss:      6/23/16
Location:          Newark, Ohio
Nature:            Water damage with damages to a finished basement

State Farm's Xactimate water mitigation estimate, dated 6/28/16[27]:

RCV:               $3,088.38
Depreciation:           0.00
ACV:               $3,088.38

State Farm's Xactimate interior damage estimate, also dated 6/28/16:[28]

RCV:               $3,011.96
Depreciation:      $  563.24
ACV:               $2,448.72

- This loss was the result of water damages caused when a pipe broke in the home's basement. The water discharge caused damages to the carpeting and door/door jamb paint finish. It was a relatively common property damage loss.

- State Farm utilized Xactimate and standard database pricing to estimate the loss.

---

[27]SFCRANFIELD00037346-00037356.
[28]Ibid.

Confidential Pursuant to Protective Order

Charles Cranfield, et al. v. State Farm Fire & Casualty Company                                    March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division                                                          Page 30

- In order to evaluate the impact of labor depreciation, one would need to make a detailed review of the State Farm Claim File History Information (SFCFHI), pages 1-6, to understand the fact patterns of this loss.[29]

- State Farm provided a water mitigation estimate, dated 6/28/16, and subsequent payment to fully cover the initial water mitigation cost for Rainbow International (Rainbow), a water restoration vendor, to perform emergency water evacuation.  State Farm simply adopted Rainbow's invoice and remitted $2,088.38 ($3,088.38 minus $1,000 homeowner's deductible = $2,088.38) without any depreciation.

- State Farm's estimated RCV for the interior damages, carpeting and painting, was $3,011.96 and the estimated ACV was $2,448.72.  The completed estimate and ACV payment was made to the homeowner on the same day as the inspection.  At the time the initial damage estimate was written, the State Farm adjuster estimated, *based on sight alone*, the carpet's replacement cost value to be $2.23/square foot and pad's replacement cost at $0.42/square foot.  But, contemporaneously, the adjuster also obtained a sample of the carpet to be submitted to ITEL.[30]  The ITEL information was received the next day but after the ACV had already been paid to the homeowner.  The ITEL analysis determined the carpet and carpet pad actual replacement cost to be $1.55/square foot and $0.34/square foot, respectively.  These values were less than those used by State Farm to estimate the RCV and ACV; hence, the RCV and ACV were overestimated.  This claim file demonstrates how an estimate is just that—an estimate.  Here, as is the common practice, the estimator made her "best determination" of the grade of the flooring, pending information on specialized products from an industry recognized source.  As outlined earlier in this report, many times it is not possible to make an accurate determination of material grades when the damage estimate is first written.  This often causes the estimated RCV and estimated ACV to be higher than necessary.

- State Farm estimated $563.24 in total depreciation.  Based on the Excel spreadsheet of data produced by State Farm ("Data Report") and assuming that data is correct, it appears that the amount of non-material depreciation included within this total depreciation figure was $163.70:[31]

- But, this non-material depreciation was more than offset by the overestimation of the value of the carpet and carpet pad in State Farm's initial estimate of RCV and ACV, before the ITEL information became available.  Again, this demonstrates how the policyholder may receive more

---

[29] SFCRANFIELD00037303-00037308.

[30] ITEL is an industry recognized, independent flooring material testing firm often used to empirically determine the value of construction materials, such as carpet and carpet pad.  See itelinc.com/lab-analysis.html.

[31] SFCRANFIELD00005461 and SFCRANFIELD00005462

Case: 1:16-cv-01273-CAB Doc #: 109-9 Filed: 04/05/21 32 of 47. PageID #: 4120
Confidential Pursuant to Protective Order
Charles Cranfield, et al. v. State Farm Fire & Casualty Company          March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division                    Page 31

than enough money to fully repair the property regardless of whether non-material items are depreciated or not.

- This loss is an example of the depth of claim file examination and mathematical calculations that would be required to accurately determine if the depreciation of non-material items caused a policyholder to receive less than what was required for needed repairs. Many times, as a function of the variables and estimating processes, a policyholder will receive ample funds to complete the full repairs, regardless of whether or not non-material items are depreciated.

- Approximately six (6) months later, the policyholder inquired about the release of the depreciation and agreed to submit photographs of completed repairs but did not. Questions arise as to why photographs or receipts for the work were not provided: Was the work performed? Did the actual cost of the repairs exceed the estimated ACV or was the ACV more than enough to accomplish the needed repairs? Further inquiry would be needed and additional documentation would need to be obtained to determine the impact of non-material depreciation, if any.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## IV.    Claim # 35-9X17-955, Bates SFCRANFILED00048106-00048340

Date of Loss:        3/8/17
Location:            Grafton, Ohio
Nature:              Wind damage

State Farm's initial Xactimate estimate, dated 4/1/17[32]
RCV:                 $5,854.77
Depreciation:         3,528.96
ACV:                 $2,325.81

State Farm's final Xactimate estimate, dated 4/24/17[33]
RCV:                 $4,144.11
Depreciation:        $   62.08
ACV:                 $3,082.03

- This claim involved wind damages to a roof and some interior drywall and paint at the home's kitchen. It was a relatively common property damage loss.

---

[32]SFCRANFIELD00048233-00048245.
[33]SFCRANFIELD00048223-00048232.

Charles Cranfield, et al. v. State Farm Fire & Casualty Company                March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division                                      Page 32

- State Farm utilized Xactimate and standard database pricing to estimate the loss.

- In order to test the impact of labor depreciation, one would need to make a detailed review of the State Farm Claim File History Information (SFCFHI), pages 1-6, to understand the fact patterns and actual cost incurred in this loss.[34]

- State Farm initially estimated the roof replacement RCV at $5,410.66 and corresponding ACV at $1,943.78.

CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|
| 6. 3 tab - 25 yr. - composition shingle roofing - incl. felt | 16.67 SQ | 216.65 | 82.92 | 3,694.48 | (2,955.59) | 738.89 |
| 7. Drip edge | 155.67 LF | 2.16 | 5.97 | 342.22 | (195.55) | 146.67 |
| 8. R&R Ridge vent - Metal roofing - floating ventilator | 24.00 LF | 28.53 | 25.69 | 710.41 | (315.74) | 394.67 |
| **Totals: Roof** | | | **114.58** | **5,410.66** | **3,466.88** | **1,943.78** |

About three (3) weeks later, the homeowner submitted a signed contract for the roof's replacement from their chosen roofing contractor, Don Starcher (Starcher), for $3,700.  Starcher's proposal was significantly less than State Farm's estimated RCV for the roof.  Again, this demonstrates that often the *estimated* cost of the repairs (RCV), and occasionally the ACV, are greater than what is needed to accomplish the work.  As explained previously, a host of dynamic variables are wrapped up in the estimating process that can cause this to occur.[35]

---

[34]SFCRANFIELD00048118-00048123.
[35]SFCRANFIELD0048159.

Charles Cranfield, et al. v. State Farm Fire & Casualty Company      March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division      Page 33

DON STARCHER
240 OAKWOOD ST.
ELYRIA, OHIO 44035
(440) 387-1529

████████████
████████████ RD.
GRAFTON, OHIO 44044
████████████

APRIL 11, 2017

| SALESPERSON | JOB | PAYMENT TERMS | | DUE DATE |
|---|---|---|---|---|
| DON | GARAGE ROOF | Due on receipt | | |

| QTY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|
| | TEAR OFF GARAGE ROOF | | |
| | PUT ON NEW: | | |
| | FELT PAPER | | |
| | DRIP EDGE | | |
| | RIDGE VENT | | |
| | LIFETIME FACTORY WARRANTED SHINGLES | | |
| | MAGNETIC CLEAN UP AND HAUL AWAY | | |
| | $3700.00 | | |
| | $2000.00 DOWN IS EXPECTED TO START | | |
| | $1700.00 DUE WHEN JOB IS COMPLETED | | |
| | MAKE CHECK PAYABLE TO: DON STARCHER | | |
| | | TOTAL | $3700.00 |

Quotation prepared by: _Don Starcher_

This is a quotation on the goods named, subject to the conditions noted below: (Describe any conditions pertaining to these prices and any additional terms of the agreement. You may want to include contingencies that will affect the quotation.)

To accept this quotation, sign here and return: ____ ███ ███ ████ ███ ██ ████ ██

- Starcher's contract also demonstrates the fact that most often the ACV alone, or the sum of the ACV and the deductible, is sufficient for the homeowner to begin work without having to come out of pocket with additional funds. Here, the estimated $1,325.81 ACV + $1,000 deductible = $2,325.81 RCV was greater than the $2,000.00 Starcher required to start the roofing work.

- Moreover, State Farm released the roof depreciation with receipt of a signed contract for the work. Such availability of funds is shown within the State Farm damage estimate under the heading of "Explanation of Building Replacement Cost Benefits."

Charles Cranfield, et al. v. State Farm Fire & Casualty Company          March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division                              Page 34

&State Farm

### Explanation of Building Replacement Cost Benefits
### Homeowner Policy
### Coverage A - Dwelling - 35 Windstorm and Hail

To:  Name:         ████████████
     Address:      ██████████████
     City:         Grafton
     State/Zip:    ██████████

Insured:          ██████████              Claim Number:   359X17955
Date of Loss:     3/8/2017                Cause of Loss:  WIND

Your insurance policy provides replacement cost coverage for some or all of the loss or damage to your dwelling or structures. Replacement cost coverage pays the actual and necessary cost of repair or replacement, without a deduction for depreciation, subject to your policy's limit of liability. To receive replacement cost benefits you must:

1. Complete the actual repair or replacement of the damaged part of the property within two years of the date of loss; and

2. Notify us within 30 days after the work has been completed.

3. Confirm completion of repair or replacement, by submitting invoices, receipts or other documentation to your agent or claim office.

Until these requirements have been satisfied, our payment(s) to you will be for the actual cash value of the damaged part of the property, which may include a deduction for depreciation.

Without waiving the above requirements, we will consider paying replacement cost benefits prior to actual repair or replacement if we determine repair or replacement costs will be incurred because repairs are substantially under way or you present a signed contract acceptable to us.

Consequently, the homeowner had 100% of the funds needed for roof replacement, most likely as the work was beginning or perhaps before the roof work started. Even though non-material depreciation was calculated in State Farm's initial damage estimate, it was immaterial because the full cost of the needed roof repairs was paid as the repair process proceeded. Based upon my direct experience as a restoration contractor, this is often the case.

- Although the Starcher contract appears to cover both labor and materials, it is in a "lump sum" format and provides no segregation of labor and material costs. There is no way to make any comparison of the *actual* roof labor and material costs in Starcher's contract with State Farm's respective *estimated* costs. For the reasons previously outlined, even a review of Starcher's records would likely be insufficient. Even if they were available, it would require discussions with Starcher and his cooperation to obtain his itemized records of labor and materials costs, assuming such records are available and in a format that lends itself to meaningful comparison.

- After receiving Starcher's contract the adjuster revised the Xactimate estimate to reflect the actual repair cost for the roof. This adjustment resulted in a *lower* RCV for the claim.[36]

  RCV:              $4,144.11

---

[36] SFCRANFIELD00048225

Confidential Pursuant to Protective Order
Charles Cranfield, et al. v. State Farm Fire & Casualty Company      March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division      Page 35

Depreciation:          62.08
Resulting ACV:     $4,082.03

- The Starcher contract is the only actual cost information available in this loss. In order to test the impact of labor depreciation, one would first need to know the actual cost of the other repair work that was performed and compare it to the estimated cost, without depreciation applied to labor. The work performed and its actual costs can only be known by inspecting the site and procuring appropriate information from the insured or other repairs vendors identified by the insured.

- The balance of the work consisted of relatively simple repairs at a kitchen/dining room ceiling that included drywall repair, painting and insulation. The estimated RCV of these tasks was $117.92, plus an additional $326.19 estimated due to drywall and painting "minimums." Again, these "minimums" are software-driven, imputed values which are automatically added to the damage estimate. Computer software-added "minimum" charges suggests more than one vendor would perform this minor work. But, it is highly likely that only one vendor would perform this package of work for the following reasons:

  1. Minor interior repairs that require drywall, painting and insulation are routinely performed by one (1) vendor—not 2 or 3 vendors. This reduces coordination needs, access needed to the interior of the home, trip time and mobilization charges, etc.
  2. The necessary critical economic mass and practicality can be gained.

The addition of "minimums" by the estimating program is a pre-programmed function of the software, but it *does not reflect how the work will necessarily be performed or the resulting actual cost,* which often will be lower than estimated. As explained earlier in this report, how the workmen actually organize the work tasks often creates savings such that the *actual cost* of the work is less that the *estimated cost.*

Thus, one vendor doing the remainder of the work could render savings of as much as $326.19, or a portion thereof. Since the ACV paid to the insured for this interior repair work was $382.03, it was likely more than enough to complete the remainder of the work.[37] Since the non-material depreciation in this claim is only $45.82 according to the Data Report[38], it most likely would not have reduced the insured's total claim payment below the amount the insured needed to complete repairs.[39]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

---

[37] $382.03 ACV paid for interior > 81.92 ($444.11 RCV minus 362.19 Xactimate "minimum" charges).
[38] SFCRANFIELD00005461 and SFCRANFIELD00005462.
[39] ~$326.19, or portion thereof (probable savings) > $45.82 non-material depreciation.

Confidential Pursuant to Protective Order

Charles Cranfield, et al. v. State Farm Fire & Casualty Company      March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division      Page 36

        I reserve the right to supplement this report to address additional information made available to me and to provide illustrative exhibits at a later date. Please find attached as a part of this report my current Curriculum Vitae which lists all cases in which I have given

testimony, both at deposition and trial over the last four (4) years. It establishes my qualifications and my compensation.

Sincerely,

Michael J. Berryman
BERRYMAN ENTERPRISES, INC.

Charles Cranfield, et al. v. State Farm Fire & Casualty Company          March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division                             Page 37

# CURRICULUM VITAE

Name:        Michael J. Berryman

Born:         September 23, 1957
               Lincoln, Nebraska

Occupation:

               President and Chief Executive Officer
               Berryman Enterprises, Inc.
               General Contractor / Consultant
               426 N.W. 5th Street
               Oklahoma City, Oklahoma  73102

Formal Education:

               B.A., Vanderbilt University 1979
               Molecular Biology

Licenses:

               Qualifying Agent (QA) and/or Qualifying Managing Employee
               (QME) for licensure and/or operating authorization in the following
               states:

                         Louisiana            Arkansas
                         Virginia              Mississippi
                         West Virginia      Nebraska

Building Codes:

               UBC          Uniform Building Code
               BOCA        Building Officials and Code Administration
               SBCCI        Southern Building Code Congress International
               IRC           International Residential Code
               IBC           International Building Code

Compensation Structure:

Expert services and review, study, estimation and written opinions shall be billed
at a rate of $295.00/ hour.

Expert services at deposition and trial shall be billed at $445.00/hour.

Previous Depositions and Court Appearances:

1)      Bill Flanagan v.
       Lee Daube, et al
       Case No. CJ-2014-249
       In the District Court of Carter County
       State of Oklahoma
       Trial Testimony Date: 02/13/17

2)      Phillip & Charla Bird v.
       Barnett Building Co. and R.J. Byrd Construction, Inc.
       Case No:  CJ-2010-1605
       In the District Court of Cleveland County
       State of Oklahoma
       Deposition Date:  02/22/17

3)      Nolan Lamb v.
       Certainteed Corporation, et al.
       Case No.  MSC 15-00057
       Superior Court of California
       County of Contra Costa
       Deposition Date:  02/27/17

4)      Mitchell and Melanie Payne v.
       Republic Insurance Company
       Case No. CJ-2013-3894
       In the District Court of Tulsa County
       State of Oklahoma
       Trial Testimony Date: 04/11/17

5)      John and Laura Foegelle v.
       Kelly and Mary O'Dell
       Case No.  CJ-2015-248
       In the District Court of Wagoner County
       State of Oklahoma
       Deposition Date:  04/18/17

Confidential Pursuant to Protective Order

6)   Charles and Kathleen Abbott v.
     NIBCO INC., Locke Supply and Preferred Total
     Mechanical & Plumbing
     In the District Court in and for Tulsa County
     State of Oklahoma
     Case No. CJ-2012-03217
     Deposition Date:  05/16/17

7)   Steven L. Holtsclaw v.
     BorgWarner Morse Tec, Inc., et al.,
     Superior Court of the State of California
     County of Los Angeles
     No.:  BC631830
     Deposition Date:  06/28/17

8)   Patrik C. McCall and Malinda McCall v.
     State Farm Fire and Casualty Company
     In the United States District Court for the
     Eastern District of Oklahoma
     Case No. 16-CIV-457-RAW
     Trial Testimony Date:  08/10/17

9)   Keith E. Best, et al v.
     Arthur S. Bridal, et al
     In the District Court of Logan County
     State of Oklahoma
     No.  CJ-2012-137
     Trial Testimony Date:  11/16/17

10)  Steven F. and Jean Lucas v.
     Charles J. Miller
     In the District Court of Lincoln County
     State of Oklahoma
     Case No.: CJ-2016-34
     Deposition Date:  12/07/17

11)  Leah Wiseman, personal Representative of
     The Estate of Jack Wiseman, deceased v.
     Choice Hotels International, Inc. and Idabel
     Hospitality, Inc. d/b/a Comfort Suites
     In the District Court of McCurtain County
     State of Oklahoma
     Case No. CJ-2015-106
     Deposition Date:  12/20/17

12)   Ronald Diaso, Sr., and Virginia Diaso v.
       CBS Corporation, et al
       Superior Court of the State of California
       For the County of Los Angeles
       Case No. BC661775
       Deposition Date: 01/11/18

13)   Michael Max v.
       Heritage Construction Corporation, an Oklahoma Corporation
       In the District Court in and for Tulsa County
       State of Oklahoma
       Case No. CJ-2008-832
       Deposition Date: 03/30/18

14)   Shelter Mutual Insurance Co. A/S/O
       Charles Givens and Laurie Givens v.
       Oklahoma Gas & Electric Co., Davis H. Elliot &
       CoxCom, LLC
       In the District Court of Oklahoma County
       State of Oklahoma
       Case No. CJ-17-2825
       Deposition Date: 4/09/18

15)   Stephen S. Hull, Ph.D and Kathryn E. Reilly, MD., v
       Michael A. Gilles and Gay Lynn Gilles
       In the District Court in and for Oklahoma County
       State of Oklahoma
       Case No. CJ-2009-7709
       Deposition Date: 4/23/18

16)   Precious Joiner v.
       Almonte Apartments, LLC dba Almonte Apartments;
       Almonte Company, LLC: dba Almonte Apartments; and
       Myan Management Group, LLC
       In the District Court of Oklahoma County
       State of Oklahoma
       Case No: CJ-2015-2798
       Deposition Date: 4/24/18

17)   Jennifer Lin Cooper, et al. v.
       New Dominion, LLC, et al.
       In the District Court of Cleveland County
       State of Oklahoma
       Case No: CJ-2015-24
       Class Certification Hearing Date: 5/16/18

Confidential Pursuant to Protective Order

18) Stephen S. Hull, Ph.D. and Kathryn E. Reilly M.D,
Husband and Wife, v
Michael A. Gilles and Gay Lynn Gilles, Husband and Wife
In the District Court in and for Oklahoma County
State of Oklahoma
Case No:  CJ-2009-7709
Trial Testimony Date:  05/24/18

19) Lorine Mitchell v
State Farm Fire and Casualty Company
In the United States District Court for the
Northern District of Mississippi Oxford Division
Case No. 3:17-cv-170-MPM-RP
Deposition Date:  06/07/18

20) Jennifer Lee Allen v
Tulsa Riverside Park, LLC d/b/a Riverside Park Apartments,Inc.
A Domestic for Profit Limited Liability Company; and Gaines
Investment Trust, Inc., a Foreign for Profit Corporation
In the District Court in and for Tulsa County
State of Oklahoma
Case No. CJ-2015-3679
Deposition Date:  06/29/18

21) NEC Networks, LLC, d/b/a CaptureRx v
Airport Center, LLP, Airport Center Office Building, LLP,
Spectrum Building of Texas, LLP, S&H Realty Management, LLP
And Le Pere Commercial Real Estate Services, LLC.
Scott D. Elfstrom, Individually, Steve Heim, Individually, Chrissy
Sells,
Individually
In the District Court 285th Judicial District Bexar County, Texas
Cause No. 2017CI02470
Deposition Date:  08/28/18

22) Patrick Pete Stover, Sheri Lynn Stover v
State Farm Fire & Casualty Company
In the United States District Court for the
Western District of Oklahoma
Case No. CIV-17-1002-HE
Deposition Date:  08/31/18

23)     Richard Mays and Sheri Mays, Individuals; and Mays Service, Inc.
        An Oklahoma Corporation v
        Liberty Mutual Fire Insurance Company
        In the District Court of Cleveland County
        State of Oklahoma
        Case No. CJ-16-921
        Deposition Date:  09/25/18

24)     Donald and Mary Temple v State Farm Fire and Casualty Co.
        In the United States District Court for the
        Northern District of Oklahoma
        Case No. 4:18-CV-00041-JED-JFJ
        Deposition Date:  12/19/18

25)     Robert Walker and Brandy Newson v
        USAA Casualty Insurance Company
        In the United States District Court for
        The Western District of Oklahoma
        Case No.  CIV-17-752-D
        Deposition Date:  01/25/19

26)     The State of Oklahoma, ex rel., Department of Transportation v
        Trade Winds Motor Hotel East, Inc. and
        United National Insurance Company, et al
        In the District Court within and for Tulsa County
        State of Oklahoma
        Case No.  CJ-2008-5677
        Deposition Date:  02/08/19

27)     David Stevenson v USAA General Indemnity Company
        And Blackmon Mooring of Oklahoma City, Inc.
        In the District Court of Cleveland County
        State of Oklahoma
        Case No. CJ-17-544 TS
        Deposition Date:  03/08/19

28)     Cherokee Crossing Development, LLC v
        Meek Development, LLC
        District Court of Oklahoma County
        State of Oklahoma
        Case No.  CJ-2017-4776
        Trial Testimony Date:  03/12/19

Confidential Pursuant to Protective Order

29)   Ali Torabi and Sanaz Torabi v
     Ford Homes, Inc. LLC, and Joshua Ford and Joanna Ford v
     Whiteacre Glass Works, Aspen Plumbing, LLC, D&J
     Custom Remodeling, Billy Ammons Concrete Contractors,
     Dowd Heat & Air, Xpert Plumbing, Triple T. Roofing, LLC, and
     Dusty Day, an individual
     In the District Court In and For Tulsa County
     State of Oklahoma
     Case No. CJ-2016-1562
     Trial Testimony Date: 04/11/19

30)   Michael Max v
     Heritage Construction Corporation
     In the District Court In and For Tulsa County
     State of Oklahoma
     Case No. CJ-2008-832
     Trial Testimony Date: 04/25/19

31)   Trade Winds Motor Hotel East, Inc. v
     United National Insurance Company
     In the District Court of Tulsa County
     State of Oklahoma
     Case No. CJ-2008-5677
     Trial Testimony Date: 05/13/19

32)   Marie Bartlett v BMC Management
     In the District Court of Murray County
     State of Oklahoma
     Case No. CJ-2018-15
     Deposition Date: 06/26/19

33)   First Christian Church of Blackwell v
     Brotherhood Mutual Insurance Company
     In the District Court of Kay County
     State of Oklahoma
     Case No. CJ-2017-59
     Deposition Date: 08/07/19

34)   Kimberly Thomas v
     Sooner Sports and Imports, Inc.
     In the District Court of Cleveland County
     State of Oklahoma
     Case No. CJ-2018-1117
     Deposition Date: 09/20/19

35) William Bowlin v
Phoenix Mining Company
In the District Court of Craig County
State of Oklahoma
Case No.  CJ-2013-102
Trial Testimony Date:  10/23/19

36) Pam Belote and Oliver Belote v
C. Mike Holt d/b/a Holt Homes, LLC
In the District Court of Oklahoma County
State of Oklahoma
Case No CJ-2017-198
Deposition Date:  11/15/19

37) First Christian Church of Blackwell v
Brotherhood Mutual Insurance Company
In the District Court of Kay County
State of Oklahoma
Case No. CJ-2017-59
Trial Testimony Date:  02/26/20

38) Michael D. Farmer v
QBE Insurance Corporation and Corbin Swain, P.E.,
An Individual
In the United States District Court
For the Western District Court of Oklahoma
State of Oklahoma
Case No. 19-CV-00628-JD
Deposition Date:  04/29/20

39) Brokram, Inc. d/b/a Elite Exteriors
a Nebraska Corporation,  Assignee and
R.A.D. Services, LLC, a Nebraska
Limited Liability Company, Assignee,
Plaintiffs v
State Farm Fire and Casualty Company,
Defendant
United States District Court
District of Nebraska
Case No. 18-cv-348
Deposition Date:  06/25/20

Charles Cranfield, et al. v. State Farm Fire & Casualty Company     March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division     Page 45

40)    Millard Gutter Company, a Corporation
d/b/a Millard Roofing and Gutter v
State Farm Fire and Casualty Company
United States District Court
For the District of Nebraska
Case No. 8:18-CV-528-LSC-MDN
Deposition Date: 06/26/20

41)    Annie Arnold, individually, and on behalf of all others
Similarly situated v
State Farm Fire and Casualty Company
In the United States District Court
For the Southern District of Alabama Northern Division
Civil Action Number 2:17-CV148-WS-C
Class Certification Hearing Date: 07/22/20

42)    Garage Condos of Oklahoma, LLC v
NCB, LLC and Todd Nordstrom
The American Arbitration Association
Case Number: 01-18-0004-400
Arbitration Date: 09/24/20

43)    Johnathon R. Ellis, Tiffany R. Ellis v
State Farm Fire and Casualty Company,
a foreign for profit insurance corporation
In the United States District Court
For the Eastern District of Oklahoma
Case No. 19-cv-273-RAW
Deposition Date: 09/29/20

44)    Douglas B. Cook, an individual; Kimberly L Cook, an
Individual; and CHANPRESANDPROPERTIES, an Oklahoma
limited liability company v
Jim Loomis, Inc. an Oklahoma corporation; Jim Loomis, an
Individual; Nurnberg Roofing, LLC, an Oklahoma limited liability
Company; Southwest Glass and Mirror Co., Inc., an Oklahoma cor-
poration; and Easley Associates, Inc., an Oklahoma Corporation;
Randy Lynn Smith d/b/a Randy's Plumbing; Sanchez Masonry, an
unincorporated proprietorship; and Mexcon, LLC, an Oklahoma
limited liability Company
In the District Court of Custer County
State of Oklahoma
Case No. CJ-2017-45
Deposition Date: 11/13/20

Confidential Pursuant to Protective Order

Charles Cranfield, et al. v. State Farm Fire & Casualty Company                March 11, 2021
U.S.D.C., Northern District of Ohio, Eastern Division                          Page 46

45) Drew Nichols and Amy Nichols v
    Alan Cheshier, d/b/a Muirfield Homes
    In the District Court of Cleveland County
    State of Oklahoma
    Case No.  CJ-2019-1471
    Deposition Date:  01/18/21